# EXHIBIT A

## FILED UNDER SEAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4
      10X GENOMICS, INC.,          :   CIVIL ACTION
 5                                 :
                   Plaintiff,      :
 6                                 :
           vs.                     :
 7                                 :
      CELSEE, INC.,                :
 8                                 :
                   Defendant.      :   NO. 19-00862-CFC-SRF
 9

10                          - - -

11                             Wilmington, Delaware
                               Thursday, November 5, 2020
12                             9:30 o'clock, a.m.
                               ***Telephone conference
13                          - - -

14
      BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
15
                            - - -
16
      APPEARANCES:
17

18              RICHARDS, LAYTON & FINGER
                BY:  JASON J. RAWNSLEY, ESQ. and
19                   FREDERICK L. COTTRELL III, ESQ.

20
                         -and-
21

22

23

24
                                 Valerie J. Gunning
25                               Official Court Reporter
```

Case 1:19-cv-00862-CFC-SRF   Document 537-1   Filed 11/30/20   Page 2 of 169 PageID #: 7011

1    APPEARANCES (Continued):

2

              DURIE TANGRI
3             BY:  DARALYN J. DURIE, ESQ.
                   EUGENE NOVIKOV, ESQ. and
4                  DAVID F. McGOWAN, ESQ.
                   (San Francisco, California)
5

6                  Counsel for Plaintiff

7

8             FARNAN LLP
              BY:  BRIAN E. FARNAN, ESQ.
9

10                     -and-

11

              FOLEY HOAG LLP
12            BY:  BARBARA A. FIACCO, ESQ. and
                   JEREMY A. YOUNKIN, ESQ.
13                 (Boston, Massachusetts)

14

15                 Counsel for Defendant

16                  -   -   -

17

18

19

Case 1:19-cv-00859-CFC-SRF  Document 537-1  Filed 11/30/20  Page 3 of 169 PageID #: 7012
20

21

22

23

24

25

**P R O C E E D I N G S**

1

2

3         (The following telephone conference began at

4  9:30 a.m.)

5

6         THE COURT:  All right.  Can I have a roll call?

7  Let's hear from plaintiffs, please.

8         MR. RAWNSLEY:  Good morning, Your Honor.  This

9  is Jason Rawnsley of Richards Layton & Finger, and I'm also

10  joined by Fred Cottrell from Richards Layton for the

11  plaintiff.

12         Today we're joined by Dave McGowan, Daralyn

13  Durie and Gene Novikov of Durie Tangri, and with the

14  Court's permission, Mr. McGowan will be presenting the

15  argument.

16         THE COURT:  Okay.  Thank you very much.  How

17  about from defendant?

18         MR. FARNAN:  Good morning, Your Honor.  Brian

19  Farnan on behalf of the defendant, and with me is Barbara

20  Fiacco and Jeremy Younkin from Foley Hoag, and Mr. Younkin

21  will be addressing the Court.

22         THE COURT:  All right.  Very good.

23         Before we begin, let me just give you some --

24  why I decided to have a call on this.

25         First of all, I think it's a very interesting

Case 1:19-cv-00085-CFC-SRF  Document 537-1  Filed 11/30/20  Page 4 of 169 PageID #: 1073

1    issue, and by issue, I mean the common interest issue.  But

2    I'm very concerned this is really not teed up.  I mean, I

3    think that that issue is complicated.  I don't think there's

4    any binding precedent, and it just doesn't seem to be teed

5    up in a way that would permit me to make a really informed

6    decision about the scope of the common interest exception

7    under these facts.  That is one issue.

8          The second issue is the way it was teed up, I

9    find it very confusing, because on one hand, the defendants

10    have expressly stated in their letter to the Magistrate that

11    they didn't want any attorney impressions.  Basically, in

12    the footnote, as far as I'm concerned, they're basically

13    saying we don't want work product and yet they seem to be

14    pursuing work product.

15          And there's a footnote from 10X in its papers

16    where it does raise a relevance objection, but I don't know

17    that there was any kind of briefing or consideration in

18    front of the Magistrate about proportionality and relevance

19    and burden, so I want to hear about that.

Case 1:19-cv-00809-CFC-SRF   Document 237-1   Filed 11/30/20   Page 5 of 169 PageID #: 4107

20          So I think both parties can be guided in their

21    arguments by what I've just shared.  And then I would ask at

22    the outset from plaintiff to just tell me the status of

23    things.  Was the deponent -- was there, in fact, a second

24    deposition?  Where do things stand in terms of discovery in

25    the case generally?  And so let's hear first then from the

1    plaintiff.

2            MR. McGOWAN:  Thank you, Your Honor.  This is

3    David McGowan from Durie Tangri.  I will try and take the

4    Court's guidance in I think reverse order.

5            Your first question was, is -- are the

6    plaintiffs seeking mental impressions as opposed to some

7    non-work product material.  The distinction that's being

8    drawn that the Court references is between the merger

9    negotiation and between the work product and the types of

10   things that in these cases are considered work product,

11   which would be, for example, an opinion letter from the

12   underlying litigation was at issue in the Hewlett-Packard

13   case, but the distinction is between what were the attorneys

14   in the litigation thinking about and pondering inside their

15   heads and what the parties to the merger negotiations said

16   to each other across the table.

17           The across-the-table discussions we do not think

18   are work product under Rule 26 or any precedent and they're

19   also not deliberations that are inside the head.  They're

20   statements in a negotiation.

21           If I might proceed stepwise and see if that

22   clarifies the scope for the Court.

23           THE COURT:  Well, so I appreciate -- I mean,

24   frankly, the way you just kind of did it, I mean, that's the

25   way I do it, I think of it.  I'm not sure your papers did

Case 1:19-cv-00805-CFC-SRF   Document 232-1   Filed 11/30/20   Page 6 of 169 PageID #: 5075

1    that in front of the Magistrate especially because of the

2    footnote you dropped.

3              And the way I looked at it is you had two

4    depositions.  I read the papers last week, so I may get

5    something wrong here.  But my recollection is the deposition

6    conducted by Ms. Durie, the questions went to what was put

7    into the data room, into the virtual data room.  Is that

8    right?

9              MR. McGOWAN:  The question, the specific

10   question that was teed up is what were the considerations

11   that went to the holdback number with respect to the

12   instruction that they're citing.

13             THE COURT:  Okay.

14             MR. McGOWAN:  So there are two different

15   questions, the Court is exactly right.  And we are

16   proceeding in view of that distinction, I think, in Exhibit

17   D, Mr. Starks' deposition, the question that led to the

18   instruction the defendant cites in its footnote, in its

19   papers to this Court, that what were the considerations that

20   led to the holdback number and there was an objection on

21   work product and privilege ground.

22             THE COURT:  Right.

23             MR. McGOWAN:  In a subsequent corporate witness

24   deposition of Mr. LaPointe, the questioning was drawn

25   specifically to conversation, and when that question was

Case 1:18-cv-00485-CFC-SRF Document 537-1 Filed 11/30/20 Page 7 of 169 PageID #: 7076

1  withdrawn specifically to conversations, there was not a

2  work product objection.  There was an objection based on,

3  quote unquote, "common interest privilege," which doesn't

4  exist in our view as a standalone privilege.

5           There are two depositions.  There are two

6  different framings of the question.

7           THE COURT:  Yes.  Let's go to the first, the

8  first one, because -- hold on a second.  Give me a second.

9  All right.

10          And this conversation points to why I've got

11  concerns about the way the issue was teed up.  So I'm

12  looking right now at document 204-1, which is the transcript

13  of the deposition that Ms. Durie conducted, and at page 2

14  87, there's a question.

15          And these -- incidentally, these questions and

16  these responses were cited by you in your briefing.  And so

17  the first question is found at line 16 of 287.

18          Question:  So can you tell me, do you know,

19  Mr. Stark, what information Celsee provided Bio-Rad about

20  the 10X litigation in the virtual data room?

Case 1:19-cv-00085-CFC-SRF  Document 237-1  Filed 11/30/20  Page 8 of 169 PageID #: 7107

21          And Mr. Younkin said, that's a yes or no.  You

22  can answer that question.

23          And so the witness answered.  Actually, the

24  witness asked for some kind of repetition.  And then if you

25  turn to page 288, the question is repeated.  The witness

1   said, I believe I do, yes.

2               Then the question is:  What information did

3   Celsee provide?

4               Mr. Younkin at that point objected:  I'm going

5   to instruct the witness not to answer the question on the

6   grounds that it calls for work product protection material.

7   All right.

8               Then Ms. Durie asked:  Did Celsee provide

9   information Bio-Rad about the 10X litigation outside of the

10   virtual data room, and then again, there's an objection.

11               Now, this time Mr. Younkin says:  I'm going to

12   instruct the witness not to answer that question as phrased

13   on the ground that it calls for privileged and work product

14   information.

15               So then if you go to the next page, page 289,

16   the question that again where we have an objection is, the

17   question is:  Did Celsee provide any information Bio-Rad

18   about the 10X litigation outside the virtual data room

19   between the time the letter of intent, the non-binding

Case 1:19-cv-00805-CFC-SRF   Document 537-1   Filed 11/30/20   Page 9 of 169 PageID #: 1078

20   letter of intent was signed and the time the parties entered

21   into the ultimate transaction?

22               The witness was permitted to answer that

23   question initially, and then though there was an objection,

24   and the objection was for both privilege and for work

25   product.

1        So in there, this witness I do see, the way I

2    look at it is, there are two things now at issue with this

3    witness.  One is questions that are being addressed about

4    the contents of the virtual data room, there's a work

5    product objection.  Questions that are addressed by the

6    negotiations between the two parties, it looks at the very

7    least it's privileged and perhaps it's also work product.

8        Then later on there's a question I think you're

9    talking about, which says, did the parties -- this is on

10   page 291 -- did the parties discuss in connection with

11   negotiating this non-binding letter of intent whether the

12   escrow holdback would include some for the 10X litigation?

13       And then on that one, there's a work product

14   objection, not a privilege question, a work product

15   question, and that's found at lines 19 to 22.

16       Then the next -- well, that's it, I think.

17   Right?  So that's the first deposition.

18       So as I understand the objections for that

19   deposition, there are really two issues.  One is, what's put

Case 1:19-cv-00825-CFC-SRF   Document 231-1   Filed 11/30/20   Page 10 of 169 PageID #: 1019

20   in the virtual data room and that's a work product

21   objection.  And then the second one is conversations between

22   the two parties, and there's a, it looks like I will give

23   you the benefit of the doubt, an attorney/client privilege

24   objection and a work product objection.

25       All right.  Now, in your papers before the

1    Magistrate you say, we don't want any work product.  I mean,

2    you say you don't want any attorney impressions.  That, to

3    me, I'm treating synonymous with you don't want work

4    product.

5            So what is it, you know, that you really want, I

6    mean, when I look at that?

7            MR. McGOWAN:  So the note in the submission to

8    the Magistrate indicated that we're not trying to delve into

9    their files, which was a reference to the kind of material

10    that is discussed in the Hewlett-Packard case, which is

11    something that's created to the litigation, may have been

12    transferred, but which exists on a standalone basis as a

13    work product doctrine.  That would correspond possibly,

14    because we don't know the contents, to something that would

15    have been put in the data room, but it exists independently

16    of the conversations and the negotiation.  It sits there and

17    maybe somebody looks at it.  Maybe they don't.

18            It's not something that is said back and forth

19    verbally or exchanged back and forth in an e-mail as a

20    counter-proposal or something like that.

Case 1:19-cv-00825-CFC-SRF   Document 537-1   Filed 11/30/20   Page 11 of 169   PageID #: 2050

21            But I do believe that distinction tracks.  The

22    30(b)(6) witness on this topic, Mr. LaPointe, which is in

23    Exhibit B, and the instruction there is somewhat different

24    as the scope was more highly drawn.

25            And I apologize, Your Honor.  When you were just

1   reading the second excerpt that you were reading, I missed

2   the page number you were on.  The portion that I was

3   referring to was on page 298, 3 to 14, which is what

4   defendant cited in its submission to this Court.  My

5   apologies.

6              THE COURT:  Right.  298.

7              MR. McGOWAN:  Eight to 14.  My apologies.

8              THE COURT:  And that is a specific question.

9   It's another one.  I didn't read that one, but that's

10  another one.  What were the considerations that led you to

11  the ███████████ number, and there's an objection.  Don't

12  answer because it calls for the disclosure of privileged and

13  work product information.

14             MR. McGOWAN:  That's the, that's the reference,

15  it's my recollection, that defendant cited in its submission

16  to this Court saying that the defendant did instruct on work

17  product grounds.

18             We then have the 30(b)(6) deposition --

19             THE COURT:  But this is my point.  You say you

20  cite that to me.  What did you cite to the Magistrate?

21             MR. McGOWAN:  To the Magistrate, we did not

22  understand that they were taking the position that the

23  negotiations themselves are work product because the

24  instruction to the corporate witness was the common interest

25  instruction with respect to discussions.

1       What we tried to do with the Magistrate is

2  narrow this down somewhat.  We're trying to narrow it down

3  somewhat here so that we present a cleaner issue in an

4  effort to actually tee it up than is sometimes presented in

5  the cases where you have underlying work product doctrine

6  material.

7       So what we presented to the Magistrate was an

8  effort to get at the back and forth, so I don't know if

9  that's responsive to your question.  What we're focusing on

10  both here and before the Magistrate is the communications

11  themselves.  So if the Court's question is, where is the

12  argument to the Magistrate, it would be in the transcript

13  before the Magistrate at page 27.

14       And --

15       THE COURT:  Well, wait.  Well, let's go to your

16  letter, because you've got to tee this up in your letter.

17  So where is it in the letter?

18       MR. McGOWAN:  I mean --

19       THE COURT:  And the reason I'm getting at all of

20  this because, see, I think this is a really important issue.

21  Right?  It deals with privilege.  I don't think it was teed

22  up really cleanly, and I'm not faulting anybody because

23  there were a lot of discovery issues and it's in the middle

24  of a deposition.  And I mean, frankly, the fact that it was

25  the third issue is my recollection in the letter, it was

Case 1:19-cv-00925-CFC-SRF  Document 221-1  Filed 11/30/20  Page 13 of 169 PageID #: 7022

1    almost like it didn't seem this was the most pressing issue

2    and yet I don't want to rush into a very important decision

3    about privilege and work product when it really hasn't been

4    teed up.

5          And then, and I think you are cleaning up things

6    now, and, again, I'm not necessarily faulting for that, to

7    try to make it like it's, you know, a narrow issue.  But,

8    see, then that's why I want you to get back to the practical

9    issue, which I asked you to open up with.  Where are things,

10   because, you know, it's almost like we should just present

11   this anew, and therefore it's important for me to think

12   about proportionality issues, burden, probative value of the

13   information being sought, and so that's why I want to know,

14   where do things stand?  Did you, after the Magistrate ruled,

15   was there another deposition of any witness?

16          MS. DURIE:  Your Honor, this is Daralyn Durie.

17   May I address that issue?

18          THE COURT:  Sure.

19          MS. DURIE:  Your Your Honor, so we did take a

Case 1:19-cv-00825-CFC-SRF  Document 537-1  Filed 11/30/20  Page 14 of 169 PageID #: 1053

20   second deposition of Mr. Stark.  It was extremely

21   abbreviated and there were literally a handful of questions

22   that Celsee permitted, but we were not able to get any

23   further information from Mr. Stark on this topic.  The only

24   information that he provided was the identity of the lawyers

25   whose analysis had been referenced in the investor letter

1   and that was that.

2          THE COURT:  Okay.

3          MS. DURIE:  So from our perspective, this does

4   remain very much a live and important issue.

5          THE COURT:  All right.  And where does the case

6   stand?  See, this all became an issue right at the very end

7   of fact discovery, or you tell me.  When did it come up in

8   terms of the case schedule and where do things stand with

9   the case schedule?

10         MS. DURIE:  It did come up towards the end of

11  fact discovery and we are now in the process of submitting

12  expert reports.

13         THE COURT:  All right.  So fact discovery is

14  over?

15         MS. DURIE:  It is.

16         THE COURT:  All right.  You're in the middle of

17  expert discovery.  Do we have a trial date?

18         MS. DURIE:  We do, Your Honor.  The trial

19  date -- go ahead.

Case 1:19-cv-00823-CFC-SRF  Document 231-1  Filed 11/30/20  Page 15 of 169 PageID #: 7204

20         MR. McGOWAN:  I didn't mean to interrupt.  We do

21  have a trial date, Your Honor, yes.  It's June 14th.

22         THE COURT:  June 14th of next year.  Okay.  When

23  are summary judgment motions due?

24         MR. McGOWAN:  February 5th, Your Honor.

25         THE COURT:  All right.  What do you hope to get

1  from Mr. Stark?  Give me some examples of the information

2  that you think you could get if there were no objections and

3  explain to me its probative value.

4        MR. McGOWAN:  Okay.  Your Honor, this is Dave

5  McGowan again.  I can respond to that.

6        If I may just note for the record, the answer to

7  the question that you asked, where was it raised in the

8  submission to the Magistrate, is at page 3 of the letter

9  where both the Stark and LaPointe transcripts are cited in

10 limited portion that we referenced.

11       THE COURT:  Okay.  Hold up, hold up.  It's page

12 3 of the letter?

13       MR. McGOWAN:  Page 3.

14       THE COURT:  Right.  And you say, you just

15 broadly say -- basically, you went through what I cited,

16 which is the 287 to 291, 295 to 296, and then the one we

17 just covered, 298 to 299.  Correct?  And then you also

18 point to the LaPointe transcript at 55, 56 and page 59.

19 Correct?

Case 1:19-cv-00825-CFC-SRF  Document 231-1  Filed 11/30/20  Page 16 of 169 PageID #: 7052

20       MR. McGOWAN:  Yes.  The LaPointe transcript is

21 the distinction I was drawing earlier.  The LaPointe

22 transcript is drawn to conversations and the assertion at

23 those pages is common interest.

24       THE COURT:  And I read that.  I agree that that

25 was teed up.  Okay.

1    MR. McGOWAN:  In answer to the Court's question

2  with respect to relevance and probative value, the

3  communications between the two parties regarding the

4  litigation are relevant to the issues certainly of

5  infringement, damages, in the sense that what the buyer in

6  these cases is asking is, what's going on in this case?  How

7  do I think about it?

8    Now, this is just a stock acquisition.  This is

9  not one of the cases where the buyer is getting a division,

10  they're going to keep selling the product and wind up being

11  a joint, joint defendant, which is what all the other cases

12  are like, and it is a not a successor liability case as far

13  as the defendants are arguing.

14    But what they are asking is, tell us how right

15  we should be about this, how right do you think we should

16  be, and the buyer and the seller are going to have different

17  takes on that presumably, but they are going to talk about

18  the underlying merits from a business point of view in the

19  sense that they are going to translate the business

Case 1:19-cv-00825-CFC-SRF   Document 237-1   Filed 11/30/20   Page 17 of 169 PageID #: 2082

20  practices of the defendant in the dollar terms based on

21  whether the defendant is practicing the patent, the kind of

22  information that is relevant to the Georgia-Pacific factors,

23  how important is this business, what kind of a holdback do

24  we need to cover ourselves, what implications does this

25  have.

1          When you go through the Georgia-Pacific factors,

2     a lot of them are about the competitive position of the

3     business team, the value of the invention.  In essence, how

4     significant is this.

5          THE COURT:  Can I stop you for a second?

6          MR. McGOWAN:  Yes.

7          THE COURT:  So, all right.  So you are telling

8     me that these negotiations occur when?

9          MR. McGOWAN:  These negotiations are in 2019.

10         THE COURT:  All right.  And what is the time

11    frame that I'm supposed to consider in applying the

12    Georgia-Pacific factors to ascertain damages or what a

13    jury would be instructed to consider?  What is the time

14    frame?

15         MR. McGOWAN:  So you're going to look at it on

16    the eve of first infringement typically subject to the Book

17    of Wisdom, which means that sometimes you can do a lookback.

18         To the extent that the negotiations are

19    addressing --

Case 1:19-cv-00825-CFC-SRF   Document 337-1   Filed 11/30/20   Page 18 of 169 PageID #: 7052

20         THE COURT:  I'm not a patent lawyer.

21         MR. McGOWAN:  Sorry.

22         THE COURT:  I'm thinking Bible when you say Book

23    of Wisdom, so I don't know what that means and I don't know

24    what the clause you said afterwards.  But, you know, I don't

25    have your expertise, so I have to go back to, so the

1 negotiations that we're talking about are occurring in 2019.

2 Do you have a month?

3              MR. McGOWAN:  August is my recollection.

4              THE COURT:  Okay.  And then infringement for

5 damages in the patent, this patent case, I'm supposed to

6 look to Exhibit 8 of first infringement.  When is that

7 alleged by you to have occurred, or actually by Celsee to

8 have occurred?

9              MR. McGOWAN:  I need to look at it by month.

10              THE COURT:  That's all right.

11              MS. DURE:  Your Honor --

12              MR. McGOWAN:  I misspoke, Your Honor.

13 Negotiation of the letter of intent is December of '19.

14              THE COURT:  December of 2019.  Okay.  But that's

15 the letter of intent.  So beginning December of '19 and

16 extending into what would cover the negotiations?

17              MR. McGOWAN:  So the date range is the case is

18 filed in May.  The negotiation of the initial NDA is

19 September of '19.  The letter of intent on which the

Case 1:19-cv-00502-CFC-SRF  Document 231-1  Filed 11/30/20  Page 19 of 169 PageID #: 3258

20 Magistrate relied is December of '19.  The business

21 transaction is done, the acquisition is in April of '20.

22              THE COURT:  Okay.  Great.  All right.  So it's

23 going to be some time between December of 2019 and April of

24 2020 when the conversations about which you would like to

25 learn occurred.  Is that correct?

1          MR. McGOWAN:  And if I can go back to the

2    Court's --

3          THE COURT:  Sorry.  We didn't hear an answer.  I

4    think it might have been a technical thing.

5          Am I correct, the time frame of the negotiations

6    about which you'd like to discover evidence, those

7    negotiations occurred between December 2019 and April 2020?

8          MR. McGOWAN:  That is correct, Your Honor.

9          THE COURT:  Okay.  Sorry.  All right.  Now, so

10   then let's go back to date of first infringement.  What are

11   we looking at?  What's the time frame for that?

12         MR. NOVIKOV:  Your Honor, this is Gene Novikov

13   for 10X.

14         I can answer that quickly as folks try to

15   marshal back.  December 8, 2018.

16         THE COURT:  December 8, 2018.  Okay.  All right.

17         So then, and forgive me, sir.  It's Mr. --

18   what's your name again, sir?

19         MR. McGOWAN:  McGowan.

Case 1:19-cv-00862-CFC-SRF  Document 537-1  Filed 11/30/20  Page 20 of 169 PageID #: 9650

20         THE COURT:  McGowan.  Sorry.

21         So, Mr. McGowan, why is it probative what folks

22   are thinking about in 2019, when I'm supposed to be looking

23   at what occurred or at least I'm supposed to be using the

24   time frame as of December 8, 2018?

25         MR. McGOWAN:  Sure.  Thank you, Your Honor.  And

1   I apologize for the Book of Wisdom reference.  I tried

2   to clarify that.  I try to avoid jargon.  The Court is

3   quite right, this is a general issue, not a patent specific

4   issue.

5           To the extent that the business discussions bear

6   on the question of what are the prospective damages from the

7   case, part of that is going to have a liability element.

8   Part of that is going to have a damages element.

9           The damages element, there should be no

10  difference between what is said in the business discussions

11  and the date of hypothetical negotiation, because the date

12  of hypothetical negotiation is part of the damages input,

13  and to the extent the business discussion and the merger is

14  talking about what do we think that number will be, it's

15  going to be talking about the process of estimating the

16  value of litigation.

17          So from that point of view, there is no

18  difference between what one would expect the business

19  discussions to be focusing on and the analysis the Court

Case 1:19-cv-00825-CFC-SRF   Document 537-1   Filed 11/30/20   Page 21 of 169 PageID #: 9030

20  would do in a damages context.

21          The reference that I made to the Book of Wisdom

22  refers to the Supreme Court case and some District Court

23  cases that indicate that in some circumstances, if there's

24  relevant information during a period of time after the

25  hypothetical negotiation, that can be taken into account as

1  well.  It is not prohibited.  It is true that under the

2  Georgia-Pacific factors, typically look at the date of first

3  infringement.  There's not a flat prohibition on considering

4  subsequent evidence, and sometimes that happens.  And, for

5  example, people are looking at changing the business

6  practices, which one would expect to be part of an

7  acquisition negotiation as well.

8         So --

9         THE COURT:  Okay.  Sorry.  Let me just push you

10  back though.  Let's assume there were no negotiations.

11  Right?  I'm going to go back, or the jury is going to be

12  asked to go back to December 8, 2018, and consider the

13  Georgia-Pacific factors.  Right?

14         Now, do the Georgia-Pacific factors include

15  anything about the trial judge's proclivities or a

16  philosophical approach to patent cases and damages?

17         MR. McGOWAN:  Ideally, they certainly don't say

18  that, and one would expect that that is not something a

19  juror would be instructed on.

Case 1:19-cv-00825-CFC-SRF  Document 232-1  Filed 11/30/20  Page 22 of 169 PageID #: 1037

20         THE COURT:  Okay.  Do they consider the quality

21  of the lawyers that are engaged in the patent lawsuit that's

22  before them?

23         MR. McGOWAN:  The Georgia-Pacific factors don't.

24  I don't know if the Court is asking me two questions.  The

25  jurors -- I think that would be up to them.

1    THE COURT:  Well, okay.  That's fair because

2  it's a pretty bad question.

3    My point is that we don't ask jurors, and, in

4  fact, I think the law would preclude us from asking jurors

5  in deciding whether damages should be awarded and how much

6  damages should be awarded to consider all of the things that

7  lawyers consider when they evaluate a case, right, which

8  would include things like the quality of the judge or the

9  philosophy or proclivities of the judge, whether the

10  jurisdiction is a plaintiff or defendant-friendly

11  jurisdiction, how good the lawyers are, how much time has

12  been spent in developing the case, all of these kind of

13  legal strategic things.  Right?

14    You would agree that that is what really goes

15  into or at least it plays a prominent role in any assessment

16  of the value of a case.  Right?

17    MR. McGOWAN:  I think with respect, Your Honor,

18  I would provide qualified agreement.  I think that might

19  reflect the litigation side, but I would not presume, and

Case 1:19-cv-00825-CFC-SRF  Document 237-1  Filed 11/30/20  Page 23 of 169 PageID #: 7032

20  certainly I don't think there has been a proffer to this

21  effect, that that is what the business discussions are

22  about, because the business discussions from the buyer's

23  side are, we're going to buy the stock of this company.  We

24  see there's litigation out there and we need to pick a

25  number to protect ourselves.

1           It would surprise me, quite candidly, if the

2    only thing the businesspeople talked about were things that

3    business lawyers don't do day to day, which is proclivities

4    of judges, this and that.

5           I certainly would not assume that the

6    discussions that are the subject of the present motion would

7    exclusively bear on specific factors unrelated to the

8    business of the defendant, the infringement of the defendant

9    and the economic consequences of that infringement.  It

10    would surprise me if there were only litigation tactics

11    discussed in a merger where you've got corporate people

12    talking to each other.  If that's the testimony, then that

13    would be the testimony, but we don't know that and I don't

14    think we can assume it.

15           THE COURT:  All right.  Now, this is a stock

16    acquisition.  Right?  You mentioned that?

17           MR. McGOWAN:  That's what the letter of intent

18    states.

19           THE COURT:  What was the ultimate transaction?

Case 1:19-cv-00825-CFC-SRF  Document 537-1  Filed 11/30/20  Page 24 of 169 PageID #: 1033

20    In what form did it take?  How was it structured?

21           MR. McGOWAN:  I don't have the answer to that

22    question at my fingertips.  I believe it was consistent

23    throughout, but I need to look that up.

24           So --

25           THE COURT:  So you don't know if it was a stock

1    acquisition or a merger, or we just don't know.  All we know

2    is that at the time of the negotiation, Bio-Rad wanted to

3    buy stock.  Right?

4           MR. McGOWAN:  At the time of the letter of

5    intent on which the Magistrate relied, the letter of intent

6    recites a stock date.

7           THE COURT:  Right.

8           MR. McGOWAN:  And I have nothing to contradict

9    that.

10          THE COURT:  And I might have overstated it.

11    Right?  It's not that -- I mean, it's probably more precise

12    to say Bio-Rad was interested in purchasing stock.

13          MR. McGOWAN:  Correct.  It is a nonbinding

14    letter on the system, and in our view, that distinguishes it

15    from most of, on whole of the common interest case law,

16    which there found to be a common interest.

17          THE COURT:  Right.  So I go back to understand

18    how exactly this was presented to the Magistrate or how it

19    ought to be presented today.  You know, in footnote 3 you

20    write, 10X is not seeking attorney files or mental

21    impression, but rather information concerning the

22    negotiation of the agreement between counterparties, but

23    then the questions you cite, at least a lot of them, go to

24    the content of the virtual data room.

25          So maybe, I mean, is it fair to say that really,

Case 1:19-cv-00825-CFC-SRF   Document 221-1   Filed 11/30/20   Page 25 of 169 PageID #: 4037

1  you're not pursuing, you don't need to know what's in the

2  data room?  All you want to know is what was said across the

3  table?

4          MR. McGOWAN:  What we're pursuing in this

5  submission is the across-the-table communications.  That

6  would be for the e-mails.

7          THE COURT:  And you had an agreement, I think,

8  right, that there would be no logging of documents that

9  postdate the beginning of the litigation.  Is that right?

10          MR. McGOWAN:  That is correct.

11          THE COURT:  And you want what?  A 30(b)(6)

12  witness to come in and just answer questions about what was

13  said to Bio-Rad during the negotiation.  That's, at the end

14  of the day, what you want.  Is that fair?

15          MR. McGOWAN:  Fair.  Yes, Your Honor.

16          THE COURT:  All right.  Anything else you want

17  to bring to my attention?

18          MR. McGOWAN:  The only point that I'd like to

19  make is that I believe that this can be done simply on the

20  law just by looking at Rule 26, because in our view, the

21  across-the-table communications and work product in the

22  first instance.

23          THE COURT:  Wait, we had a technical glitch.

24  Can you repeat that because I don't know what you said

25  between privilege and work product, so can you just start?

Case 1:19-cv-00825-CFC-SRF  Document 231-1  Filed 11/30/20  Page 26 of 169 PageID #: 1032

1                    MR. McGOWAN:  Sure.

2                    THE COURT:  What did you say?  We can resolve by

3          looking at Rule 26 because what?

4                    MR. McGOWAN:  Because we don't believe the

5          across-the-table communications are work product in the

6          first instance, and we believe the Magistrate treated them

7          as being work product.

8                    THE COURT:  Well, I mean, look, and this may

9          be -- I mean, they could be work product to the extent if

10         somebody from 10X said, my lawyer told me X, Y and Z because

11         she thought blank because she thought A, B and C, I mean,

12         that's work product.  Right?  It's communicating work

13         product.  You would argue it's waiving it, but the point is,

14         it is conveying the mental impression.

15                   MR. McGOWAN:  Right.

16                   THE COURT:  And you said you're not interested

17         in getting those.  So that's why you, you know, say you're

18         not seeking attorney mental impressions, so it seems to me

19         based on that footnote, you shouldn't get to get work

Case 1:19-cv-00825-CFC-SRF   Document 231-1   Filed 11/30/20   Page 27 of 169 PageID #: 3608
20         product even if it were weighed during the negotiation.

21                   MR. McGOWAN:  And I apologize if it's unclear.

22         I think that if a statement is made across the table,

23         that's, A, not work product; and, B, if there were work

24         product, it would be waiver, and we can talk about the

25         Philippines case and selective waiver and all the rest.

1           What we're trying to indicate in that footnote

2    is, we're not trying to dive down into the underlying

3    documents and the litigation files.  We're trying to

4    distinguish what we're asking for in the Hewlett-Packard

5    case, Sealed Air case, where they are trying to go down into

6    the litigation files.  We're trying to stay across the

7    table.

8           If across the table a lawyer or a businessperson

9    in a corporate setting recites something, then that

10   recitation is not work product, and it's strictly a waiver

11   analysis, we think the error that we want to draw to the

12   Court's attention is in treating those statements themselves

13   as work product.

14          I believe the law on waiver would establish that

15   the communication constitutes a waiver because we don't have

16   the facts that were put within the common interest stock,

17   but the distinction we're trying to draw is between

18   litigation files and across the table, and I apologize if I

19   was not clear on that point.

20          THE COURT:  Well, that's all right.  But, see,

21   you know, the thing is, work product, it's a different test

22   whether work product has been waived.  And would you agree

23   that at least there are circumstances where an NDA -- let me

24   start again.

25          There are circumstances where parties share

Case 1:19-cv-00828-CFC-SRF  Document 231-1  Filed 11/30/20  Page 28 of 169 PageID #: 7037

1   attorney impressions pursuant to an NDA and there would be

2   no waiver because under Westinghouse, they did take

3   appropriate measures to try to guard the secrecy of that and

4   limit the distribution of that work product?

5             MR. McGOWAN:  I think that the answer to Your

6   Honor's question is a qualified yes.  The qualification

7   comes from the requirement in the common interest cases that

8   there be a common legal interest as this Court said, in the

9   Dow chemical case, such as co-defendants or anticipation of

10  joint litigation.

11            Just for the record, I think that the rule on

12  this is stated in the Philippines case, the Republic of the

13  Philippines case at page 1429, where the Court says, a party

14  who discloses documents protected by the work product

15  doctrine may continue to assert the document's protection

16  only when the disclosure furthers the doctrine's underlying

17  goal.

18            I agree that work product and privilege have

19  some different aspects.  The purpose of work product is to

Case 1:19-cv-00825-CFC-SRF   Document 537-1   Filed 11/30/20   Page 29 of 169 PageID #: 2038

20  prepare for trial.  Rule 26 says, in anticipation of

21  litigation or for use at trial.

22            It is not anything that happens because

23  litigation is out there.  It's not the case that if I have

24  to rent extra office space in order to accommodate the files

25  of the case, that the lease agreement becomes work product

1    and is subjectively the reason I did it is because of the

2    litigation.  It's a purpose driven doctrine, and the point

3    is whether the communication in question furthers the

4    purpose of the doctrine.

5              In the Hewlett-Packard case and the other common

6    interest cases in Maine, disclosures are found within a

7    common interest when there is a common interest such as

8    being joint defendants, and the disclosure relates to that

9    interest.

10             THE COURT:  Right.  Now, on this though, let me

11   just stop you, because you didn't argue any of this to the

12   Magistrate.  Right?

13             MR. McGOWAN:  I think that before the

14   Magistrate, I think that what we did is argue that -- we

15   argued the instruction we got.  We did not understand at the

16   time that they were going to claim that, the defendant was

17   going to claim that the negotiations were themselves work

18   product, so what we argued was the common interest point.

19             THE COURT:  Right.  But, see, in fairness to

20   them, I know you apologized for it.  You don't need to

21   apologize, but you have.

22             I mean, I go back to how you presented it in

23   footnote 3.  You said you're not seeking attorney files or

24   mental impression, and that's why I began the conversation

25   by just talking about dissatisfaction on my part in the way

Case 1:19-cv-00825-CFC-SRF  Document 221-1  Filed 11/30/20  Page 30 of 169 PageID #: 1039

1    the thing was teed up.  I'm not faulting anybody, but just

2    that's the reality.  And a lot of the questions in the first

3    deposition were really designed to find out what was in the

4    data room, and I could see in the data room there being what

5    would normally be called work product, like opinions of

6    counsel about validity or invalidity of patents, things like

7    that.

8              MR. McGOWAN:  Sure.

9              THE COURT:  But I'm just going to tell you right

10   now, I mean, I think you've waived your right to pursue that

11   because of the footnote, the content of the footnote says

12   it, and it sounds like you're not pursuing the data room

13   documents anyway.  So I think that I'm just going to go

14   ahead and say that's the way I am going to rule, that you

15   have -- by footnote 3, you waived your right, or at least

16   you didn't tee up, and it's too late to do so now, to find

17   out or obtain documents that would reflect the mental

18   impressions of attorneys.

19              And, furthermore, it sounds like this morning

Case 1:19-cv-00825-CFC-SRF   Document 221-1   Filed 11/30/20   Page 31 of 169 PageID #:
1040

20   you're saying you are not even pursuing documents from the

21   data room at this point.  You want to limit the scope of

22   your discovery requests to oral and e-mail communications

23   between the parties between December 2019 and April of 2020.

24   Is that right?

25              MR. McGOWAN:  Yes.  And just to go back to the

point you just made, it was at the end of footnote 3 where

we say we're not seeking mental impressions, but information

concerning the negotiation of the agreement.  What we're

doing, in fairness, I think is consistent with the

negotiations point even in that footnote.

THE COURT:  Well, but I raised it because I

think it explains why -- you know, you say you didn't raise

these, this issue of Westinghouse or what's the purpose of

the disclosure.  You're faulting 10X.  I'm sorry.  You're

faulting Celsee, and I'm not finding that very persuasive.

It sounds like you have raised cases in the first instance

before me that weren't addressed to the Magistrate.

MR. McGOWAN:  May I have one brief response to

that, Your Honor?

THE COURT:  Sure.  Go ahead.

MR. McGOWAN:  As I said before, when we were

going through exhibits, Exhibit G, by focusing on

communication, we were focusing on the line of inquiry where

the objection was straightforwardly common interest.  I

Case 1:19-cv-00825-CFC-SRF   Document 527-1   Filed 11/30/20   Page 32 of 169 PageID #: 10471

don't think that there was any effort made at any point in

time to establish that a negotiating statement is a work

product statement, but the briefing before the Magistrate

focused on the question whether there was a common interest,

and we discussed the Hewlett-Packard cases on most of those.

But I don't believe there was ever any effort to establish

1    that the communications were themselves work product.  The

2    objection of the 30(b)(6) deposition, a common interest

3    privilege.

4              THE COURT:  Well see, I disagree.  That's why I

5    read it to you at the outset.  I mean 291:

6              Question:  Did the parties discuss in connection

7    with negotiating this nonbinding letter of intent whether

8    that escrow holdback would include some for the 10X

9    litigation?

10             Mr. Younkin:  Instruct the witness not to

11   answer that question on the grounds it calls for work

12   product.  That sounds like a work product objection.

13             MR. McGOWAN:  Right, but I was referencing the

14   30(b) deposition.

15             THE COURT:  Well, okay.  All right.  But you

16   cited before the Magistrate, and I thought that was -- the

17   discovery issue is related to both depositions.

18             MR. McGOWAN:  It is.  The more specific to the

19   communications in the negotiation I think is the 30(b)

Case 1:19-cv-00325-CFC-SRF   Document 537-1   Filed 11/30/20   Page 33 of 169 PageID #: 7042

20   instruction.  That's the point that I'm making.

21             THE COURT:  Okay.  All right.  We have narrowed

22   it now, I think.  We have narrowed it to all you want are

23   oral and e-mail communications between December '19,

24   April 2020, between Celsee and Bio-Rad relating to the

25   escrow and fees, expenses and damages relating to this

1   case.

2           MR. McGOWAN:  I would say the litigation.  I

3   don't know if there are things that are --

4           THE COURT:  Okay.

5           MR. McGOWAN:  -- related to the escrow that are

6   in there, because we don't know what was said yet.

7           THE COURT:  Right.

8           MR. McGOWAN:  A fair summary.

9           THE COURT:  Okay.  That's where we are.  All

10  right.  And you want to also get from that any statements

11  that may have conveyed attorney mental impressions?

12          MR. McGOWAN:  Yes.  Anything that was said back

13  and forth, our view is not work product in the first

14  instance, and if it happened to convey work product does not

15  fall within the common interest exception for waiver.

16          We have not discussed the details of the

17  exception a lot, but it caches out to just what the Court

18  said.  If there is a mental impression and an

19  across-the-table statement, our request is that that would

Case 1:19-cv-00825-CFC-SRF  Document 231-1  Filed 11/30/20  Page 34 of 169 PageID #:
7043

20  have to be disclosed as well.  What doesn't need to be

21  disclosed are the things sitting in the files themselves

22  or things just sitting in people's heads that were not

23  stated.

24          THE COURT:  Okay.  And then on the merits -- I

25  don't know if it's the right word, but on the common

1    interest issue, I mean, your position is it's a non-binding

2    letter, the negotiating across the table from each other.

3    It's a stock acquisition, so it's not like Bio-Rad has taken

4    on the defense of this litigation and so the cases that are

5    cited by 10X are inapposite.  Is that a fair summary?

6                 MR. McGOWAN:  Fair summary, Your Honor.  Yes.

7                 THE COURT:  Okay.  All right.  Let me hear from

8    the other side then.

9                 MR. YOUNKIN:  Thank you, Your Honor.  This is

10   Jeremy Younkin.

11                I think if I may just at the outset point out

12   that there were really two independent grounds for the

13   Magistrate Judge's decision, and so one of them was the

14   squarely work product.

15                And so as we have discussed today, 10X stated in

16   their footnote that they were not interested in attorney

17   mental impressions, and then the Judge asked, well, why do

18   you want this information?

19                And they said, because we think, as we've heard

Case 1:19-cv-00825-CFC-SRF   Document 531-1   Filed 11/30/20   Page 35 of 169 PageID #: 7044

20   today, that the negotiation is going to reflect the parties'

21   views about the value of this case.  And, indeed, I think

22   Mr. McGowan has made it clear, it's their theory this

23   evidence is relevant because, you know, it's going to

24   reflect, you know, quote, "how worried we should be and what

25   are the underlying merits of the action and what are the

1   potential damages."

2               And when Magistrate Judge Fallon heard that, she

3   said, I can't think of a clearer example of work product,

4   and then she said, that work product protection was not

5   waived because it is difficult to waive work product.  You

6   need to do something that allows your adversary to find out

7   the information, and that was not done here.

8               Celsee and Bio-Rad were talking to one another

9   under a nondisclosure agreement about an acquisition and

10  there was really no risk that 10X was going to get the

11  information and so work product protection applies and it

12  wasn't waived, full stop.  I mean, and that standing alone

13  without even getting into common interest case law provides

14  grounds to affirm Magistrate Judge Fallon's decision and

15  finds --

16              THE COURT:  But I mean I feel bad for Magistrate

17  Judge Fallon because I just think the way it was teed up was

18  kind of unfair to her.

19              So let's go to the transcript that you've just

Case 1:19-cv-00825-CFC-SRF   Document 231-1   Filed 11/30/20   Page 36 of 169 PageID #: 7042

20  recited.  What page are you on?

21              MR. McGOWAN:  Well, her statements, if you look

22  at the very end on page 38 of the transcript.

23              THE COURT:  Right.

24              MR. YOUNKIN:  She says, in addition, even

25  putting aside the common interest doctrine, so she is taking

1    that out of the equation, the work product doctrine affords

2    an additional basis for protection of the information that

3    plaintiffs plaintiff seeks to compel.

4              THE COURT:  Right.  Now, you know, it's not

5    clear to me.  What is she talking about?  The information

6    the plaintiff seeks to compel?  What's the information the

7    plaintiff seeks to compel that she's referring to?

8              MR. YOUNKIN:  I think what she's referring to

9    are the communications between Bio-Rad and Celsee about this

10   litigation.  And so the way that this kind of came up, Your

11   Honor, if you turn to page 28 of the transcript --

12             THE COURT:  Right.

13             MR. YOUNKIN:  Okay?

14             THE COURT:  I'm there.

15             MR. YOUNKIN:  Okay.  So this is Mr. Novikov

16   arguing about why he says the negotiations of the escrow

17   provision are not subject to common interest, and I will

18   just point out that Mr. Novikov opened with this argument

19   and so clearly 10X understood --

Case 1:19-cv-00825-CFC-SRF   Document 237-1   Filed 11/30/20   Page 37 of 169 PageID #:
10469

20             THE COURT:  Sorry, sorry.  What line were you on

21   and then start again.

22             MR. YOUNKIN:  Page 28.  28, Line 7.

23             THE COURT:  Okay.  All right.  Got you.  Thanks.

24             MR. YOUNKIN:  Okay.  So this is 10X arguing, and

25   they say that their assessments, meaning the Bio-Rad and

Celsee's assessments or representations as part of that back
and forth about how much this litigation is worth, and then
what financially they view the risk to be is certainly
highly relevant to a number of issues.  And so Judge
Fallon's reaction to that is found on page 36.

THE COURT:  Okay.

MR. YOUNKIN:  And if we look at line 16 --
sorry, the beginning of that paragraph around line 10, she's
talking about these communications.  I think there, clearly
we're talking about the communications between Celsee and
Bio-Rad about the escrow provision.

And then at line 16, she says, these go to the
very heart of what the parties think about what this case
ending in litigation is worth, and I can't think of a clear
example of what might be protected by the work product
privilege.

And, indeed, we've heard today that their whole
theory of this evidence is that it will reflect each party's
mental impressions about this litigation -- the strengths,

Case 1:19-cv-00825-CFC-SRF  Document 537-1  Filed 11/30/20  Page 38 of 169  PageID #: 1047

the weaknesses, the damages.  And that sort of evidence
is -- it's just product information.

THE COURT:  Hold on.  I agree with you.  All
right.  So on that statement, I do understand that, and I do
think there's no question about it.  Then I think we've got
an issue about whether there's a waiver of disclosing it.

1        MR. YOUNKIN:  Okay.

2        THE COURT:  And so the way I look at it is that

3   because of footnote 3, that wasn't teed up.  In other words,

4   the way I look at it is the footnote 3 -- sorry.  Hold on

5   one second.

6        There it is.  In footnote 3, the statement that

7   10X does not seek an attorney files for mental impression.

8   So as far as I'm concerned, they don't get to get -- they

9   are not asking the Magistrate to force them, to force a

10  disclosure of mental impressions.  That wasn't teed up and

11  so I'm going to affirm the Magistrate to the extent that she

12  said that on page 36 that Celsee's evaluation, or, rather,

13  Celsee's attorney's evaluation of the case is quintessential

14  work product, I think that's true.  And why I am going to

15  affirm her, I'm not sure this is the reason she made the

16  ruling, but I'm going to affirm it is, you can't in a, what

17  is effect effectively a motion to compel, which is the

18  letter dated September 21, 2020, at DI 204, you can't say

19  you're not seeking attorney files or mental impressions and

20  then expect to get them.

Case 1:19-cv-00825-CFC-SRF  Document 231-1  Filed 11/30/20  Page 39 of 169 PageID #: 7048

21       So I don't have to get into whether or not there

22  was a waiver of work product during the course of these

23  negotiations or not because that issue in my mind wasn't

24  properly brought up to the Magistrate, and, in fact, it was

25  essentially -- it was waived, and so I'd affirm her on that

1    issue.

2           So now what I think is left though -- well,

3    what's left in the negotiation and the back and forth, okay,

4    where there's not a disclosure by Celsee about the

5    impressions of their attorney as far as valuing the case,

6    but there are negotiations, other statements they made that

7    do not reveal work product.

8           Now, why shouldn't 10X get that information?

9           MR. YOUNKIN:  Well, I don't think actually that

10   they are seeking that information.  I mean, I think --

11          THE COURT:  Well, I mean, I think Mr. McGowan is

12   seeking that information.

13          Mr. McGowan -- wait.  Let me just ask him

14   because I thought it was pretty clear, that's what he wants.

15   He just wants as well any disclosures that included work

16   product.

17          Mr. McGowan, that's what you are seeking.

18   Right?

19          MR. McGOWAN:  The Court is correct.  If it's

Case 1:19-cv-00828-CFC-SRF   Document 237-1   Filed 11/30/20   Page 40 of 169 PageID #: 7049

20   across the table, it's the subject of our submission to the

21   Court.

22          THE COURT:  Right.  But, okay.

23          MR. YOUNKIN:  Okay.  But I think we're

24   potentially talking past each other here.  I mean,

25   Mr. McGowan's position is anything said across the table he

1   wants, and I think Your Honor just said, well, if it's work

2   product material, you don't get it.

3          THE COURT:  Correct.

4          MR. YOUNKIN:  And so my -- right.

5          THE COURT:  But there's still a lot of other

6   information.  I mean, in other words, a person across the

7   table could say, he could say, I think the case is worth

8   this much, or she could say, I don't know who the 30(b)(6)

9   witness is going to be.  She could say, you know, we think

10  the case is worth this much, or she could say -- I mean, she

11  could make revelations about a lot of stuff without

12  disclosing work product.

13         MR. YOUNKIN:  Your Honor, I disagree with that.

14  I think if somebody says I think the case is worth X, that

15  is a disclosure of -- I mean, that's protected by the work

16  product, because that is one party telling the other party

17  its mental impression about the value of the litigation,

18  which is, of course, informed by, as I said, that's clearly

19  a mental impression about the value of the case.

Case 1:19-cv-00825-CFC-SRF   Document 231-1   Filed 11/30/20   Page 41 of 169 PageID #: 1020

20         And so --

21         THE COURT:  Hold on.  Attorney work product goes

22  to the attorney's mental impression.  Now, the client might

23  agree with the attorney or disagree with the attorney, but

24  the client's ultimate mental impression is not the

25  attorney's mental impression.

1           The other thing is, and I'm sure you're

2    familiar, I mean Upjohn, all the work product cases

3    distinguish between fact and opinion.  And so what I want

4    you to focus on now, so this is the issue.  I'm basically,

5    I'm not going to allow Celsee to get a disclosure of the

6    mental impressions of 10X's attorneys.  Okay?  They've

7    waived that by their footnote.  So to that extent, I'm

8    affirming the Magistrate.

9           What remains to be decided is, what about the

10   rest of the negotiation?  And I am concerned that the

11   Magistrate Judge read too much into AgroFresh.  I'm

12   concerned that AgroFresh and the other cases upon which you

13   rely don't really apply here, and yet I'm also concerned, as

14   I mentioned in my questioning of Mr. McGowan, about how

15   probative is this stuff and is it even wore worth the burden

16   of a deposition.

17          And, you know, I see where you drop a footnote

18   in your papers in front of me based on relevance, but did

19   you do that in front of the Magistrate?  Did you argue

20   proportionality or burden or relevance in front of the

21   Magistrate?

22          MR. YOUNKIN:  I believe that I noted it during

23   the hearing, Your Honor, but really, the way that the issue

24   was teed up was, it was an argument to that privilege

25   instructions given at a deposition were improper, and so

Case 1:19-cv-00862-CFC-SRF  Document 231-1  Filed 11/30/20  Page 42 of 169 PageID #: 7051

```
 1    that was their argument, and so we were defending the
 2    privilege instruction.
 3              I did note at the hearing that the relevance
 4    argument seemed a bit stretched, but certainly, we weren't
 5    instructing the witness not to answer a question at a
 6    deposition based on relevance grounds.
 7              I do think --
 8              THE COURT:  I've got the transcript in front of
 9    me, where did you say that or something about burden,
10    relevance, or any considerations, proportionality?
11              MR. YOUNKIN:  Yes.  And this may have been --
12    this may have actually been in connection with the first
13    argument.
14              Yes.  I mean, so to be clear, the statement is
15    that I was referring to is on page 19 and it really is
16    dealing with the first of the two arguments that were before
17    her.
18              THE COURT:  Okay.  So the bottom line is, you
19    really didn't argue proportionality or overly burdensome or
20    even relevance as a basis to prevent further deposition of
21    this 30(b)(6) witness.  Correct?
22              MR. YOUNKIN:  Not with respect to this argument.
23    That's right.
24              THE COURT:  Okay.  So then I think we're stuck.
25    Right?  So then I do have to, it looks like, address the
```

Case 1:19-cv-00825-CFC-SRF   Document 537-1   Filed 11/30/20   Page 43 of 169 PageID #: 7052

1    common interest doctrine and whether it applies.  Is that

2    fair?

3                MR. YOUNKIN:  I actually don't think that that

4    is correct, Your Honor, because I think that the waiver, the

5    waiver rules around a work product are much more stringent

6    than the waiver rules --

7                THE COURT:  I'm not going to give them work

8    product.  I've already said that.  You've won that.

9                MR. YOUNKIN:  They don't -- okay.  I think there

10   is still an open question about the limits of that though,

11   because, firstly, I do need to say that the work product

12   doctrine does not just protect attorney mental impression.

13   It also protects the mental impressions of a party about

14   litigation, so that's number one.

15               Number two --

16               THE COURT:  All right.  So, wait.  Now, this is

17   an example of, unfortunately, you guys are asking me to make

18   a pretty, you know -- there are few things more important

19   than attorney/client privilege and attorney work product.

20   Do you have a case that says that if I ask a

21   client about the client's mental impressions, that that is

22   prohibited by the attorney work product doctrine?

23               MR. YOUNKIN:  Well, Your Honor, yes.  I think

24   that just the plain language of Federal Rule of Civil

25   Procedure 26(b)(3) --

Case 1:19-cv-00825-CFC-SRF  Document 537-1  Filed 11/30/20  Page 44 of 169  PageID #: 1023

```
 1                THE COURT:  All right.  Hold up.  Let me pull it
 2    up.  26 what?
 3                MR. YOUNKIN:  (b)(3).
 4                THE COURT:  Okay.
 5                MR. YOUNKIN:  Okay.  So, and this is Section A.
 6                THE COURT:  All right.
 7                MR. YOUNKIN:  Which is basically the work
 8    product rule.  And it says, ordinarily, a party, 10X, may
 9    not discover documents and tangible things that are prepared
10    in anticipation of litigation or for trial by or for another
11    party, another party, or its representatives, including the
12    party's attorney.
13                And so a party, you know, a company gets a
14    demand letter or something and the CEO works on it and forms
15    a mental impression about the value of the case.  That can
16    clearly be work product.  And so when you have --
17                THE COURT:  Well, I didn't say it couldn't be,
18    but --
19                MR. YOUNKIN:  I was just trying to make the
20    point that work product protection is not limited to an
21    attorney's mental impressions, that it also covers a party's
22    mental impressions about a litigation.  And here, that's all
23    they want.  All they want is a party's mental impressions
24    about this case, and I think Judge Fallon heard that and she
25    said, that's clearly work product.  You don't get that.
```

Case 1:19-00825-CEC-SRF  Document 221-1  Filed 11/30/20  Page 45 of 169 PageID #: 7057

              And, you know, I think in this case, too, I
mean, attempting to tease out, you know, even if you were to
say, well, okay.  Let's try to distinguish the lawyers's
mental impressions from the negotiators mental impressions,
I mean, I'm not even sure how you could possibly do that,
which is why I say, they're only interested in the mental
impressions.  If the discussions do not reveal or reflect
what a party thinks about this case, they don't want them.
That's their whole theory of relevance here, which is why I
think the Magistrate Judge said, that's what sounds like
what you want is work product.  You, 10X, have to show
waiver of work product and you can't do that because the
parties were talking under a nondisclosure agreement and
there is no risk that that information would get to 10X.
And you can do that just based on the waiver rules around
work product without even delving into, you know,
Hewlett-Packard and the common interest body of case law.
It's just independent grounds of affirmance.

              And I do not think --

              THE COURT:  So let me just ask you this.  Let's
say Bio-Rad at the last minute said, we're not doing this
deal and, or let's say Celsee said we're not doing it and
then Bio-Rad sued Celsee.  Are you telling me that those
negotiations, they would never see the light of day in a
Court if there was a dispute over the meaning or, you know,

Case 1:19-cv-00825-CFC-SRF   Document 237-1   Filed 11/30/20   Page 46 of 169 PageID #: 7055

1   the way the negotiations went?

2          MR. YOUNKIN:  I don't know the answer to that

3   question, Your Honor.  I mean, I think it's possible in that

4   situation that --

5          THE COURT:  Well, it happens all the time.  It

6   happens all the time when there's a negotiation that doesn't

7   get consummated or gets consummated and the parties argue

8   about it.  As long as parol evidence is admitted, if you

9   have then an ambiguous contract or something, this is the

10   kind of evidence that comes in under the parol evidence

11   rule.

12          MR. YOUNKIN:  Well, the parties -- the parties,

13   of course, are free to waiver work product if they decide to

14   in a litigation, and here, that's not being done.  The

15   parties are, you know, making their work product objection.

16          I also want to make just one point about it

17   seems like Mr. McGowan is drawing this distinction between

18   the documents in the data room, which he, I think, now

19   concedes is off-the-table and communications that were made

Case 1:19-cv-00825-CFC-SRF  Document 221-1  Filed 11/30/20  Page 47 of 169 PageID #: 1056

20   in a negotiation, but there's no reason to draw a

21   distinction between those two things.  It's just, it's just

22   the form of communication.

23          And so if we all agree that if an opinion of

24   counsel gets put into the data room and there's no waiver,

25   then the same thing should apply if the contents of the

1    opinion of counsel are disclosed in an oral communication or

2    an e-mail.

3              THE COURT:  I don't think he said that and I

4    don't need to rule on that because I've already said he

5    doesn't get work product.  He doesn't get work product

6    because they took the position in footnote 3 that they

7    weren't seeking it.  All right.

8              So the only question is, do they get the

9    communications that went back and forth between the parties.

10   I mean, to me, I mean, I don't think it has huge probative

11   value, but as you said, you didn't make that argument.

12             Now, the good question is, you know, they're

13   making a new argument, you could argue, so can I just

14   consider now, like what's the relevance of this material?

15   What would be the burden to produce it?  But you have not

16   said anything in that regard even though I've asked.

17             MR. YOUNKIN:  Well, I mean, I think that I mean

18   I would point to the footnote that we make in the response

19   to the objection, and I would also say that the

Case 1:19-cv-00825-CFC-SRF   Document 221-1   Filed 11/30/20   Page 48 of 169 PageID #: 7057

20   circumstances have changed a bit because, you know, where we

21   find ourselves right now is November 5th, the plaintiffs

22   served an opening damages report, so we already have their

23   expert opinion on what she thinks the damages in this case

24   should be, and we're about to serve our rebuttal report on

25   Friday, tomorrow.

           1            And then what they want to do is have a

           2    deposition in the next couple of weeks, I guess, that they

           3    think is going to uncover evidence that's going to bear on

           4    damages, and so then what are we going to do?  Supplemental

           5    reports, you know, as we head towards summary judgment in

           6    February?

           7            I mean, just from a practical standpoint, you

           8    know, it's going to be difficult.  Like I said --

           9            THE COURT:  Have you considered what kind of

          10    burden it would take to go review all the different e-mails

          11    and communications between 10X and Bio-Rad?  You didn't log

          12    the material.  Right?  Have you even conducted a search for

          13    the material?

          14            MR. YOUNKIN:  I don't, I don't know the answer

          15    to that question.  You know, these requests, the requests

          16    for the Bio-Rad discussions in particular came in pretty

          17    late in discovery.  We objected to them.  There was a little

          18    bit of hashing things out.  But I mean I think that we have

          19    been pretty clear that we weren't going to produce these

          20    communications, you know, going way back.

          21            And, really, I mean, the issue really got teed

          22    up around this, the deposition as opposed to responses to

          23    document requests.  But like I said, Your Honor, I think

          24    that we still have to address this issue of we all agree

          25    that they're not entitled to work product information, but I

Case 1:19-cv-00825-CFC-SRF   Document 221-1   Filed 11/30/20   Page 49 of 169 PageID #: 7058

1    think it still leaves open a question, well, what is work

2    product information?  And Judge Fallon said, communications

3    about this litigation are covered by the work product

4    doctrine, and that conclusion, we submit, is not clearly

5    erroneous, and 10X has not shown that it was.

6              They are not asking for communications about,

7    you know, some random provision in this merger agreement.

8    They are asking for communications about the litigation.

9    That's all they care about.

10             THE COURT:  Well, there was no work product

11   objection lodged to the 30(b)(6) witness.  Right?  It was

12   based solely on the objection on the common interest

13   exception.

14             MR. YOUNKIN:  But the common interest exception,

15   I mean, I don't think that's mutually exclusive of work

16   product.  Really, what the common interest exception is

17   saying, the underlying privilege was not waived.  And, by

18   the way, the LaPointe deposition happened first, and so they

19   understood kind of what our position was, I think, and if

20   they had any questions about it, they could approach further

21   with Mr. Stark, the witness who is actually involved in the

22   negotiation, and they didn't.

23             And so they asked him specific questions.  You

24   know, what were the considerations that led to this escrow

25   provision?  And I was there and I objected to work product

Case 1:19-cv-00825-CFC-SRF  Document 221-1  Filed 11/30/20  Page 50 of 169 PageID #: 2089

1    grounds.  And as I think you said, it really couldn't have

2    been clearer.

3           And then in the meet-and-confer, which

4    Mr. McGowan didn't attend, work product was featured.  I

5    mean, I was telling Mr. Novikov that I thought that work

6    product prevented him from getting this information.  And so

7    they understood this was an issue, which is why they dropped

8    a footnote to address it briefly in their letter.

9           And then when we got to the argument,

10   Mr. Novikov opened up by arguing that communications about

11   this negotiation, about the negotiation of this merger

12   agreement are not covered by the work product doctrine.

13          So that was aired, and the Magistrate Judge

14   disagreed and said, no, that those communications are

15   covered by the work product doctrine.

16          THE COURT:  So why don't you explain to me why

17   communications with another party that's trying to buy, is

18   interested in purchasing your stock, why would my

19   communications with that entity constitute work product?

20          MR. YOUNKIN:  Because the content of the

21   communication is a mental impression about the litigation,

22   and so just as a side note here, the deal is being

23   characterized as a stock deal.  I mean, this is an

24   acquisition.  Right?  Bio-Rad bought it.  They own it now.

25   It's not just they bought ten percent of the shares or

Case 1:13-cv-00025-CFC-SRF   Document 231-1   Filed 11/30/20   Page 51 of 169 PageID #: 1000

1    anything like that.  Bio-Rad purchased, acquired,

2    100 percent of Celsee.

3            THE COURT:  Okay.

4            MR. YOUNKIN:  But so if there's a negotiation

5    happening and under an NDA where a defendant in a lawsuit is

6    talking about somebody who wants to buy them and the

7    defendant says to the potential acquirer, let me tell you my

8    mental impressions about this litigation, okay.  So what is

9    being communicated is a mental impression that had been

10   formed in connection with the litigation.

11           And the disclosure of that mental impression to

12   the other side is not a waiver in the same way that, you

13   know, if you had -- you know, a general counsel sits down

14   and says something like, you know, here are the defenses to

15   this, to this claim, here are the arguments that I think,

16   you know, are good ones that we're making, those are his or

17   her mental impressions.  And if you disclose that to a

18   potential acquirer under an NDA, under the very strict rules

19   surrounding waiver, which they had the burden to prove,

Case 1:19-cv-00825-CFC-SRF  Document 537-1  Filed 11/30/20  Page 52 of 169 PageID #: 7007

20   there is no waiver, and that's what Judge Fallon held and

21   she was correct.

22           THE COURT:  Well, I'm having a hard time.  You

23   know, you cite 26(b)(3)(A).  I mean, that deals with

24   documents and tangible things.  So, A, that is off the

25   table.  We're not talking about that.  We're talking about

1    conversations, number one, and then we're talking about

2    e-mails that are sent to Bio-Rad.  They are not in

3    anticipation of litigation.  I mean, you've got to

4    demonstrate to me why they would be.

5         I get where it may be within those documents

6    they are conveying what 10X's lawyers thought about the case

7    and they are not getting that.  We've already discussed

8    that.  So I want us to go back and narrow the scope of what

9    is really being addressed.

10        Now, I do think it's, you know, it's informative

11   that they are buying all the stock, so they are taking over,

12   they're basically taking over the case, and they are, is it

13   fair to say then they are at least indirectly inheriting the

14   liability in the litigation in your view?

15        MR. YOUNKIN:  I mean, subject to the terms of

16   the merger, which address this.

17        THE COURT:  Okay.  What does it address?  What

18   does it say?

19        MR. YOUNKIN:  Well, there are -- I mean, there

20   are --

Case 1:19-cv-00825-CFC-SRF   Document 221-1   Filed 11/30/20   Page 53 of 169 PageID #: 2005

21        THE COURT:  Actually, what does the letter of

22   intent say?  Let's focus on that, about what happened to the

23   litigation.

24        MR. YOUNKIN:  The letter of intent says that

25   Bio-Rad will acquire a hundred percent of Celsee, and then

1    it goes through some of the money payments.  I do not

2    believe that it talks about -- you know, then it says we're

3    going to do due diligence and it doesn't mention the

4    litigation, I don't think, just looking at it quickly,

5    expressly.

6            The merger agreements does contain provisions

7    that squarely address the litigation, including how it's

8    going to be paid for, and those are, those are the

9    provisions that 10X wants discovery on.

10           But, again, if you have -- let's just say you

11   have two businesspeople sitting across the table from each

12   other and one businessperson says, as Mr. McGowan asked, how

13   worried should we be?  How could that question possibly be

14   answered without revealing the attorney's mental impression?

15           THE COURT:  Very easily.  You just don't

16   disclose what your attorney said to you or wrote to you.

17           MR. YOUNKIN:  But the negotiators, the

18   negotiators's view on that is inextricably tied to what his

19   lawyers are telling him.  A businessperson is not an

20   independent view of the potential liability separate and

21   apart from information that has been given to him by

22   lawyers.  No way is he forming a judgment about that.

23           THE COURT:  Well, I don't find that argument

24   very compelling.

25           So, Mr. McGowan, here's where I am.  It just

Case 1:19-cv-00825-CFC-SRF  Document 221-1  Filed 11/30/20  Page 54 of 169 PageID #: 3003

strikes me that I don't see how I would let into evidence in

front of a jury any statements that were made during the

course of the negotiations, because I think if I applied

Rule 403, I would conclude that the probative value here

would be substantially outweighed by a number of

considerations.  I think it would confuse the jury and

potentially mislead the jury because I don't think any of

the statements that might have been made during the

negotiation with respect to the value of the litigation or

potential damages award, I don't think that it would be --

it would be fair or proper to have the jury try to parse,

well, how much of that is based on things that the jury

should never think about, some of the legal strategies and

assessments about juries, about judges.  I just think it

would -- and I think the probative value is limited.

Now, I have not heard anything about burden

from 10X, but I really just question why we need to have

teed up --

MR. McGOWAN:  May I respond, Your Honor?

Case 1:19-cv-00862-CFC-SRF   Document 237-1   Filed 11/30/20   Page 55 of 169 PageID #: 4097

THE COURT:  Yes.  Sorry.  I was hoping you

would.  Thanks.

MR. McGOWAN:  I just wasn't sure if the Court

was concluded.

Let me suggest that a 403 ruling usually has the

benefit of the proffered testimony, so there's something

1    concrete to rule on.  Part of the discussion we've just been

2    having is hypothesizing what the testimony might be, and if

3    Bio-Rad comes in and makes its own statement, that's what

4    we've looked at.  Says, yes, we've got a problem there.  It

5    feels very different from the kind of hypotheses that 10X's

6    counsel was just making.

7            I think the way to cut through all of this is to

8    actually adduce the testimony respecting the Court's work

9    product, the way the Court has ruled, but the Court I think

10   is correct, that that is not everything.  And I agree that

11   back and forth across the table in a merger in a hundred

12   percent stock acquisition, I don't think that makes a

13   difference in the common interest doctrine.  But I think

14   that kind of evidence comes in all the time.  I don't think

15   there's a plausible work product decision there.

16           So I think the way to cut through this is to

17   respect the Court's ruling that it has made on work product,

18   recognized that there was some residuum, then find out what

19   it is and then have a concrete piece of testimony or a

Case 1:19-cv-00825-CFC-SRF  Document 321-1  Filed 11/30/20  Page 56 of 169 PageID #: 1985

20   concrete question that can be addressed.  That's what I

21   would suggest.

22           I feel as though making assumptions about what

23   might be the case is not a good way to resolve the question

24   of admissibility or a question of burden when that hasn't

25   really even been briefed.

1                 And --

2                 THE COURT:  Well, I said, I used the conditional

3     language when I said it, and I said it with the hope that

4     you might think the odds of it coming in are so minimal,

5     that you wouldn't pursue it.  But you are not willing to do

6     that, and I'm not making a definitive 403 judgment because I

7     don't have something specific in front of me.  I was just

8     sharing with you my general thought process based on your

9     explanation of how this information you hoped to get would

10    be probative.  It is just I didn't find it really, really

11    compelling.

12                MR. McGOWAN:  Sure.  If I can just -- let me

13    just -- I don't want to dwell too much in hypotheticals, but

14    the Court alluded earlier to the idea that, well, maybe

15    Bio-Rad makes a comment that is not -- and a Celsee person

16    agree with it.

17                THE COURT:  Wait.  You broke off again.  You

18    said Bio-Rad makes a comment and then I lost you.

19                MR. McGOWAN:  And then a Celsee person agrees

Case 1:19-cv-00825-CFC-SRF  Document 231-1  Filed 11/30/20  Page 57 of 169 PageID #: 5000

20    with it and says, yes, that's true.  That could be a

21    liability issue, not a damages issue.  That's a response to

22    a comment.  That's not work product in any respect.

23                Now, what the Court would do with that, would

24    think about that in a 403 context would depend, I think, on

25    the question, and the Court would have something concrete to

1 look at.  But I really feel as though with respect to the

2 Magistrate's ruling, that the premise that the non-mental

3 impressions across the table testimony is not work product,

4 I think that's a matter of law.  I don't think there was any

5 foundation laid to show that it's work product and I don't

6 think there has been any laid here.

7    So I think that ruling was incorrect with

8 respect to the traunch of communications the Court has

9 identified this morning.

10    Then the question becomes, if I take the Court's

11 point to be is the game worth the candle with respect to

12 that bit of information.  We're looking at a June trial

13 date.  I don't think this -- I have not heard a reason why

14 this should take a huge amount of time, but I think that in

15 order to follow the legal rules of work product and

16 admissibility, we really need to see what the evidence is so

17 concrete decisions can be made.

18    MR. YOUNKIN:  If I can respond to that?

19    THE COURT:  Yes.  Sure.  Go ahead.

Case 1:19-cv-00825-CFC-SRF   Document 223-1   Filed 11/30/20   Page 58 of 169 PageID #: 7001

20    MR. YOUNKIN:  I mean, you know, Courts make

21 relevance calls all the time before we know what the answer

22 is.  That's what -- I mean, when you are ruling on a motion

23 to compel a document request, the question is, you know,

24 what is the question?  What are the documents you are

25 seeking and are those relevant?  Can you show that they're

```
 1  relevant?

 2              And, you know, and prejudice and burden can play

 3  a role in that as well.  I mean, here, we're here on a

 4  motion to compel answers to questions that were asked at a

 5  deposition.  This shouldn't be, you know, open up, have a

 6  whole deposition.  They should come in here and say, point

 7  to the transcript.  Here's the question I asked.  It was

 8  blocked.  I would like an answer to that question.

 9              And I don't think that Mr. McGowan can point to

10  any questions that were asked where, you know, he feels like

11  he needs the answer in order to make an argument that, you

12  know, that passes 403 muster.

13              MR. McGOWAN:  May I respond, Your Honor?

14              THE COURT:  Sure.

15              MR. McGOWAN:  The instruction given in

16  Exhibit G, the corporate deposition, was a categorical

17  instruction.

18              MR. YOUNKIN:  That issue has been waived.  I

19  mean, what they asked Magistrate Judge Fallon for was a

20  deposition of Mr. Stark.  They did not ask for a new

21  30(b)(6).  They didn't ask for Mr. LaPointe to reappear.

22  They said, this is in --

23              THE COURT:  All right.  So, hold on.  This is

24  the first, you know, that somebody has said that to me.

25  Maybe it's in the papers, but this is -- again, I go back
```

Case 1:19-cv-00825-CFC-SRF Document 237-1 Filed 11/30/20 Page 59 of 169 PageID #: 8087

1  to, it just wasn't really presented, at least something that

2  I would grasp immediately.  So hold on.

3          So the pending motion is solely to redepose

4  Mr. Stark.  Is that right?

5          MR. YOUNKIN:  Yes.  Footnote 1 in their letter

6  brief to the Magistrate Judge.

7          THE COURT:  All right.  Hold up.  Well, this is

8  made in the context of another argument.

9          MR. YOUNKIN:  Well, the proposed order is to

10  produce Mr. Stark to provide deposition testimony as a

11  corporate representative.  I mean, Mr. Stark wasn't our

12  corporate representative on any topic.  He is a former

13  employee.

14          THE COURT:  Okay.  So, you know, now I'm looking

15  at it, it does say, Celsee should be compelled to reproduce

16  Mr. Stark to testify as its corporate representative

17  concerning the negotiation of the merger agreement.  I mean,

18  that's a 30(b)(6) witness.  They want Mr. Stark to be the

19  witness because they think he's probably most knowledgeable,

20  but I mean, they're asking for a 30(b)(6) witness.  They

21  just want it to be Mr. Stark.  That's on page 3 of your

22  letter, DI 204.  I don't think they've waived their right to

23  have a 30(b)(6) witness given that language.

24          Okay.  Anything else anybody wants to bring to

25  my attention?

Case 1:19-cv-00283-CFC-SRF   Document 231-1  Filed 11/30/20  Page 60 of 169 PageID #: 3093

1      MR. YOUNKIN:  I mean, we've been going for

2  awhile, Your Honor, so I don't want to belabor the point.  I

3  will just say though that I think you have really focused on

4  this one prong of the Magistrate Judge's decision, which I

5  think is fully sufficient to affirm, which is the no waiver

6  of work product, but there is a separate and independent

7  ground around the common interest doctrine, and I think that

8  what, you know, what 10X is trying to do here, you know, and

9  I think that they've been pretty candid about it, is

10  basically get this Court to rule for the first time in

11  Delaware at the Third Circuit that you cannot have a common

12  interest when you're in merger talks.  A common interest

13  doctrine simply doesn't apply there.

14      THE COURT:  No.  So I don't view it that

15  broadly.  I mean, frankly, I would prefer not to opine,

16  period, because I don't think -- because of the manner in

17  which the issues were brought to me and brought to the

18  Magistrate.  But I don't think they're asking for as broad a

19  ruling as you just said.  Am I correct?

Case 1:19-cv-00825-CFC-SRF  Document 221-1  Filed 11/30/20  Page 61 of 169 PageID #: 10107

20      MR. YOUNKIN:  At the hearing they told the

21  Magistrate Judge -- I mean, their position is that

22  Hewlett-Packard was wrongly decided and that it should no

23  longer be followed.  And the Magistrate Judge says, well, if

24  I agree with you, is this going to (inaudible) privilege

25  whenever there's a merger?

1          And they candidly said, yes, they would like the

2     District of Delaware to say that Hewlett-Packard was wrongly

3     decided and it's not the law in Delaware.  And so that when

4     parties -- and they would like the Court to follow, you

5     know, other cases, like out of Illinois that say that when

6     parties are in a merger negotiation, there's no common

7     interest.

8          It's just not the law in the Third Circuit.  I

9     mean, the Sealed Air case rejected that, rejected that

10     argument squarely and then there's a Bankruptcy Court in

11     Delaware that did the same.

12          And so I think that they are candidly saying

13     that they would like, that they would like Your Honor to

14     rule that Hewlett-Packard is not the law of Delaware and

15     that that line of cases --

16          THE COURT:  First of all, when you say that the

17     law -- so actually, this gives me a perfect example.  In

18     fact, I'm glad.  I forgot to raise this and I really should

19     have at the outset, but it's a perfect example of why I mean

Case 1:19-cv-00823-CFC-SRF  Document 231-1  Filed 11/30/20  Page 62 of 169 PageID #: 7071

20     this is not teed up for me.  And let me ask Mr. McGowan

21     first.

22          Mr. McGowan, are you there?

23          MR. McGOWAN:  I'm here.

24          THE COURT:  So what law of privilege should

25     guide, should I follow?

1          MR. McGOWAN:  To the extent that -- Rule 26 is

2     the answer to the Court's question.  To the extent the

3     common interest doctrine has been recognized and we're

4     dealing with a federal question case, then I think on work

5     product, it's always Rule 26.

6          THE COURT:  Wait, wait, wait.  So hold on.

7     We're not dealing with work product.  I already ruled on

8     work product.

9          MR. McGOWAN:  Right.

10         THE COURT:  So we are only dealing with

11    privilege.  All right?  So what rule applies?

12         MR. McGOWAN:  Okay.  I apologize.  When the

13    Court said privilege, so the rules that the Court would be

14    bound by I believe would be Third Circuit.

15         The rule --

16         THE COURT:  When you say -- wait.  When you say

17    rule of the Third Circuit, so when the Third Circuit

18    addresses a privilege, doesn't it look to the state law, the

19    state law privilege that's relevant?

Case 1:19-cv-00825-CFC-SRF  Document 231-1  Filed 11/30/20  Page 63 of 169 PageID #: 7012

20         MR. YOUNKIN:  So it depends on the basis for

21    jurisdiction in my view, Your Honor.

22         So in a diversity case, for example,

23    attorney/client privilege with respect to causes of action

24    grounded in state law would be governed by state law.  With

25    respect to work product, state law is not relevant because

1    it's a rule of civil procedure, and under the Erie doctrine,

2    the Federal Rules govern.

3            THE COURT:  But we're not dealing with work

4    product.  Right?  I only have a brain, I've got a limited

5    brain.  I'm not as smart as you guys.  The reason why I'm

6    bringing up work product, I lose track of things.  I'm only

7    interested in this issue and no one briefed this.

8            So let help out again with --

9            MR. YOUNKIN:  Sure.

10          THE COURT:  -- when I'm making a privilege call

11    in a patent case in the Third Circuit, does it matter

12    whether the lawyers are from one jurisdiction or another?

13    Does it matter -- you tell me.  How do I figure out, because

14    the states have different views about what's privileged or

15    not.  Correct?

16          MR. YOUNKIN:  I agree with that, Your Honor, and

17    I don't want to repeat the Rule 26 phrase if I can call it

18    that because I don't want to sidetrack this discussion.

19          The common interest doctrine is not an

20    independent privilege.  It is an anti-waiver rule.  So if

21    the question is how does the common interest doctrine relate

22    to some underlying privilege against disclosure, then the

23    answer to what law the Court looks to depends on the basis

24    of jurisdiction.  In a patent case, we don't need to worry

25    about that.  It's a federal question.

Case 1:19-cv-00825-CFC-SRF   Document 231-1   Filed 11/30/20   Page 64 of 169 PageID #: 1013

 1            The common interest doctrine is largely federal

 2     common law, which I understand is not supposed to exist, the

 3     Erie case, but it has been absorbed out of the criminal

 4     cases starting with joint defense and it has now become a

 5     case law doctrine.

 6            So the answer to the Court's question, the

 7     exception is a federal case law exception, the underlying

 8     privileges or protections against disclosure are Rule 26 in

 9     this case, because I don't believe there has been an

10     attorney/client privilege argument in this case and we can

11     set that aside.

12            You were correct, if it were attorney/client

13     privilege, then you would have to look to see if it's

14     diversity or federal question, then federal question would

15     be under the rules and would probably absorb common law of

16     the state in which the communication was made, but that's

17     not important to the Court's decision here, I don't think.

18            THE COURT:  What --

19            MR. McGOWAN:  So if I can --

Case 1:19-cv-00825-CFC-SRS   Document 223-1   Filed 11/30/20   Page 65 of 169 PageID #: 4701

20            THE COURT:  Go ahead.

21            MR. McGOWAN:  So if I can respond on the common

22     interest question, I don't think that we're asking for a

23     ruling of the breadth that counsel just described and I also

24     don't think the Hewlett-Packard case is the font of all

25     knowledge.

1        This Court, the District of Delaware,

2   established the rule applied in Hewlett-Packard in the

3   Union Carbide case with reference to protective shield

4   in cases such as co-defendants or anticipated joint

5   litigation.

6        Hewlett-Packard has a broad policy discussion of

7   how important it is for business deals to get done, but its

8   very specific holding tracked the Union Carbide case.  And

9   in the Hewlett-Packard case, the issue was sale of a

10  division where the seller had been practicing the patent for

11  the sale and the buyer was going to practice after the sale,

12  so in all likelihood they would have wound up on the same

13  caption as defendants with respect to different periods of

14  time.

15       The Sealed Air case, when it goes back to

16  Hewlett-Packard and reads it, also applied the joint

17  litigation test that goes back to this Court's 1985 ruling

18  in Union Carbide.

19       And our point is then the Sealed Air case is a

Case 1:19-cv-00825-CFC-SRF   Document 231-1   Filed 11/30/20   Page 66 of 169 PageID #: 1012

20  successor liability case.  It's a little unusual because the

21  parties were worried that the transaction itself was going

22  to be a fraudulent transfer of assets, but the Court made

23  very clear that the liability of the seller and the buyer

24  was the same liability.

25       So using the Union Carbide rule and its whole

1    stars of co-defendants for joint litigation, that's what the

2    case is recognizing a common interest against Lozier turned

3    on.

4         The reason I mentioned the stock acquisition is

5    acquiring even a hundred percent of the stock of a company

6    doesn't really matter, doesn't put the buyer on the same

7    caption.  It gives it an economic interest in the company

8    whose assets it holds, but I've not heard Celsee suggest

9    that Celsee has been merged into Bio-Rad so that it's now

10   Bio-Rad.  I haven't heard it suggested that it's no longer a

11   standalone company.  What has been suggested I believe is

12   that its stock is now owned by somebody else.  That's not

13   Hewlett-Packard, Sealed Air, and it's not the Union Carbide

14   test.

15        So I don't think that there needs to be any

16   broad ruling or very general statement about the common

17   interest doctrine.  If we just follow the actual facts and

18   holdings of the cases and bring it back to its origin, I

19   think that that doctrine doesn't apply in this circumstance.

20        THE COURT:  Okay.

Case 1:19-cv-00825-CFC-SRF   Document 237-1   Filed 11/30/20   Page 67 of 169 PageID #: 10767

21        MR. YOUNKIN:  If I may, Your Honor, I need to

22   point out --

23        THE COURT:  No.  Go ahead.  I think that the

24   challenge for you is that Union Carbide addressed a

25   situation where there was, where both parties were likely to

1  be involved in what the Court called "anticipated joint

2  litigation," and we don't have that here, do we?

3          MR. YOUNKIN:  Well, what we have here is a

4  company that is the -- that now owns, 100 percent owns a

5  party to litigation.  And I don't think that there's

6  anything in the case law that suggests that this question

7  turns on whether or not post acquisition the acquiring

8  company is going to be added as a named defendant in the

9  case.  I think that that is a much too narrow reading of

10  these cases and it's not what they argued.

11          I mean, what they argued to the Judge, to

12  Magistrate Judge Fallon, was Courts have widely rejected the

13  contention that a company and a potential purchaser who sat

14  on opposite sides of the bargaining table share a commonly

15  owned interest in contemplated or pending legal proceedings.

16  That was the argument they presented to her, and she said,

17  that's not correct.  That's not correct under Sealed Air.

18  It's contrary to AgroFresh and it's contrary to the

19  Hewlett-Packard line of cases.

Case 1:19-cv-00825-CFC-SRF   Document 231-1   Filed 11/30/20   Page 68 of 169 PageID #: 7707

20          The cases that they cite are completely

21  different from our case.  They cite a case where somebody

22  was going to buy a majority share of a company, just a

23  majority share, but that's just an investment.

24          When you buy 51 percent of a company, you might

25  have an economic interest, but that is completely different

1    from owning the company.  You know, owning 100 percent of

2    it.  It's a subsidiary at that point.  Right?

3              And --

4              THE COURT:  Yes, but I mean --

5              MR. YOUNKIN:  The way the deal was structured --

6              THE COURT:  Have you read Judge Chen's opinion

7    in Nidec?  I mean, he really braces the history of the

8    common interest privilege, and one thing he points out is

9    that the parties have to have a joint legal interest and we

10   don't have that here.  Right?  There there's no joint legal

11   interest, is there?  It's economic.

12             MR. YOUNKIN:  Well, I think it's the same

13   interest you see in Sealed Air or you see in

14   Hewlett-Packard.

15             Nidec, all that was happening in Nidec was --

16             THE COURT:  You know, you keep saying

17   Hewlett-Packard, and you say, oh, it's binding in Delaware.

18   I mean, Judge Chen didn't go with Hewlett-Packard.  Right?

19             MR. YOUNKIN:  I'm not suggesting --

Case 1:19-cv-00825-CFC-SRF   Document 237-3   Filed 11/30/20   Page 69 of 169 PageID #: 7018

20             THE COURT:  A Delaware case, which is Union

21   Carbide, but even it's not binding.  You know, why --

22             MR. YOUNKIN:  I agree with you, Your Honor.

23             THE COURT:  Yes.  Why should I give more to

24   Hewlett-Packard that I give to Nidec?

25             MR. YOUNKIN:  Well, I think for two reasons.

1         One, I think that Nidec is distinguishable

2    because there, you have a situation where an investment

3    group is trying to buy the majority stake of a company.

4    They are not going to own it.  That's number one.

5         Number two, Hewlett-Packard has been -- has been

6    followed in the Sealed Air case out of New Jersey, and also,

7    you know, we think that it is the correct, it's the correct

8    decision.

9         But, you know, as I think we've been talking

10    about, I mean, what they tried to do in a very short letter

11    brief to the Magistrate Judge was get a ruling, and the

12    transcript is crystal clear on this.  The Magistrate says,

13    the Magistrate asked them, if I find in your favor, won't

14    that mean that there's no common interest when there's

15    merger discussions?  And the answer was, yes, I think that's

16    right.

17         And the Magistrate Judge said, I don't think

18    that is the law.  And it's their burden now to come in and

19    say that she, that she, like, misapplies binding precedent.

Case 1:19-cv-00852-CFC-SRF  Document 221-1  Filed 11/30/20  Page 70 of 169 PageID #: 7079

20    And then they point to Nidec, which is a

21    factually distinguishable case out of the Northern District

22    of California.

23         THE COURT:  All right.  Anything else?

24         MR. McGOWAN:  I could comment further if the

25    Court wishes it.

1       THE COURT:  No.  You know, I had hoped this

2  argument would make it unnecessary for me to have to address

3  the legal issue, but I guess it doesn't look like I'm going

4  to be able to do that, and, frankly, it's going to take me a

5  little bit of time.

6       What I would like is, I'm going to give you

7  chance by next Wednesday to file a letter no more than

8  750 words to address what is the applicable law of privilege

9  to make the decision.  You know, Mr. McGowan, you can answer

10  orally that question, but I think I wouldn't mind seeing

11  both parties respond to that.

12       Whether I might look to state law, federal law,

13  federal common law and also just to lay out how I make that

14  decision, what's a starting point for that decision, and

15  then what is the applicable privilege law and common

16  interest law.  All right?

17       MR. YOUNKIN:  You want both parties to submit on

18  the same day, Your Honor?

19       THE COURT:  Yes.  Why don't you do Wednesday at

Case 1:19-cv-00825-CFC-SRF  Document 231-1  Filed 11/30/20  Page 17 of 169 PageID #: 1080

20  noon, so you both have to do it at the same time.  You know,

21  I think the unfortunate thing about this is, you know, you

22  guys have to keep going with the calendar here and I'm just

23  bothered because I still continue to think at the end of the

24  day, I doubt this has really much probative value and, you

25  know, I've got to spend -- we just have limited resources

1     and the cases are, I don't want to take the case off the

2     track its on as far as proceeding to trial in June, but

3     we'll just have to do what we do.

4              All right.  Anything else from the plaintiff?

5              MR. McGOWAN:  No.  Thank you, Your Honor.

6              THE COURT:  All right.  Anything from the

7     defendant?

8              MR. YOUNKIN:  No, Your Honor.  Thank you.

9              THE COURT:  Thanks, everybody.  Bye-bye.

10            (Telephone conference concluded at 11:14 a.m.)

11                     -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:19-cv-00825-CFC-SRF   Document 537-1   Filed 11/30/20   Page 72 of 169 PageID #: 7801

**$**

[blacked out] - 11:11

**'**

**'19** [5] - 18:13, 18:15, 18:19, 18:20, 32:23
**'20** [1] - 18:21

**1**

**1** [1] - 59:5
**10** [1] - 37:8
**100** [3] - 51:2, 67:4, 68:1
**10X** [26] - 1:4, 4:15, 7:20, 8:9, 8:18, 9:12, 19:13, 24:20, 26:10, 31:9, 32:8, 34:5, 34:15, 35:10, 36:19, 36:24, 38:7, 39:8, 44:8, 45:11, 45:14, 48:11, 49:5, 53:9, 54:17, 60:8
**10X's** [3] - 41:6, 52:6, 55:5
**11:14** [1] - 71:10
**14** [2] - 11:3, 11:7
**1429** [1] - 28:13
**14th** [2] - 14:21, 14:22
**16** [3] - 7:17, 37:7, 37:12
**19** [2] - 9:15, 42:15
**19-00862-CFC-SRF** [1] - 1:8
**1985** [1] - 65:17

**2**

**2** [1] - 7:13
**2018** [4] - 19:15, 19:16, 19:24, 21:12
**2019** [7] - 17:9, 18:1, 18:14, 18:23, 19:7, 19:22, 30:23
**2020** [6] - 1:11, 18:24, 19:7, 30:23, 32:24, 38:18
**204** [2] - 38:18, 59:22
**204-1** [1] - 7:12
**21** [1] - 38:18
**22** [1] - 9:15
**26** [9] - 5:18, 25:20, 26:3, 28:20, 44:2, 62:1, 62:5, 63:17, 64:8
**26(b)(3** [1] - 43:25
**26(b)(3)(A)** [1] - 51:23
**27** [1] - 12:13

**28** [3] - 36:11, 36:22
**287** [2] - 7:17, 15:16
**288** [1] - 7:25
**289** [1] - 8:15
**291** [3] - 9:10, 15:16, 32:5
**295** [1] - 15:16
**296** [1] - 15:16
**298** [3] - 11:3, 11:6, 15:17
**299** [1] - 15:17

**3**

**3** [13] - 11:3, 15:8, 15:12, 15:13, 24:19, 29:23, 30:15, 31:1, 38:3, 38:4, 38:6, 47:6, 59:21
**30(b** [2] - 32:14, 32:19
**30(b)(6** [10] - 10:22, 11:18, 25:11, 32:2, 40:8, 42:21, 49:11, 59:18, 59:20, 59:23
**30(b)(6)** [1] - 58:21
**36** [2] - 37:5, 38:12
**38** [1] - 35:22

**4**

**403** [5] - 54:4, 54:24, 56:6, 56:24, 58:12

**5**

**5** [1] - 1:11
**51** [1] - 67:24
**55** [1] - 15:18
**56** [1] - 15:18
**59** [1] - 15:18
**5th** [2] - 14:24, 47:21

**7**

**7** [1] - 36:22
**750** [1] - 70:8

**8**

**8** [5] - 18:6, 19:15, 19:16, 19:24, 21:12
**87** [1] - 7:14

**9**

**9:30** [2] - 1:12, 3:4

**A**

**a.m** [3] - 1:12, 3:4, 71:10

**abbreviated** [1] - 13:21
**able** [2] - 13:22, 70:4
**absorb** [1] - 64:15
**absorbed** [1] - 64:3
**accommodate** [1] - 28:24
**account** [1] - 20:25
**acquire** [1] - 52:25
**acquired** [1] - 51:1
**acquirer** [2] - 51:7, 51:18
**acquiring** [2] - 66:5, 67:7
**acquisition** [11] - 16:8, 18:21, 21:7, 23:16, 24:1, 34:3, 35:9, 50:24, 55:12, 66:4, 67:7
**across-the-table** [5] - 5:17, 25:5, 25:21, 26:5, 33:19
**action** [2] - 34:25, 62:23
**ACTION** [1] - 1:4
**actual** [1] - 66:17
**added** [1] - 67:8
**addition** [1] - 47:9
**additional** [1] - 36:2
**address** [9] - 13:17, 42:25, 48:24, 50:8, 52:16, 52:17, 53:7, 70:2, 70:8
**addressed** [6] - 9:3, 9:5, 31:12, 52:9, 55:20, 66:24
**addresses** [1] - 62:18
**addressing** [2] - 3:21, 17:19
**adduce** [1] - 55:8
**admissibility** [2] - 55:24, 57:16
**admitted** [1] - 46:8
**adversary** [1] - 35:6
**affirm** [6] - 35:14, 38:11, 38:15, 38:16, 38:25, 60:5
**affirmance** [1] - 45:18
**affirming** [1] - 41:8
**affords** [1] - 36:1
**afterwards** [1] - 7:24
**agree** [13] - 15:24, 22:14, 27:22, 28:18, 37:22, 40:23, 46:23, 48:24, 55:10, 56:16, 60:24, 63:19, 66:23
**agreement** [10] - 22:18, 24:22, 25:7, 28:25, 31:3, 35:9, 45:13, 49:7, 50:12,

59:17
**agreements** [1] - 53:6
**agrees** [1] - 56:19
**AgroFresh** [3] - 41:11, 41:12, 67:18
**ahead** [4] - 14:19, 30:14, 31:15, 57:19, 64:20, 66:23
**Air** [8] - 27:5, 61:9, 65:15, 65:19, 66:13, 67:17, 68:13, 69:6
**aired** [1] - 50:13
**alleged** [1] - 18:7
**allow** [1] - 41:5
**allows** [1] - 35:6
**alluded** [1] - 56:14
**almost** [2] - 13:1, 13:10
**alone** [1] - 35:12
**ambiguous** [1] - 46:9
**amount** [1] - 57:14
**analysis** [3] - 13:25, 20:19, 27:11
**AND** [1] - 1:2
**anew** [1] - 13:11
**answer** [24] - 7:22, 8:5, 8:12, 8:22, 11:12, 15:6, 16:1, 19:3, 19:14, 23:21, 25:12, 28:5, 32:11, 42:5, 46:2, 48:14, 57:21, 58:8, 58:11, 62:2, 63:23, 64:6, 69:15, 70:9
**answered** [2] - 7:23, 53:14
**answers** [1] - 58:4
**anti** [1] - 63:20
**anti-waiver** [1] - 63:20
**anticipated** [2] - 65:4, 67:1
**anticipation** [4] - 28:9, 28:20, 44:10, 52:3
**anyway** [1] - 30:13
**apart** [1] - 53:21
**apologies** [2] - 11:5, 11:7
**apologize** [6] - 10:25, 20:1, 26:21, 27:18, 29:21, 62:12
**apologized** [1] - 29:20
**APPEARANCES** [2] - 1:16, 2:1
**applicable** [2] - 70:8, 70:15
**applied** [3] - 54:3, 65:2, 65:16
**applies** [3] - 35:11, 43:1, 62:11
**apply** [4] - 41:13,

46:25, 60:13, 66:19
**applying** [1] - 17:11
**appreciate** [1] - 5:23
**approach** [2] - 21:16, 49:20
**appropriate** [1] - 28:3
**April** [5] - 18:21, 18:23, 19:7, 30:23, 32:24
**argue** [7] - 26:13, 29:11, 29:14, 41:19, 42:19, 46:7, 47:13
**argued** [4] - 29:15, 29:18, 67:10, 67:11
**arguing** [4] - 16:13, 36:16, 36:24, 50:10
**argument** [18] - 3:15, 12:12, 36:18, 41:24, 42:1, 42:4, 42:13, 42:22, 47:11, 47:13, 50:9, 53:23, 58:11, 59:8, 61:10, 64:10, 67:16, 70:2
**arguments** [3] - 4:21, 42:16, 51:15
**ascertain** [1] - 17:12
**aside** [2] - 35:25, 64:11
**aspects** [1] - 28:19
**assert** [1] - 28:15
**assertion** [1] - 15:22
**assessment** [1] - 22:15
**assessments** [3] - 36:25, 37:1, 54:14
**assets** [2] - 65:22, 66:8
**assume** [2] - 21:10, 23:5, 23:14
**assumptions** [1] - 55:22
**attempting** [1] - 45:2
**attend** [1] - 50:4
**attention** [3] - 25:17, 27:12, 59:25
**attorney** [19] - 4:11, 10:2, 44:20, 26:18, 28:1, 29:23, 33:11, 34:16, 38:7, 38:19, 39:5, 40:21, 40:23, 43:12, 43:19, 43:22, 44:12, 53:16
**attorney's** [5] - 38:13, 40:22, 40:25, 44:21, 53:14
**attorney/client** [5] - 9:23, 43:19, 62:23, 64:10, 64:12
**attorneys** [5] - 5:13, 30:18, 41:6

**August** [1] - 18:3
**avoid** [1] - 20:2
**award** [1] - 54:10
**awarded** [2] - 22:5, 22:6
**awhile** [1] - 60:2

## B

**b)(3)** [1] - 44:3
**bad** [2] - 22:2, 35:16
**Bankruptcy** [1] - 61:10
**BARBARA** [1] - 2:12
**Barbara** [1] - 3:19
**bargaining** [1] - 67:14
**based** [9] - 7:2, 16:20, 26:19, 41:18, 42:6, 45:15, 49:12, 54:12, 56:8
**basis** [5] - 10:12, 36:2, 42:20, 62:20, 63:23
**bear** [3] - 20:5, 23:7, 48:3
**became** [1] - 14:6
**become** [1] - 64:4
**becomes** [2] - 28:25, 57:10
**BEFORE** [1] - 1:14
**began** [2] - 3:3, 29:24
**begin** [1] - 3:23
**beginning** [3] - 18:15, 25:9, 37:8
**behalf** [1] - 3:19
**belabor** [1] - 60:2
**benefit** [2] - 9:23, 54:25
**between** [25] - 5:8, 5:9, 5:13, 8:19, 9:6, 9:21, 16:3, 18:23, 19:7, 20:10, 20:18, 24:22, 25:25, 27:17, 30:23, 32:23, 32:24, 36:9, 37:10, 41:3, 46:17, 46:21, 47:9, 48:11
**Bible** [1] - 17:22
**binding** [1] - 67:14
**Bio** [25] - 7:19, 8:9, 8:17, 24:2, 24:12, 25:13, 32:24, 34:3, 35:8, 36:9, 36:25, 37:11, 45:21, 45:23, 48:11, 48:16, 50:24, 51:1, 52:2, 52:25, 55:3, 56:15, 56:18, 66:9, 66:10
**Bio-Rad** [25] - 7:19,

8:9, 8:17, 24:2, 24:12, 25:13, 32:24, 34:3, 35:8, 36:9, 36:25, 37:11, 45:21, 45:23, 48:11, 48:16, 50:24, 51:1, 52:2, 52:25, 55:3, 56:15, 56:18, 66:9, 66:10
**bit** [5] - 42:4, 47:20, 48:18, 57:12, 70:5
**blank** [1] - 26:11
**blocked** [1] - 58:8
**body** [1] - 45:17
**Book** [4] - 17:16, 17:22, 20:1, 20:21
**boston** [1] - 2:13
**bothered** [1] - 70:23
**bottom** [1] - 42:18
**bought** [2] - 50:24, 50:25
**bound** [1] - 62:14
**braces** [1] - 68:7
**brain** [2] - 63:4, 63:5
**breadth** [1] - 64:23
**BRIAN** [1] - 2:8
**Brian** [1] - 3:18
**brief** [3] - 31:13, 59:6, 69:11
**briefed** [2] - 55:25, 63:7
**briefing** [3] - 4:17, 7:16, 31:22
**briefly** [1] - 50:8
**bring** [3] - 25:17, 59:24, 66:18
**bringing** [1] - 63:6
**broad** [3] - 60:18, 65:6, 66:16
**broadly** [2] - 15:15, 60:15
**broke** [1] - 56:17
**brought** [3] - 38:24, 60:17
**burden** [12] - 4:19, 13:12, 41:15, 41:20, 42:9, 47:15, 48:10, 51:19, 54:16, 55:24, 56:1, 56:9, 62:11, 62:18, 63:9, 63:11
**burdensome** [1] - 42:19
**business** [15] - 16:18, 16:19, 16:23, 17:3, 18:20, 20:5, 20:10, 20:13, 20:18, 21:5, 22:21, 22:22, 23:3, 23:8, 65:7
**businesspeople** [2] - 23:2, 53:11
**businessperson** [3] - 27:8, 53:12, 53:19

**buy** [7] - 22:23, 24:3, 50:17, 51:6, 67:22, 67:24, 69:3
**buyer** [6] - 16:5, 16:9, 16:16, 65:11, 65:23, 66:6
**buyer's** [1] - 22:22
**buying** [1] - 52:11
**BY** [3] - 1:18, 2:8, 2:12
**bye** [2] - 71:9
**bye-bye** [1] - 71:9

## C

**caches** [1] - 33:17
**calendar** [1] - 70:22
**California** [2] - 2:4, 69:22
**candid** [1] - 60:9
**candidly** [3] - 23:1, 61:1, 61:12
**candle** [1] - 57:11
**cannot** [1] - 60:11
**caption** [2] - 65:13, 66:7
**Carbide** [7] - 65:3, 65:8, 65:18, 65:25, 66:13, 66:24, 68:21
**care** [1] - 49:9
**case** [71] - 4:25, 5:13, 10:10, 14:5, 14:8, 14:9, 16:6, 16:12, 18:5, 18:17, 20:7, 20:22, 22:7, 22:12, 22:16, 24:15, 26:25, 27:5, 28:9, 28:12, 28:13, 28:23, 28:25, 29:5, 33:1, 34:21, 35:13, 37:13, 38:13, 39:5, 40:7, 40:10, 40:14, 40:19, 43:20, 44:15, 44:24, 45:1, 45:8, 45:17, 47:23, 52:6, 52:12, 55:23, 61:9, 62:4, 62:22, 63:11, 63:24, 64:3, 64:5, 64:7, 64:9, 64:10, 64:12, 65:7, 65:8, 65:9, 65:15, 65:19, 65:20, 66:2, 67:6, 67:9, 67:21, 68:20, 69:6, 69:21, 71:1
**cases** [23] - 5:10, 12:5, 16:6, 16:9, 16:11, 20:23, 21:16, 28:7, 29:6, 31:11, 31:24, 34:4, 41:2, 41:12, 61:5, 61:15, 64:4, 65:4, 66:18, 67:10,

67:19, 67:20, 71:1
**categorical** [1] - 58:16
**causes** [1] - 62:23
**Celsee** [22] - 7:19, 8:3, 8:8, 8:17, 13:22, 18:7, 31:10, 32:24, 35:8, 36:9, 37:10, 39:4, 41:5, 45:22, 45:23, 51:2, 52:25, 56:15, 56:19, 59:15, 66:8, 66:9
**CELSEE** [1] - 1:7
**Celsee's** [3] - 37:1, 38:12, 38:13
**CEO** [1] - 44:14
**certainly** [6] - 16:4, 21:17, 22:20, 23:5, 37:3, 42:4
**challenge** [1] - 66:24
**chance** [1] - 70:7
**changed** [1] - 47:20
**changing** [1] - 21:5
**characterized** [1] - 50:23
**chemical** [1] - 28:9
**Chen** [1] - 68:18
**Chen's** [1] - 68:6
**Circuit** [6] - 60:11, 61:8, 62:14, 62:17, 63:11
**circumstance** [1] - 66:19
**circumstances** [4] - 20:23, 27:23, 27:25, 47:20
**cite** [6] - 11:20, 24:23, 51:23, 67:20, 67:21
**cited** [7] - 7:16, 11:4, 11:15, 15:9, 15:15, 32:16, 34:5
**cites** [1] - 6:18
**citing** [1] - 6:12
**civil** [1] - 63:1
**Civil** [1] - 43:24
**CIVIL** [1] - 1:4
**claim** [3] - 29:16, 29:17, 51:15
**clarified** [1] - 20:2
**clarify** [1] - 20:2
**clause** [1] - 17:24
**cleaner** [1] - 12:3
**cleaning** [1] - 13:5
**cleanly** [1] - 12:22
**clear** [9] - 27:19, 34:22, 36:5, 37:14, 39:14, 42:14, 48:19, 65:23, 69:12
**clearer** [2] - 35:3, 50:2
**clearly** [6] - 36:19, 37:9, 40:18, 44:16,

44:25, 49:4
**client** [2] - 40:22, 43:21
**client's** [2] - 40:24, 43:21
**co** [3] - 28:9, 65:4, 66:1
**co-defendants** [3] - 28:9, 65:4, 66:1
**COLM** [1] - 1:14
**coming** [1] - 56:4
**comment** [4] - 56:15, 56:18, 56:22, 69:24
**common** [45] - 4:1, 4:6, 7:3, 11:24, 15:23, 24:15, 24:16, 27:16, 28:7, 28:8, 29:5, 29:7, 29:18, 31:19, 31:23, 32:2, 33:15, 33:25, 35:13, 35:25, 36:17, 43:1, 45:17, 49:12, 49:14, 49:16, 55:13, 60:7, 60:11, 60:12, 61:6, 62:3, 63:19, 63:21, 64:1, 64:2, 64:5, 64:21, 66:2, 66:16, 68:8, 69:14, 70:13, 70:15
**commonly** [1] - 67:14
**communicated** [1] - 51:9
**communicating** [1] - 26:12
**communication** [7] - 27:15, 29:3, 31:18, 46:22, 47:1, 50:21, 64:16
**communications** [24] - 12:10, 16:3, 25:5, 25:21, 26:5, 30:22, 32:1, 32:19, 32:23, 36:9, 37:9, 37:10, 46:19, 47:9, 48:11, 48:20, 49:2, 49:6, 49:8, 50:10, 50:14, 50:17, 50:19, 57:8
**company** [12] - 22:23, 44:13, 66:5, 66:7, 66:11, 67:4, 67:8, 67:13, 67:22, 67:24, 68:1, 69:3
**compel** [6] - 36:3, 36:6, 36:7, 38:17, 57:23, 58:4
**compelled** [1] - 59:15
**compelling** [2] - 53:24, 56:11
**competitive** [1] - 17:2
**completely** [2] -

Case 3:21-mc-80003-WHO   Document 1-1   Filed 01/06/21   Page 74 of 169

67:20, 67:25
**complicated** [1] - 4:3
**concedes** [1] - 46:19
**concerned** [6] - 4:2, 4:12, 38:8, 41:10, 41:12, 41:13
**concerning** [3] - 24:21, 31:3, 59:17
**concerns** [1] - 7:11
**conclude** [1] - 54:4
**concluded** [2] - 54:23, 71:10
**conclusion** [1] - 49:4
**concrete** [5] - 55:1, 55:19, 55:20, 56:25, 57:17
**conditional** [1] - 56:2
**conducted** [3] - 6:6, 7:13, 48:12
**confer** [1] - 50:3
**conference** [3] - 1:12, 3:3, 71:10
**confuse** [1] - 54:6
**confusing** [1] - 4:9
**connection** [4] - 9:10, 32:6, 42:12, 51:10
**CONNOLLY** [1] - 1:14
**consequences** [1] - 23:9
**consider** [7] - 17:11, 17:13, 21:12, 21:20, 22:6, 22:7, 47:14
**consideration** [1] - 4:17
**considerations** [6] - 6:10, 6:19, 11:10, 42:10, 49:24, 54:6
**considered** [2] - 5:10, 48:9
**considering** [1] - 21:3
**consistent** [2] - 23:22, 31:4
**constitute** [1] - 50:19
**constitutes** [1] - 27:15
**consummated** [2] - 46:7
**contain** [1] - 53:6
**contemplated** [1] - 67:15
**content** [1] - 24:24, 30:11, 50:20
**contention** [1] - 67:13
**contents** [3] - 9:4, 10:14, 46:25
**context** [3] - 20:20, 56:24, 59:8
**continue** [1] - 28:15, 70:23
**Continued** [1] - 2:1
**contract** [1] - 46:9

**contradict** [1] - 24:8
**contrary** [2] - 67:18
**conversation** [3] - 6:25, 7:10, 29:24
**conversations** [6] - 7:1, 9:21, 10:16, 15:22, 18:24, 52:1
**convey** [1] - 33:14
**conveyed** [1] - 33:11
**conveying** [2] - 26:14, 52:6
**corporate** [8] - 6:23, 11:24, 23:11, 27:9, 58:16, 59:11, 59:12, 59:16
**correct** [20] - 15:17, 15:19, 18:25, 19:5, 19:8, 24:13, 25:10, 39:19, 40:3, 42:21, 43:4, 51:21, 55:10, 60:19, 63:15, 64:12, 67:17, 69:7
**correspond** [1] - 10:13
**Cottrell** [1] - 3:10
**COTTRELL** [1] - 1:19
**counsel** [4] - 30:6, 46:24, 47:1, 51:13, 55:6, 64:23
**Counsel** [2] - 2:6, 2:14
**counter** [1] - 10:20
**counter-proposal** [1] - 10:20
**counterparties** [1] - 24:22
**couple** [1] - 48:2
**course** [4] - 38:22, 40:18, 46:13, 54:3
**COURT** [132] - 1:1, 3:6, 3:16, 3:22, 5:23, 6:13, 6:22, 7:7, 11:6, 11:8, 11:19, 12:15, 12:19, 13:18, 14:2, 14:5, 14:13, 14:16, 14:22, 14:25, 15:11, 15:14, 15:24, 17:5, 17:7, 17:10, 17:20, 17:24, 18:10, 18:14, 18:22, 19:3, 19:9, 19:16, 19:20, 21:9, 21:20, 22:1, 23:15, 23:19, 23:25, 24:7, 24:10, 24:17, 25:7, 25:11, 25:16, 25:23, 26:2, 26:8, 26:16, 27:20, 29:10, 29:19, 30:9, 31:6, 31:15, 32:4, 32:15, 32:21, 33:4, 33:7, 33:9, 33:24, 34:7,

35:16, 35:23, 36:4, 36:12, 36:14, 36:20, 36:23, 37:6, 37:22, 38:2, 39:11, 39:22, 40:3, 40:5, 40:21, 42:8, 42:18, 42:24, 43:7, 43:16, 44:1, 44:4, 44:6, 44:17, 45:20, 46:5, 47:3, 48:9, 49:10, 50:16, 51:3, 51:22, 52:17, 52:21, 53:15, 53:23, 54:20, 56:2, 56:17, 57:19, 58:14, 58:23, 59:7, 59:14, 60:14, 61:16, 61:24, 62:6, 62:10, 62:16, 63:3, 63:10, 64:18, 64:20, 66:20, 66:23, 68:4, 68:6, 68:16, 68:20, 68:23, 69:23, 70:1, 70:19, 71:6, 71:9
**Court** [36] - 1:25, 3:21, 5:8, 5:22, 6:15, 6:19, 11:4, 11:16, 20:2, 20:19, 20:22, 21:24, 28:8, 28:13, 33:17, 39:19, 39:21, 45:25, 54:22, 55:9, 56:14, 56:23, 56:25, 57:8, 60:10, 61:4, 61:10, 62:13, 63:23, 65:1, 65:22, 67:1, 69:25
**Court's** [13] - 3:14, 5:4, 12:11, 16:1, 19:2, 27:12, 55:8, 55:17, 57:10, 62:2, 64:6, 64:17, 65:17
**Courts** [2] - 57:20, 67:12
**cover** [2] - 16:24, 18:16
**covered** [4] - 15:17, 49:3, 50:12, 50:15
**covers** [1] - 44:21
**created** [1] - 10:11
**criminal** [1] - 64:3
**crystal** [1] - 69:19
**cut** [2] - 55:7, 55:16

# D

**damages** [19] - 16:5, 17:12, 18:5, 20:6, 20:8, 20:9, 20:12, 20:20, 21:16, 22:5, 22:6, 32:25, 35:1, 37:20, 47:22, 47:23, 48:4, 54:10, 56:21
**Daralyn** [2] - 3:12,

13:16
**DARALYN** [1] - 2:3
**data** [16] - 6:7, 7:20, 8:10, 8:18, 9:4, 9:20, 10:15, 24:24, 25:2, 30:4, 30:12, 30:21, 46:18, 46:24
**date** [10] - 14:17, 14:19, 14:21, 18:17, 19:10, 20:11, 21:2, 24:6, 57:13
**dated** [1] - 38:18
**Dave** [2] - 3:12, 15:4
**David** [1] - 5:3
**DAVID** [1] - 2:4
**deal** [4] - 45:22, 50:22, 50:23, 68:5
**dealing** [5] - 42:16, 62:4, 62:7, 62:10, 63:3
**deals** [2] - 12:21, 51:23, 65:7
**December** [12] - 18:13, 18:14, 18:15, 18:20, 18:23, 19:7, 19:15, 19:16, 19:24, 21:12, 30:23, 32:23
**decide** [1] - 46:13
**decided** [4] - 3:24, 41:9, 60:22, 61:3
**deciding** [1] - 22:5
**decision** [11] - 4:6, 13:2, 34:13, 35:14, 55:15, 60:4, 64:17, 69:8, 70:9, 70:14
**decisions** [1] - 57:17
**Defendant** [2] - 1:8, 2:14
**defendant** [17] - 3:17, 3:19, 6:18, 11:4, 11:15, 11:16, 16:11, 16:20, 16:21, 22:10, 23:8, 29:16, 51:5, 51:7, 67:8, 71:7
**defendant-friendly** [1] - 22:10
**defendants** [7] - 4:9, 6:8, 65:4, 65:13, 66:1
**defending** [1] - 42:1
**defense** [2] - 34:4, 64:4
**defenses** [1] - 51:14
**definitive** [1] - 56:6
**DELAWARE** [1] - 1:2
**Delaware** [9] - 1:11, 60:11, 61:2, 61:3, 61:11, 61:14, 65:1, 68:17, 68:20
**deliberations** [1] -

5:19
**delve** [1] - 10:8
**delving** [1] - 45:16
**demand** [1] - 44:14
**demonstrate** [1] - 52:4
**deponent** [1] - 4:23
**deposition** [26] - 4:24, 6:5, 6:17, 6:24, 7:13, 9:17, 9:19, 11:18, 12:24, 13:15, 13:20, 30:3, 32:2, 32:14, 41:16, 41:25, 42:6, 42:20, 48:2, 48:22, 49:18, 58:5, 58:6, 58:16, 58:20, 59:10
**depositions** [3] - 6:4, 7:5, 32:17
**described** [1] - 64:23
**designed** [1] - 30:3
**details** [1] - 33:16
**developing** [1] - 22:12
**DI** [2] - 38:18, 59:22
**difference** [3] - 20:10, 20:18, 55:13
**different** [12] - 6:14, 7:6, 10:23, 16:16, 27:21, 28:19, 48:10, 55:5, 63:14, 65:13, 67:21, 67:25
**difficult** [2] - 35:5, 48:8
**diligence** [1] - 53:3
**disagree** [3] - 32:4, 40:13, 40:23
**disagreed** [1] - 50:14
**disclose** [2] - 51:17, 53:16
**disclosed** [3] - 33:20, 33:21, 47:1
**discloses** [1] - 28:14
**disclosing** [2] - 37:25, 40:12
**disclosure** [1] - 11:12, 28:16, 29:8, 31:9, 38:10, 39:4, 40:15, 41:5, 51:11, 63:22, 64:8
**disclosures** [1] - 29:6, 39:15
**discover** [2] - 19:6, 44:9
**discovery** [10] - 4:24, 12:23, 14:7, 14:11, 14:13, 14:17, 30:22, 32:17, 48:17, 53:9
**discuss** [2] - 9:10, 32:6
**discussed** [6] - 10:10, 23:11, 31:24, 33:16, 34:15, 52:7

Case 1:15-cv-00985-CFC-SRF    Document 434-10    Filed 7/13/05    Page 75 of 169 (document

discussion [4] - 20:13, 55:1, 63:18, 65:6
discussions [11] - 5:17, 11:25, 20:5, 20:10, 20:19, 22:21, 22:22, 23:6, 45:7, 48:16, 69:15
dispute [1] - 45:25
dissatisfaction [1] - 29:25
distinction [8] - 5:7, 5:13, 6:16, 10:21, 15:21, 27:17, 46:17, 46:21
distinguish [3] - 27:4, 41:3, 45:3
distinguishable [2] - 69:1, 69:21
distinguishes [1] - 24:14
distribution [1] - 28:4
DISTRICT [2] - 1:1, 1:2
District [4] - 20:22, 61:2, 65:1, 69:21
dive [1] - 27:2
diversity [2] - 62:22, 64:14
division [2] - 16:9, 65:10
doctrine [24] - 10:13, 12:5, 28:15, 29:2, 29:4, 35:25, 36:1, 43:1, 43:12, 43:22, 49:4, 50:12, 50:15, 55:13, 60:7, 60:13, 62:3, 63:1, 63:19, 63:21, 64:1, 64:5, 66:17, 66:19
doctrine's [1] - 28:16
document [3] - 7:12, 48:23, 57:23
document's [1] - 28:15
documents [11] - 25:8, 27:3, 28:14, 30:13, 30:17, 30:20, 45:6, 45:21, 46:7, 52:5, 57:24
dollar [1] - 16:20
done [5] - 18:21, 25:19, 35:7, 46:14, 65:7
doubt [2] - 9:23, 70:24
Dow [1] - 28:9
down [5] - 12:2, 27:2, 27:5, 51:13
draw [1] - 27:11, 27:17, 46:20
drawing [2] - 15:21,

46:17
drawn [4] - 5:8, 6:24, 10:24, 15:22
driven [1] - 29:2
drop [1] - 41:17
dropped [2] - 6:2, 50:7
due [1] - 14:23, 53:3
DURE [1] - 18:11
DURIE [8] - 2:2, 2:3, 13:16, 13:19, 14:3, 14:10, 14:15, 14:18
Durie [7] - 3:13, 5:3, 6:6, 7:13, 8:8, 13:16
during [7] - 20:24, 25:13, 26:20, 38:22, 41:22, 54:2, 54:8
dwell [1] - 56:13

## E

e-mail [4] - 10:19, 30:22, 32:23, 47:2
e-mails [3] - 25:6, 48:10, 52:2
easily [1] - 53:15
economic [4] - 23:9, 66:7, 67:25, 68:11
effect [2] - 22:21, 38:17
effectively [1] - 38:17
effort [4] - 12:4, 12:8, 31:20, 31:25
Eight [1] - 11:7
element [3] - 20:7, 20:8, 20:9
employee [1] - 59:13
end [6] - 14:6, 14:10, 25:13, 31:1, 35:22, 70:23
ending [1] - 37:14
engaged [1] - 21:21
entered [1] - 8:20
entitled [1] - 48:25
entity [1] - 50:19
equation [1] - 36:1
Erie [2] - 63:1, 64:3
erroneous [1] - 1:3
enor [7] - 9:12, 32:8, 32:25, 33:5, 36:16, 37:11, 49:24
escrow [7] - 9:12, 32:8, 32:25, 33:5, 36:16, 37:11, 49:24
especially [1] - 6:1
ESQ [8] - 1:18, 1:19, 2:3, 2:3, 2:4, 2:8, 2:12, 2:12
essence [1] - 17:3
essentially [1] - 38:25
establish [3] - 27:14, 31:21, 31:25
established [1] - 65:2

estimating [1] - 20:15
EUGENE [1] - 2:3
evaluate [1] - 22:7
evaluation [2] - 38:12, 38:13
eve [1] - 17:16
evidence [12] - 19:6, 21:4, 34:23, 37:18, 37:20, 46:8, 46:10, 48:3, 54:1, 55:14, 57:16
exactly [2] - 6:15, 24:18
example [8] - 5:11, 21:5, 35:3, 37:15, 43:17, 61:17, 61:19, 62:22
examples [1] - 15:1
exception [8] - 4:6, 33:15, 33:17, 49:13, 49:14, 49:16, 64:7
excerpt [1] - 11:1
exchanged [1] - 10:19
exclusive [1] - 49:15
exclusively [1] - 23:7
Exhibit [5] - 6:16, 10:23, 18:6, 31:17, 58:16
exhibits [1] - 31:17
exist [2] - 7:4, 64:2
exists [2] - 10:12, 10:15
expect [4] - 20:18, 21:6, 21:18, 38:20
expenses [1] - 32:25
expert [3] - 14:12, 14:17, 47:23
expertise [1] - 17:25
explain [2] - 15:3, 50:16
explains [1] - 31:7
explanation [1] - 56:9
expressly [2] - 4:10, 53:5
extending [1] - 18:16
extent [7] - 17:18, 20:5, 20:13, 26:9, 27:24, 62:1, 62:2
extra [1] - 28:24
extremely [1] - 13:20

## F

fact [9] - 4:23, 12:24, 14:7, 14:11, 14:13, 22:4, 38:24, 41:3, 61:18
factors [8] - 16:22, 17:1, 17:12, 21:2,

21:13, 21:14, 21:23, 23:7
facts [5] - 4:7, 27:16, 66:17
factually [1] - 69:21
fair [10] - 22:1, 24:25, 25:14, 25:15, 33:8, 34:5, 34:6, 43:2, 52:13, 54:11
fairness [2] - 29:19, 31:4
fall [1] - 33:15
Fallon [7] - 35:2, 35:17, 44:24, 49:2, 51:20, 58:19, 67:12
Fallon's [1] - 35:14, 37:5
familiar [1] - 41:2
far [5] - 4:12, 16:12, 38:8, 39:5, 71:2
FARNAN [3] - 2:8, 2:8, 3:18
Farnan [1] - 3:19
faulting [5] - 12:22, 13:6, 30:1, 31:9, 31:10
favor [1] - 69:13
featured [1] - 50:4
February [2] - 14:24, 48:6
Federal [2] - 43:24, 63:2
federal [8] - 62:4, 63:25, 64:1, 64:7, 64:14, 70:12, 70:13
fees [1] - 32:25
few [1] - 43:18
FIACCO [1] - 2:4
Fiacco [1] - 3:20
figure [1] - 63:13
file [1] - 70:7
filed [1] - 18:18
files [10] - 10:9, 24:20, 27:3, 27:6, 27:18, 28:24, 29:23, 33:21, 38:7, 38:19
financially [1] - 37:3
finger [1] - 23:22
FINGER [1] - 1:18
fingertips [1] - 23:22
first [23] - 3:25, 4:25, 5:5, 7:7, 7:8, 7:17, 9:17, 17:16, 18:6, 19:10, 21:2, 25:22, 26:6, 30:2, 31:11, 33:13, 42:12, 42:16, 49:18, 58:24, 60:10, 61:16, 61:21
firstly [1] - 43:11
flat [1] - 21:3

focus [2] - 41:4, 52:22
focused [2] - 31:23, 60:3
focusing [4] - 12:9, 20:19, 31:17, 31:18
FOLEY [1] - 2:11
Foley [1] - 3:20
folks [2] - 19:14, 19:21
follow [4] - 57:15, 61:4, 61:25, 66:17
followed [2] - 60:23, 69:6
following [1] - 3:3
font [1] - 64:24
footnote [23] - 4:12, 4:15, 6:2, 6:18, 24:19, 26:19, 27:1, 29:23, 30:11, 30:15, 31:1, 31:5, 34:16, 38:3, 38:4, 38:6, 41:7, 41:17, 47:6, 47:18, 50:8, 59:5
FOR [1] - 1:2
force [2] - 38:9
forgive [1] - 19:17
forgot [1] - 61:18
form [2] - 23:20, 46:22
formed [1] - 51:10
former [1] - 59:12
forming [1] - 53:22
forms [1] - 44:14
forth [8] - 10:18, 10:19, 12:8, 33:13, 37:2, 39:3, 47:9, 55:11
foundation [1] - 57:5
frame [5] - 17:11, 17:14, 19:5, 19:11, 19:24
framings [1] - 7:6
Francisco [1] - 2:4
frankly [4] - 5:24, 12:24, 60:15, 70:4
fraudulent [1] - 65:22
Fred [1] - 3:10
FREDERICK [1] - 1:19
free [1] - 46:13
Friday [1] - 47:25
friendly [1] - 22:10
front [8] - 4:18, 6:1, 41:18, 41:19, 41:20, 42:8, 54:2, 56:7
full [1] - 35:12
fully [1] - 60:5
furthermore [1] - 30:19
furthers [2] - 28:16, 29:3

**G**

game [1] - 57:11
Gene [2] - 3:13, 19:12
general [4] - 20:3, 51:13, 56:8, 66:16
generally [1] - 4:25
GENOMICS [1] - 1:4
Georgia [7] - 16:22, 17:1, 17:12, 21:2, 21:13, 21:14, 21:23
Georgia-Pacific [7] - 16:22, 17:1, 17:12, 21:2, 21:13, 21:14, 21:23
given [4] - 41:25, 53:21, 58:15, 59:23
glad [1] - 61:18
glitch [1] - 25:23
goal [1] - 28:17
govern [1] - 63:2
governed [1] - 62:24
grasp [1] - 59:2
great [1] - 18:22
ground [3] - 6:21, 8:13, 60:7
grounded [1] - 62:24
grounds [8] - 8:6, 11:17, 32:11, 34:12, 35:14, 42:6, 45:18, 50:1
group [1] - 69:3
guard [1] - 28:3
guess [2] - 48:2, 70:3
guidance [1] - 5:4
guide [1] - 61:25
guided [1] - 4:20
Gunning [1] - 1:24
guys [3] - 43:17, 63:5, 70:22

**H**

hand [1] - 4:9
handful [1] - 13:21
hard [1] - 51:22
hashing [1] - 48:18
head [3] - 8:19, 46:5
heads [2] - 5:15, 33:22
hear [5] - 3:7, 4:19, 4:25, 19:3, 34:7
heard [8] - 34:19, 35:2, 37:17, 44:24, 54:16, 57:13, 66:8, 66:10
hearing [3] - 41:23, 42:3, 60:20
heart [1] - 37:13
held [1] - 51:20
help [1] - 63:8

Hewlett [21] - 5:12, 10:10, 27:4, 29:5, 31:24, 45:17, 60:22, 61:2, 61:14, 64:24, 65:2, 65:6, 65:9, 65:16, 66:13, 67:19, 68:14, 68:17, 68:18, 68:24, 69:5
Hewlett-Packard [21] - 5:12, 10:10, 27:4, 29:5, 31:24, 45:17, 60:22, 61:2, 61:14, 64:24, 65:2, 65:6, 65:9, 65:16, 66:13, 67:19, 68:14, 68:17, 68:18, 68:24, 69:5
highly [1] - 10:24, 37:4
history [1] - 68:7
HOAG [1] - 2:11
Hoag [1] - 3:20
hold [11] - 7:8, 15:11, 37:22, 38:4, 40:21, 44:1, 58:23, 59:2, 59:7, 62:6
holdback [5] - 6:11, 6:20, 9:12, 16:23, 32:8
holding [1] - 65:8
holdings [1] - 66:18
holds [1] - 66:8
Honor [39] - 3:8, 3:18, 5:2, 10:25, 13:16, 13:19, 14:18, 14:21, 14:24, 15:4, 18:11, 18:12, 19:8, 19:12, 19:25, 22:17, 25:15, 31:14, 34:6, 34:9, 36:11, 40:1, 40:13, 41:23, 43:4, 43:23, 46:3, 48:23, 54:19, 58:13, 60:2, 61:13, 62:21, 63:16, 66:21, 68:22, 70:18, 71:5, 71:8
Honor's [1] - 28:6
HONORABLE [1] - 1:16
hope [2] - 14:25, 56:3
hoped [2] - 56:9, 70:1
hoping [1] - 54:20
huge [2] - 47:10, 57:14
hundred [3] - 52:25, 55:11, 66:5
hypotheses [1] - 55:5
hypothesizing [1] - 55:2
hypothetical [3] - 20:11, 20:12, 20:25

hypotheticals [1] - 56:13

**I**

idea [1] - 56:14
ideally [1] - 21:17
identified [1] - 57:9
identity [1] - 13:24
Ill [1] - 1:19
Illinois [1] - 61:5
immediately [1] - 59:2
implications [1] - 16:24
important [8] - 12:20, 13:2, 13:11, 14:4, 16:23, 43:18, 64:17, 65:7
impression [16] - 24:21, 26:14, 29:24, 33:18, 38:7, 40:17, 40:19, 40:22, 40:24, 40:25, 43:12, 44:15, 50:21, 51:9, 51:11, 53:14
impressions [25] - 4:11, 5:6, 10:2, 26:18, 28:1, 30:18, 31:2, 33:11, 34:17, 37:19, 38:10, 38:19, 39:5, 41:6, 43:13, 43:21, 44:21, 44:22, 44:23, 45:4, 45:7, 51:8, 51:17, 57:3
improper [1] - 41:25
IN [2] - 1:1, 1:2
inapposite [1] - 34:5
inaudible [1] - 60:24
INC [2] - 1:4, 1:7
incidentally [1] - 7:15
include [4] - 9:12, 21:14, 22:8, 32:8
included [1] - 39:15
including [2] - 44:11, 53:7
incorrect [1] - 57:7
indeed [2] - 34:21, 37:20
independent [5] - 34:12, 45:18, 53:20, 60:6, 63:20
independently [1] - 10:15
indicate [2] - 20:23, 27:1
indicated [1] - 10:8
indirectly [1] - 52:13
inextricably [1] - 53:18
information [32] -

7:19, 8:2, 8:9, 8:14, 8:17, 11:13, 13:13, 13:23, 13:24, 15:1, 16:22, 20:24, 24:21, 31:2, 34:18, 35:7, 35:11, 36:2, 36:5, 36:6, 37:21, 39:8, 39:10, 39:12, 40:6, 45:14, 48:25, 49:2, 50:6, 53:21, 56:9, 57:12
informative [1] - 52:10
informed [2] - 4:5, 40:18
infringement [8] - 16:5, 17:16, 18:4, 18:6, 19:10, 21:3, 23:8, 23:9
inheriting [1] - 52:13
initial [1] - 18:18
input [1] - 20:12
inquiry [1] - 31:18
inside [2] - 5:14, 5:19
instance [4] - 25:22, 26:6, 31:11, 33:14
instruct [4] - 8:5, 8:12, 11:16, 32:10
instructed [2] - 17:13, 21:19
instructing [1] - 42:5
instruction [10] - 6:12, 6:18, 10:23, 11:24, 11:25, 29:15, 32:20, 42:2, 58:15, 58:17
instructions [1] - 41:25
intent [12] - 8:19, 8:20, 9:11, 18:13, 18:15, 18:19, 23:17, 24:5, 32:7, 52:22, 52:24
interest [49] - 4:1, 4:6, 7:3, 11:24, 15:23, 24:15, 24:16, 27:16, 28:7, 28:8, 29:6, 29:7, 29:9, 29:18, 31:19, 31:23, 32:2, 33:15, 34:1, 35:13, 41:23, 45:16, 45:17, 45:17, 49:12, 49:14, 49:16, 55:13, 60:7, 60:12, 61:7, 62:3, 63:19, 63:21, 64:1, 64:22, 66:2, 66:7, 66:17, 67:15, 67:25, 68:8, 68:9, 68:11, 68:13, 69:14, 70:16
interested [6] - 24:12, 26:16, 34:16, 45:6, 50:18, 63:7
interesting [1] - 3:25

interrupt [1] - 14:20
invalidity [1] - 30:6
invention [1] - 17:3
investment [2] - 67:23, 69:2
investor [1] - 13:25
involved [2] - 49:21, 67:1
issue [37] - 4:1, 4:3, 4:7, 4:8, 5:12, 7:11, 9:2, 12:3, 12:20, 12:25, 13:1, 13:7, 13:9, 13:17, 14:4, 14:6, 20:3, 20:4, 31:8, 32:17, 34:1, 37:25, 38:23, 39:1, 41:4, 41:23, 48:21, 48:24, 50:7, 56:21, 58:18, 63:7, 65:9, 70:3
issues [6] - 9:19, 12:23, 13:12, 16:4, 37:4, 60:17
itself [1] - 65:21

**J**

jargon [1] - 20:2
JASON [1] - 1:18
Jason [1] - 3:9
JEREMY [1] - 2:12
Jeremy [2] - 3:20, 34:10
Jersey [1] - 69:6
joined [2] - 3:10, 3:12
joint [11] - 16:11, 28:10, 29:8, 64:4, 65:4, 65:16, 66:1, 67:1, 68:9, 68:10
judge [2] - 22:8, 22:9
Judge [21] - 34:17, 35:2, 35:14, 35:17, 37:4, 41:11, 44:24, 45:10, 49:2, 50:13, 51:20, 58:19, 59:6, 60:21, 60:23, 67:11, 67:12, 68:6, 68:18, 69:11, 69:17
judge's [1] - 21:15
Judge's [2] - 34:13, 60:4
judges [2] - 23:4, 54:14
judgment [4] - 14:23, 48:5, 53:22, 56:6
June [4] - 14:21, 14:22, 57:12, 71:2
juries [1] - 54:14
jurisdiction [5] - 22:10, 22:11, 62:21,

Case 1:14-cv-00088-CAG-SRF Document 1-1 Filed 07/03/20 Page 77 of 44 PageID #: 43

63:12, 63:24
**juror** [1] - 21:19
**jurors** [3] - 21:25, 22:3, 22:4
**jury** [7] - 17:13, 21:11, 54:2, 54:6, 54:7, 54:11, 54:12

## K

**keep** [3] - 16:10, 68:16, 70:22
**kind** [14] - 4:17, 5:24, 7:24, 10:9, 16:21, 16:23, 22:12, 35:18, 36:10, 46:10, 48:9, 49:19, 55:5, 55:14
**knowledge** [1] - 64:25
**knowledgeable** [1] - 59:19

## L

**laid** [2] - 57:5, 57:6
**language** [3] - 43:24, 56:3, 59:23
**LaPointe** [8] - 6:24, 10:22, 15:9, 15:18, 15:20, 15:21, 49:18, 58:21
**largely** [1] - 64:1
**last** [2] - 6:4, 45:21
**late** [2] - 30:16, 48:17
**law** [30] - 22:4, 24:15, 25:20, 27:14, 35:13, 45:17, 57:4, 61:3, 61:8, 61:14, 61:17, 61:24, 62:18, 62:19, 62:24, 62:25, 63:23, 64:2, 64:5, 64:7, 64:15, 67:6, 69:18, 70:8, 70:12, 70:13, 70:15, 70:16
**lawsuit** [2] - 21:21, 51:5
**lawyer** [3] - 17:20, 26:10, 27:8
**lawyers** [9] - 13:24, 21:21, 22:7, 22:11, 23:3, 52:6, 53:19, 53:22, 63:12
**lawyers's** [1] - 45:3
**lay** [1] - 70:13
**Layton** [2] - 3:9, 3:10
**LAYTON** [1] - 1:18
**learn** [1] - 18:25
**lease** [1] - 28:25
**least** [8] - 9:7, 19:23, 22:15, 24:23, 27:23, 30:15, 52:13, 59:1

**leaves** [1] - 49:1
**led** [4] - 6:17, 6:20, 11:10, 49:24
**left** [2] - 39:2, 39:3
**legal** [8] - 22:13, 28:8, 54:13, 57:15, 67:15, 68:9, 68:10, 70:3
**letter** [30] - 4:10, 5:11, 8:19, 8:20, 9:11, 12:16, 12:17, 12:25, 13:25, 15:8, 15:12, 18:13, 18:15, 18:19, 23:17, 24:4, 24:5, 24:14, 32:7, 34:2, 38:18, 44:14, 50:8, 52:21, 52:24, 59:5, 59:22, 69:10, 70:7
**liability** [8] - 16:12, 20:7, 52:14, 53:20, 56:21, 65:20, 65:23, 65:24
**light** [1] - 45:24
**likelihood** [1] - 65:12
**likely** [1] - 66:25
**limit** [2] - 28:4, 30:21
**limited** [5] - 15:10, 44:20, 54:15, 63:4, 70:25
**limits** [1] - 43:10
**line** [9] - 7:17, 31:18, 36:20, 37:7, 37:8, 37:12, 42:18, 61:15, 67:19
**Line** [1] - 36:22
**lines** [1] - 9:15
**literally** [1] - 13:21
**litigation** [48] - 5:12, 5:14, 7:20, 8:9, 8:18, 9:12, 10:11, 16:4, 20:16, 22:19, 22:24, 23:10, 25:9, 27:3, 27:6, 27:18, 28:10, 28:21, 28:23, 29:2, 32:9, 33:2, 34:4, 36:10, 37:2, 37:14, 37:19, 40:17, 43:14, 44:10, 44:22, 46:14, 49:3, 49:8, 50:21, 51:8, 51:10, 52:3, 52:14, 52:23, 53:4, 53:7, 54:9, 65:5, 65:17, 66:1, 67:2, 67:5
**live** [1] - 14:4
**LLP** [2] - 2:8, 2:11
**lodged** [1] - 49:11
**log** [1] - 48:11
**logging** [1] - 25:8
**look** [17] - 9:2, 10:6, 17:15, 18:6, 18:9,

21:2, 23:23, 26:8, 35:21, 37:7, 38:2, 38:4, 57:1, 62:18, 64:13, 70:3, 70:12
**lookback** [1] - 17:17
**looked** [2] - 6:3, 55:4
**looking** [9] - 7:12, 19:11, 19:22, 21:5, 25:20, 26:3, 53:4, 57:12, 59:14
**looks** [5] - 9:6, 9:22, 10:17, 42:25, 63:23
**lose** [1] - 63:6
**lost** [1] - 56:18
**Lozier** [1] - 66:2

## M

**Magistrate** [47] - 4:10, 4:18, 6:1, 10:1, 10:8, 11:20, 11:21, 12:1, 12:7, 12:10, 12:12, 12:13, 13:14, 15:8, 18:20, 24:5, 24:18, 26:6, 29:12, 29:14, 31:12, 31:22, 32:16, 34:13, 35:2, 35:14, 35:16, 38:9, 38:11, 38:24, 41:8, 41:11, 41:19, 41:21, 45:10, 50:13, 58:19, 59:6, 60:4, 60:18, 60:21, 60:23, 67:12, 69:11, 69:12, 69:13, 69:17
**Magistrate's** [1] - 57:2
**mail** [4] - 10:19, 30:22, 32:23, 47:2
**mails** [3] - 25:6, 48:10, 52:2
**Maine** [1] - 29:6
**majority** [3] - 67:22, 67:23, 69:3
**manner** [1] - 60:16
**marshal** [1] - 19:15
**Massachusetts** [1] - 2:13
**material** [8] - 5:7, 8:6, 10:9, 12:6, 40:2, 47:14, 48:12, 48:13
**matter** [4] - 57:4, 63:11, 63:13, 66:6
**McGowan** [91] - 3:12, 5:2, 5:3, 6:9, 6:14, 6:23, 10:7, 11:7, 11:14, 11:21, 12:18, 14:20, 14:24, 15:4, 15:13, 15:20, 16:1, 17:6, 17:9, 17:15, 17:21, 18:3, 18:9, 18:12, 18:17,

19:1, 19:8, 19:19, 19:20, 19:21, 19:25, 21:17, 21:23, 22:17, 23:17, 23:21, 24:4, 24:8, 24:13, 25:4, 25:10, 25:15, 25:18, 26:1, 26:4, 26:15, 26:21, 28:5, 29:13, 30:8, 30:25, 31:13, 31:16, 32:13, 32:18, 33:2, 33:5, 33:8, 33:12, 34:6, 34:22, 35:21, 39:11, 39:13, 39:17, 39:19, 41:14, 46:17, 50:4, 53:12, 53:25, 54:19, 54:22, 56:12, 56:19, 58:9, 58:13, 58:15, 61:20, 61:22, 61:23, 62:1, 62:9, 62:12, 64:19, 64:21, 69:24, 70:9, 71:5
**mcGowan** [2] - 2:4, 3:14
**McGowan's** [1] - 39:25
**mean** [63] - 4:1, 4:2, 5:23, 5:24, 10:1, 10:6, 12:18, 12:24, 14:20, 24:11, 24:25, 26:8, 26:9, 26:11, 29:22, 30:10, 32:5, 34:1, 35:12, 35:16, 39:10, 39:11, 39:24, 40:6, 40:10, 40:15, 41:2, 42:14, 45:2, 45:5, 46:3, 47:10, 47:17, 48:7, 48:18, 48:21, 49:15, 50:5, 50:23, 51:23, 52:3, 52:15, 52:19, 57:20, 57:22, 58:3, 58:19, 59:11, 59:17, 59:20, 60:1, 60:15, 60:21, 61:9, 61:19, 67:11, 68:4, 68:7, 68:18, 69:10, 69:14
**meaning** [2] - 36:25, 45:25
**means** [2] - 17:17, 17:23
**measures** [1] - 28:3
**meet** [1] - 50:3
**meet-and-confer** [1] - 50:3
**mental** [37] - 5:6, 24:20, 26:14, 26:18, 29:24, 30:17, 31:2, 33:11, 33:18, 34:17, 37:19, 38:7, 38:10,

38:19, 40:17, 40:19, 40:22, 40:24, 40:25, 41:6, 43:12, 43:13, 43:21, 44:15, 44:21, 44:22, 44:23, 45:4, 45:6, 50:21, 51:8, 51:9, 51:11, 51:17, 53:14, 57:2
**mention** [1] - 53:3
**mentioned** [3] - 23:16, 41:14, 66:4
**merged** [1] - 66:9
**merger** [15] - 5:8, 5:15, 20:13, 23:11, 24:1, 49:7, 50:11, 52:16, 53:6, 55:11, 59:17, 60:12, 60:25, 61:6, 69:15
**merits** [3] - 16:18, 33:24, 34:25
**middle** [2] - 12:23, 14:16
**might** [12] - 5:21, 19:4, 22:18, 24:10, 37:15, 40:22, 54:8, 55:2, 55:23, 56:4, 67:24, 70:12
**▇▇▇▇▇▇** - 11:11
**mind** [2] - 38:23, 70:10
**minimal** [1] - 56:4
**minute** [1] - 45:21
**misapplies** [1] - 69:19
**mislead** [1] - 54:7
**missed** [1] - 11:1
**misspoke** [1] - 18:12
**money** [1] - 53:1
**month** [2] - 18:2, 18:9
**morning** [4] - 3:8, 3:18, 30:19, 57:9
**most** [4] - 13:1, 24:15, 31:24, 59:19
**motion** [5] - 23:6, 38:17, 57:22, 58:4, 59:3
**motions** [1] - 14:23
**MR** [128] - 3:8, 3:18, 5:2, 6:9, 6:14, 6:23, 10:7, 11:7, 11:14, 11:21, 12:18, 14:20, 14:24, 15:4, 15:13, 15:20, 16:1, 17:6, 17:9, 17:15, 17:21, 18:3, 18:9, 18:12, 18:17, 19:1, 19:8, 19:12, 19:19, 19:25, 21:17, 21:23, 22:17, 23:17, 23:21, 24:4, 24:8, 24:13, 25:4, 25:10, 25:15, 25:18,

26:1, 26:4, 26:15, 26:21, 28:5, 29:13, 30:8, 30:25, 31:13, 31:16, 32:13, 32:18, 33:2, 33:5, 33:8, 33:12, 34:6, 34:9, 35:21, 35:24, 36:8, 36:13, 36:15, 36:22, 36:24, 37:7, 38:1, 39:9, 39:19, 39:23, 40:4, 40:13, 41:22, 42:11, 42:22, 43:3, 43:9, 43:23, 44:3, 44:5, 44:7, 44:19, 46:2, 46:12, 47:17, 48:14, 49:14, 50:20, 51:4, 52:15, 52:19, 52:24, 53:17, 54:19, 54:22, 56:12, 56:19, 57:18, 57:20, 58:13, 58:15, 58:18, 59:5, 59:9, 60:1, 60:20, 61:23, 62:1, 62:9, 62:12, 62:20, 63:9, 63:16, 64:19, 64:21, 66:21, 67:3, 68:5, 68:12, 68:19, 68:22, 68:25, 69:24, 70:17, 71:5, 71:8

**MS** [7] - 13:16, 13:19, 14:3, 14:10, 14:15, 14:18, 18:11

**muster** [1] - 58:12

**mutually** [1] - 49:15

## N

**name** [1] - 19:18

**named** [1] - 67:8

**narrow** [5] - 12:2, 13:7, 52:8, 67:9

**narrowed** [2] - 32:21, 32:22

**NDA** [5] - 18:18, 27:23, 28:1, 51:5, 51:18

**necessarily** [1] - 13:6

**need** [11] - 16:24, 18:9, 22:24, 23:23, 25:1, 29:20, 33:20, 35:6, 43:11, 47:4, 54:17, 57:16, 63:24, 66:21

**needs** [2] - 58:11, 66:15

**negotiating** [4] - 9:11, 31:21, 32:7, 34:2

**negotiation** [27] - 5:9, 5:20, 10:16, 18:13, 18:18, 20:11, 20:12,

20:25, 21:7, 24:2, 24:22, 25:13, 26:20, 31:3, 32:19, 34:20, 39:3, 41:10, 46:6, 46:20, 49:22, 50:11, 51:4, 54:9, 59:17, 61:6

**negotiations** [19] - 5:15, 9:6, 11:23, 17:8, 17:9, 17:18, 18:1, 18:16, 19:5, 19:7, 21:10, 29:17, 31:5, 36:16, 38:23, 39:6, 45:24, 46:1, 54:3

**negotiators** [2] - 45:4, 53:17

**negotiators's** [1] - 53:18

**never** [2] - 45:24, 54:13

**New** [1] - 69:6

**new** [2] - 47:13, 58:20

**next** [5] - 8:15, 9:16, 14:22, 48:2, 70:7

**Nidec** [6] - 68:7, 68:15, 68:24, 69:1, 69:4

**NO** [1] - 1:8

**non** [5] - 5:7, 8:19, 9:11, 34:1, 57:2

**non-binding** [2] - 8:19, 9:11, 34:1

**non-mental** [1] - 57:2

**non-work** [1] - 5:7

**nonbinding** [2] - 24:13, 32:7

**nondisclosure** [2] - 35:9, 45:13

**noon** [1] - 70:20

**normally** [1] - 30:5

**Northern** [1] - 69:21

**note** [4] - 10:7, 15:6, 42:3, 50:22

**noted** [1] - 41:22

**nothing** [1] - 24:8

**November** [2] - 1:8, 1:9

**Novikov** [3] - 3:13, 19:12, 36:15, 36:18, 50:5, 50:10

**NOVIKOV** [2] - 3:13, 19:12

**number** [13] - 6:11, 6:20, 11:2, 11:11, 12:24, 22:25, 37:4, 43:14, 43:15, 52:1, 54:5, 69:4, 69:5

## O

**o'clock** [1] - 1:12

**objected** [3] - 8:4, 48:17, 49:25

**objection** [21] - 4:16, 6:20, 7:2, 8:10, 8:16, 8:23, 8:24, 9:5, 9:14, 9:21, 9:24, 11:11, 31:19, 32:2, 32:12, 46:15, 47:19, 49:11, 49:12

**objections** [2] - 9:18, 15:2

**obtain** [1] - 30:17

**occur** [1] - 17:8

**occurred** [5] - 18:7, 18:8, 18:25, 19:7, 19:23

**occurring** [1] - 18:1

**odds** [1] - 56:4

**OF** [1] - 1:2

**off-the-table** [1] - 46:19

**office** [1] - 28:24

**Official** [1] - 1:25

**one** [30] - 4:7, 4:9, 7:8, 9:3, 9:13, 9:19, 9:21, 11:9, 11:10, 15:16, 16:9, 20:18, 21:6, 21:18, 31:13, 34:13, 35:8, 38:5, 40:16, 43:14, 46:16, 52:1, 53:12, 60:4, 63:7, 63:12, 68:8, 69:1, 69:4

**ones** [1] - 51:16

**open** [4] - 13:9, 43:10, 49:1, 58:5

**opened** [2] - 36:18, 50:10

**opening** [1] - 47:22

**opine** [1] - 60:15

**opinion** [6] - 5:11, 41:3, 46:23, 47:1, 47:23, 68:6

**opinions** [1] - 30:5

**opposed** [1] - 35:25, 48:22

**opposite** [1] - 67:14

**oral** [3] - 30:22, 32:23, 47:1

**orally** [1] - 70:10

**order** [5] - 5:4, 28:24, 57:15, 58:11, 59:9

**ordinarily** [1] - 44:8

**origin** [1] - 66:18

**ought** [1] - 24:19

**ourselves** [3] - 16:24, 22:25, 47:21

**outset** [4] - 4:22, 32:5, 34:11, 61:19

**outside** [2] - 8:9, 8:18

**outweighed** [1] - 54:5

**overly** [1] - 42:19

**overstated** [1] - 24:10

**own** [3] - 50:24, 55:3, 69:4

**owned** [2] - 66:12, 67:15

**owning** [2] - 68:1

**owns** [2] - 67:4

## P

**Pacific** [7] - 16:22, 17:1, 17:12, 21:2, 21:13, 21:14, 21:23

**Packard** [21] - 5:12, 10:10, 27:4, 29:5, 31:24, 45:17, 60:22, 61:2, 61:14, 64:24, 65:2, 65:6, 65:9, 65:16, 66:13, 67:19, 68:14, 68:17, 68:18, 68:24, 69:5

**page** [21] - 7:13, 7:25, 8:15, 9:10, 11:2, 11:3, 12:13, 15:8, 15:11, 15:13, 15:18, 28:13, 35:20, 35:22, 36:11, 36:22, 37:5, 38:12, 42:15, 59:21

**pages** [1] - 15:23

**paid** [1] - 53:8

**papers** [7] - 4:15, 5:25, 6:4, 6:19, 9:25, 41:18, 58:25

**paragraph** [1] - 37:8

**parol** [2] - 46:8, 46:10

**parse** [1] - 54:11

**part** [7] - 20:7, 20:8, 20:12, 21:6, 29:25, 37:1, 55:1

**particular** [1] - 48:16

**parties** [25] - 4:20, 5:15, 8:20, 9:6, 9:9, 20:13, 27:25, 30:23, 32:6, 37:13, 45:13, 46:7, 46:12, 46:15, 47:9, 61:4, 61:6, 65:21, 66:25, 68:9, 70:11, 70:17

**parties'** [1] - 34:20

**party** [21] - 28:13, 40:16, 43:13, 44:8, 44:11, 44:13, 45:8, 50:17, 67:5

**party's** [4] - 37:18,

44:12, 44:21, 44:23

**passes** [1] - 58:12

**past** [1] - 39:24

**patent** [10] - 16:21, 17:20, 18:5, 20:3, 21:16, 21:21, 63:11, 63:24, 65:10

**patents** [1] - 30:6

**payments** [1] - 53:1

**pending** [2] - 59:3, 67:15

**people** [2] - 21:5, 23:11

**people's** [1] - 33:22

**percent** [8] - 50:25, 51:2, 52:25, 55:12, 66:5, 67:4, 67:24, 68:1

**perfect** [2] - 61:17, 61:19

**perhaps** [1] - 9:7

**period** [2] - 20:24, 60:16

**periods** [1] - 65:13

**permission** [1] - 3:14

**permit** [1] - 4:5

**permitted** [2] - 8:22, 13:22

**person** [3] - 40:6, 56:15, 56:19

**perspective** [1] - 14:3

**persuasive** [1] - 31:10

**Philippines** [3] - 26:25, 28:12, 28:13

**philosophical** [1] - 21:16

**philosophy** [1] - 22:9

**phrase** [1] - 63:17

**phrased** [1] - 8:12

**pick** [1] - 22:24

**piece** [1] - 55:19

**plain** [1] - 43:24

**Plaintiff** [2] - 1:5, 2:6

**plaintiff** [8] - 3:11, 4:22, 5:1, 22:10, 36:3, 36:6, 36:7, 71:4

**plaintiffs** [4] - 3:7, 5:6, 36:3, 47:21

**plausible** [1] - 55:15

**play** [1] - 58:2

**plays** [1] - 22:15

**point** [30] - 8:4, 11:19, 15:18, 16:18, 20:17, 22:3, 25:18, 26:13, 27:19, 29:2, 29:18, 30:21, 31:1, 31:5, 31:20, 32:20, 34:11, 36:18, 44:20, 46:16, 47:18, 57:11, 58:6,

Case 1:18-cv-00865-LLC-SRF Document 221-1 Filed 07/06/18 Page 79 of 169 PageID #:

58:9, 60:2, 65:19, 66:22, 68:2, 69:20, 70:14
**points** [2] - 7:10, 68:8
**policy** [1] - 65:6
**pondering** [1] - 5:14
**portion** [2] - 11:2, 15:10
**position** [7] - 11:22, 17:2, 34:1, 39:25, 47:6, 49:19, 60:21
**possible** [1] - 46:3
**possibly** [2] - 10:13, 45:5, 53:13
**post** [1] - 67:7
**postdate** [1] - 25:9
**potential** [6] - 35:1, 51:7, 51:18, 53:20, 54:10, 67:13
**potentially** [2] - 39:24, 54:7
**practical** [2] - 13:8, 48:7
**practice** [1] - 65:11
**practices** [2] - 16:20, 21:6
**practicing** [2] - 16:21, 65:10
**precedent** [3] - 4:4, 5:18, 69:19
**precise** [1] - 24:11
**preclude** [1] - 22:4
**prefer** [1] - 60:15
**prejudice** [1] - 58:2
**premise** [1] - 57:2
**prepare** [1] - 28:20
**prepared** [1] - 44:9
**present** [3] - 12:3, 13:10, 23:6
**presented** [7] - 12:4, 12:7, 24:18, 24:19, 29:22, 59:1, 67:16
**presenting** [1] - 3:14
**pressing** [1] - 13:1
**presumably** [1] - 16:17
**presume** [1] - 22:19
**pretty** [5] - 22:2, 39:14, 43:18, 48:16, 48:19, 60:9
**prevent** [1] - 42:20
**prevented** [1] - 50:6
**privilege** [31] - 6:21, 7:3, 7:4, 8:24, 9:14, 9:23, 12:21, 13:3, 25:25, 28:18, 32:3, 37:16, 41:24, 42:2, 43:19, 49:17, 60:24, 61:24, 62:11, 62:13, 62:18, 62:19, 62:23,

63:10, 63:20, 63:22, 64:10, 64:13, 68:8, 70:8, 70:15
**privileged** [4] - 8:13, 9:7, 11:12, 63:14
**privileges** [1] - 64:8
**probative** [10] - 13:12, 15:3, 16:2, 19:21, 41:15, 47:10, 54:4, 54:15, 56:10, 70:24
**problem** [1] - 55:4
**procedure** [1] - 63:1
**Procedure** [1] - 43:25
**proceed** [1] - 5:21
**proceeding** [2] - 6:16, 71:2
**proceedings** [1] - 67:15
**process** [3] - 14:11, 20:15, 56:8
**proclivities** [3] - 21:15, 22:9, 23:3
**produce** [3] - 47:15, 48:19, 59:10
**product** [11] - 4:13, 4:14, 5:7, 5:9, 5:10, 5:18, 6:21, 7:2, 8:6, 8:13, 8:25, 9:5, 9:7, 9:13, 9:14, 9:20, 9:24, 10:1, 10:4, 10:13, 11:13, 11:17, 11:23, 12:5, 13:3, 16:10, 25:21, 25:25, 26:5, 26:7, 26:9, 26:12, 26:13, 26:20, 26:23, 26:24, 27:10, 27:13, 27:21, 27:22, 28:4, 28:14, 28:18, 28:19, 28:25, 29:18, 30:5, 31:22, 32:1, 32:12, 33:13, 33:14, 34:14, 35:3, 35:4, 35:5, 35:11, 36:1, 37:15, 37:21, 38:14, 38:22, 39:7, 39:16, 40:2, 40:12, 40:16, 40:21, 41:2, 42:5, 42:10, 42:11, 43:19, 43:22, 44:8, 44:16, 44:20, 44:25, 45:11, 45:12, 45:16, 46:13, 46:15, 47:5, 48:25, 49:2, 49:3, 49:10, 49:16, 49:25, 50:4, 50:6, 50:12, 50:15, 50:19, 55:9, 55:15, 55:17, 56:22, 57:3, 57:5, 57:15, 60:6, 62:5, 62:7, 62:8, 62:25, 63:4, 63:6

**proffer** [1] - 22:20
**proffered** [1] - 54:25
**prohibited** [2] - 21:1, 43:22
**prohibition** [1] - 21:3
**prominent** [1] - 22:15
**prong** [1] - 60:4
**proper** [1] - 54:11
**properly** [1] - 38:24
**proportionality** [5] - 4:18, 13:12, 41:20, 42:10, 42:19
**proposal** [1] - 10:20
**proposed** [1] - 59:9
**prospective** [1] - 20:6
**protect** [2] - 22:25, 43:12
**protected** [3] - 28:14, 37:15, 40:15
**protection** [6] - 8:6, 28:15, 35:4, 35:11, 36:2, 44:20
**protections** [1] - 64:8
**protective** [1] - 65:3
**protects** [1] - 43:13
**prove** [1] - 51:19
**provide** [5] - 8:3, 8:8, 8:17, 22:18, 59:10
**provided** [2] - 7:19, 13:24
**provides** [1] - 35:13
**provision** [4] - 36:17, 37:11, 49:7, 49:25
**provisions** [2] - 53:6, 53:9
**pull** [1] - 44:1
**purchased** [1] - 51:1
**purchaser** [1] - 67:13
**purchasing** [2] - 24:12, 50:18
**purpose** [4] - 28:19, 29:2, 29:4, 31:8
**pursuant** [1] - 28:1
**pursue** [2] - 30:10, 56:5
**pursuing** [5] - 4:14, 25:1, 25:4, 30:12, 30:20
**push** [1] - 21:9
**put** [6] - 6:6, 9:19, 10:15, 27:16, 46:24, 66:6
**putting** [1] - 35:25

## Q

**qualification** [1] - 28:6
**qualified** [2] - 22:18, 28:6
**quality** [2] - 21:20,

22:8
**questioning** [2] - 6:24, 41:14
**questions** [14] - 6:6, 6:15, 7:15, 9:3, 9:5, 13:21, 21:24, 24:23, 25:12, 30:2, 49:20, 49:23, 58:4, 58:10
**quickly** [2] - 19:14, 53:4
**quintessential** [1] - 38:13
**quite** [2] - 20:3, 23:1
**quote** [2] - 7:3, 34:24

## R

**Rad** [25] - 7:19, 8:9, 8:17, 24:2, 24:12, 25:13, 32:24, 34:3, 35:8, 36:9, 36:25, 37:11, 45:21, 45:23, 48:11, 48:16, 50:24, 51:1, 52:2, 52:25, 55:3, 56:15, 56:18, 66:9, 66:10
**raise** [3] - 4:16, 31:7, 61:18
**raised** [3] - 15:7, 31:6, 31:11
**random** [1] - 49:7
**range** [1] - 18:17
**rather** [2] - 24:21, 38:12
**Rawnsley** [1] - 3:9
**RAWNSLEY** [2] - 1:18, 3:8
**reaction** [1] - 37:5
**read** [6] - 6:4, 11:9, 15:24, 32:5, 41:11, 68:6
**reading** [3] - 11:1, 67:9
**reads** [1] - 65:16
**reality** [1] - 30:2
**really** [33] - 4:2, 4:5, 9:19, 10:5, 12:20, 22:14, 24:25, 30:3, 34:12, 35:10, 41:13, 41:23, 42:15, 42:19, 48:21, 49:16, 50:1, 52:9, 54:17, 55:25, 56:10, 57:1, 57:16, 59:1, 60:3, 61:18, 66:6, 68:7, 70:24
**reappear** [1] - 58:21
**reason** [7] - 12:19, 29:1, 38:15, 46:20, 57:13, 63:5, 66:4

**reasons** [1] - 68:25
**rebuttal** [1] - 47:24
**recitation** [1] - 27:10
**recited** [1] - 35:20
**recites** [2] - 24:6, 27:9
**recognized** [2] - 55:18, 62:3
**recognizing** [1] - 66:2
**recollection** [4] - 6:5, 11:15, 12:25, 18:3
**record** [2] - 15:6, 28:11
**redepose** [1] - 59:3
**reference** [5] - 10:9, 11:14, 20:1, 20:21, 65:3
**referenced** [2] - 13:25, 15:10
**references** [1] - 5:8
**referencing** [1] - 32:13
**referring** [4] - 11:3, 36:7, 36:8, 42:15
**refers** [1] - 20:22
**reflect** [6] - 22:19, 30:17, 34:20, 34:24, 37:18, 45:7
**regard** [1] - 47:16
**regarding** [1] - 16:3
**rejected** [3] - 61:9, 67:12
**relate** [1] - 63:21
**related** [2] - 32:17, 33:5
**relates** [1] - 29:8
**relating** [2] - 32:24, 32:25
**relevance** [12] - 4:16, 4:18, 16:2, 41:18, 41:20, 42:3, 42:6, 42:10, 42:20, 45:9, 47:14, 57:21
**relevant** [9] - 16:4, 16:22, 20:24, 34:23, 37:4, 57:25, 58:1, 62:19, 62:25
**relied** [2] - 18:20, 24:5
**rely** [1] - 41:13
**remain** [1] - 14:4
**remains** [1] - 41:9
**rent** [1] - 28:24
**repeat** [2] - 25:24, 63:17
**repeated** [1] - 7:25
**repetition** [1] - 7:24
**report** [2] - 47:22, 47:24
**Reporter** [1] - 1:25
**reports** [2] - 14:12, 48:5
**representations** [1] -

Case 1:14-cv-00905-CFC-SRF    Document 11-33    Filed 11/30/20    Page 80 of 169 PageID #: 1263

37:1
**representative** [3] - 59:11, 59:12, 59:16
**representatives** [1] - 44:11
**reproduce** [1] - 59:15
**Republic** [1] - 28:12
**request** [2] - 33:19, 57:23
**requests** [4] - 30:22, 48:15, 48:23
**requirement** [1] - 28:7
**residuum** [1] - 55:18
**resolve** [2] - 26:2, 55:23
**resources** [1] - 70:25
**respect** [14] - 6:11, 11:25, 16:2, 22:17, 42:22, 54:9, 55:17, 56:22, 57:1, 57:8, 57:11, 62:23, 62:25, 65:13
**respecting** [1] - 55:8
**respond** [6] - 15:5, 54:19, 57:18, 58:13, 64:21, 70:11
**response** [3] - 31:13, 47:18, 56:21
**responses** [2] - 7:16, 48:22
**responsive** [1] - 12:9
**rest** [2] - 26:25, 41:10
**reveal** [2] - 39:7, 45:7
**revealing** [1] - 53:14
**revelations** [1] - 40:11
**reverse** [1] - 5:4
**review** [1] - 48:10
**Richards** [2] - 3:9, 3:10
**RICHARDS** [1] - 1:18
**risk** [3] - 35:10, 37:3, 45:14
**role** [2] - 22:15, 58:3
**roll** [1] - 3:6
**room** [16] - 6:7, 7:20, 8:10, 8:18, 9:4, 9:20, 10:15, 24:24, 25:2, 36:4, 40:12, 46:3, 46:18, 46:24
**rule** [15] - 28:11, 30:14, 44:8, 46:11, 47:4, 55:1, 60:10, 61:14, 62:11, 62:15, 62:17, 63:1, 63:20, 65:2, 65:25
**Rule** [10] - 5:18, 25:20, 26:3, 28:20, 43:24, 54:4, 62:1, 62:5, 63:17, 64:8
**ruled** [3] - 13:14, 55:9,

62:7
**Rules** [1] - 63:2
**rules** [7] - 43:5, 43:6, 45:15, 51:18, 57:15, 62:13, 64:15
**ruling** [1] - 38:16, 54:24, 55:17, 57:2, 57:7, 57:22, 60:19, 64:23, 65:17, 66:16, 69:11
**rush** [1] - 13:2

## S

**sale** [3] - 65:9, 65:11
**san** [1] - 2:4
**sat** [1] - 67:13
**schedule** [2] - 14:8, 14:9
**scope** [5] - 4:6, 5:22, 10:24, 30:21, 52:8
**Sealed** [8] - 27:5, 61:9, 65:15, 65:19, 66:13, 67:17, 68:13, 69:6
**search** [1] - 48:12
**second** [9] - 4:8, 4:23, 7:8, 9:21, 11:1, 13:20, 17:5, 38:5
**secrecy** [1] - 28:3
**Section** [1] - 44:5
**see** [17] - 5:21, 9:1, 12:20, 13:8, 14:6, 22:24, 27:20, 29:19, 30:4, 32:4, 41:17, 45:24, 54:1, 57:16, 64:13, 68:13
**seeing** [1] - 70:10
**seek** [1] - 38:7
**seeking** [11] - 5:6, 24:20, 26:18, 29:23, 31:2, 38:19, 39:10, 39:12, 39:17, 47:7, 57:25
**seeks** [3] - 36:3, 36:6, 36:7
**seem** [3] - 4:4, 4:19, 38:4
**selective** [1] - 26:25
**seller** [3] - 16:16, 65:10, 65:23
**selling** [1] - 16:10
**sense** [2] - 16:5, 16:19
**sent** [1] - 52:2
**separate** [2] - 53:20, 60:6
**September** [2] - 18:19, 38:18
**serve** [1] - 47:24
**served** [1] - 47:22

**set** [1] - 64:11
**setting** [1] - 27:9
**share** [4] - 27:25, 67:14, 67:22, 67:23
**shared** [1] - 4:21
**shares** [1] - 50:25
**sharing** [1] - 56:8
**shield** [1] - 65:3
**short** [1] - 69:10
**show** [3] - 45:11, 57:5, 57:25
**shown** [1] - 49:5
**side** [5] - 22:19, 22:23, 34:8, 50:22, 51:12
**sides** [1] - 67:14
**sidetrack** [1] - 63:18
**signed** [1] - 8:20
**significant** [1] - 17:4
**simply** [2] - 25:19, 60:13
**sits** [2] - 10:16, 51:13
**sitting** [3] - 33:21, 33:22, 53:11
**situation** [3] - 46:4, 66:25, 69:2
**smart** [1] - 63:5
**solely** [2] - 49:12, 59:3
**sometimes** [3] - 12:4, 17:17, 21:4
**somewhat** [3] - 10:23, 12:2, 12:3
**sorry** [11] - 17:21, 19:3, 19:9, 19:20, 21:9, 31:9, 36:20, 37:8, 38:4, 54:20
**sort** [1] - 37:20
**sought** [1] - 13:13
**sounds** [5] - 30:12, 30:19, 31:11, 32:12, 45:10
**space** [1] - 28:24
**specific** [8] - 6:9, 11:8, 20:3, 23:7, 32:18, 49:23, 56:7, 65:8
**specifically** [2] - 6:25, 7:1
**spend** [1] - 70:25
**spent** [1] - 22:12
**squarely** [3] - 34:14, 53:7, 61:10
**stake** [1] - 69:3
**stand** [4] - 4:24, 13:14, 14:6, 14:8
**standalone** [3] - 7:4, 10:12, 66:11
**standing** [1] - 35:12
**standpoint** [1] - 48:7
**Stark** [19] - 15:9, 49:21, 58:20, 59:4, 59:10, 59:11, 59:16, 59:18,

59:21
**stark** [4] - 7:19, 13:20, 13:23, 15:1
**Starks'** [1] - 6:17
**stars** [1] - 66:1
**start** [3] - 25:25, 27:24, 36:21
**starting** [2] - 64:4, 70:14
**state** [7] - 62:18, 62:19, 62:24, 62:25, 64:16, 70:12
**statement** [9] - 26:22, 31:21, 31:22, 33:19, 37:23, 38:6, 42:14, 55:3, 66:16
**statements** [7] - 5:20, 27:12, 33:10, 35:21, 39:6, 54:2, 54:8
**STATES** [1] - 1:1
**states** [2] - 23:18, 63:14
**status** [1] - 4:22
**stay** [1] - 27:6
**stepwise** [1] - 5:21
**still** [5] - 40:5, 43:10, 48:24, 49:1, 70:23
**stock** [16] - 16:8, 22:23, 23:15, 23:25, 24:3, 24:6, 24:12, 27:16, 34:3, 50:18, 50:23, 52:11, 55:12, 66:4, 66:5, 66:12
**stop** [2] - 17:5, 29:11, 35:12
**straightforwardly** [1] - 31:19
**strategic** [1] - 22:13
**strategies** [1] - 54:13
**strengths** [1] - 37:19
**stretched** [1] - 29:1
**strict** [1] - 51:18
**strictly** [1] - 27:10
**strikes** [1] - 54:1
**stringent** [1] - 43:5
**structured** [2] - 23:20, 68:5
**stuck** [1] - 27:18
**stuff** [2] - 40:11, 41:15
**subject** [5] - 17:16, 23:6, 36:17, 39:20, 52:15
**subjectively** [1] - 29:1
**submission** [6] - 10:7, 11:4, 11:15, 15:8, 25:5, 39:20
**submit** [2] - 49:4, 70:17
**submitting** [1] - 14:11
**subsequent** [2] - 6:23,

21:4
**subsidiary** [1] - 68:2
**substantially** [1] - 54:5
**successor** [2] - 16:12, 65:20
**sued** [1] - 45:23
**sufficient** [1] - 60:5
**suggest** [3] - 54:24, 55:21, 66:8
**suggested** [2] - 66:10, 66:11
**suggesting** [1] - 68:19
**suggests** [1] - 67:6
**summary** [5] - 14:23, 33:8, 34:5, 34:6, 48:5
**supplemental** [1] - 48:4
**supposed** [5] - 17:11, 18:5, 19:22, 19:23, 64:2
**Supreme** [1] - 20:22
**surprise** [2] - 23:1, 23:10
**surrounding** [1] - 51:19
**synonymous** [1] - 10:3
**system** [1] - 24:14

## T

**table** [21] - 5:16, 5:17, 25:3, 25:5, 25:21, 26:5, 26:22, 27:7, 27:8, 27:18, 33:19, 34:2, 39:20, 39:25, 40:7, 46:19, 51:25, 53:11, 55:11, 57:3, 67:14
**tactics** [1] - 23:10
**talks** [2] - 53:2, 60:12
**tangible** [2] - 44:9, 51:24
**Tangri** [2] - 3:13, 5:3
**TANGRI** [1] - 2:2
**team** [1] - 17:3
**tease** [1] - 45:2
**technical** [2] - 19:4, 25:23
**tee** [3] - 12:4, 12:16, 30:16
**teed** [16] - 4:2, 4:4, 4:8, 6:10, 7:11, 12:21, 13:4, 15:25, 30:1, 35:17, 38:3, 38:10, 41:24, 48:21, 54:18, 61:20
**Telephone** [1] - 1:12

Case 1:18-cv-00895-SLG-SRW Document 221-1 Filed 11/20/19 Page 18 of 36 PageID: 7554

telephone [2] - 3:3, 71:10
ten [1] - 50:25
terms [4] - 4:24, 14:8, 16:20, 52:15
test [3] - 27:21, 65:17, 66:14
testify [1] - 59:16
testimony [8] - 23:12, 23:13, 54:25, 55:2, 55:8, 55:19, 57:3, 59:10
THE [133] - 1:1, 1:2, 3:6, 3:16, 3:22, 5:23, 6:13, 6:22, 7:7, 11:6, 11:8, 11:19, 12:15, 12:19, 13:18, 14:2, 14:5, 14:13, 14:16, 14:22, 14:25, 15:11, 15:14, 15:24, 17:5, 17:7, 17:10, 17:20, 17:22, 18:4, 18:10, 18:14, 18:22, 19:3, 19:9, 19:16, 19:20, 21:9, 21:20, 22:1, 23:15, 23:19, 23:25, 24:7, 24:10, 24:17, 25:7, 25:11, 25:16, 25:23, 26:2, 26:8, 26:16, 27:20, 29:10, 29:19, 30:9, 31:6, 31:15, 32:4, 32:15, 32:21, 33:4, 33:7, 33:9, 33:24, 34:7, 35:16, 35:23, 36:4, 36:12, 36:14, 36:20, 36:23, 37:6, 37:22, 38:2, 39:11, 39:22, 40:3, 40:5, 40:21, 42:8, 42:18, 42:24, 43:7, 43:16, 44:1, 44:4, 44:6, 44:17, 45:20, 46:5, 47:3, 48:9, 49:10, 50:16, 51:3, 51:22, 52:17, 52:21, 53:15, 53:23, 54:20, 56:2, 56:17, 57:19, 58:14, 58:23, 59:7, 59:14, 60:14, 61:16, 61:24, 62:6, 62:10, 62:16, 63:3, 63:10, 64:18, 64:20, 66:20, 66:23, 68:4, 68:6, 68:16, 68:20, 68:23, 69:23, 70:1, 70:19, 71:6, 71:9
themselves [6] - 11:23, 12:11, 27:12, 29:17, 32:1, 33:21
theory [3] - 34:22,

37:18, 45:9
therefore [1] - 13:11
they've [3] - 41:6, 59:22, 60:9
thinking [3] - 5:14, 17:22, 19:22
thinks [2] - 45:8, 47:23
Third [6] - 60:11, 61:8, 62:14, 62:17, 63:11
third [1] - 12:25
throughout [1] - 23:23
Thursday [1] - 1:11
tied [1] - 53:18
today [5] - 3:12, 24:19, 34:15, 34:20, 37:17
tomorrow [1] - 47:25
took [1] - 47:6
topic [3] - 10:22, 13:23, 59:12
towards [2] - 14:10, 48:5
track [2] - 63:6, 71:2
tracked [1] - 65:8
tracks [1] - 10:21
transaction [4] - 8:21, 18:21, 23:19, 65:21
transcript [11] - 7:12, 12:12, 15:18, 15:20, 15:22, 35:19, 35:22, 36:11, 42:8, 58:7, 69:12
transcripts [1] - 15:9
transfer [1] - 65:22
transferred [1] - 10:12
translate [1] - 16:19
traunch [1] - 57:8
treated [1] - 26:6
treating [2] - 10:3, 27:12
trial [9] - 14:17, 14:18, 14:21, 21:15, 28:20, 28:21, 44:10, 57:12, 71:2
tried [3] - 12:1, 20:1, 69:10
true [3] - 21:1, 39:14, 48:23, 48:24
try [7] - 5:3, 13:7, 19:14, 20:2, 28:3, 45:3, 54:11
trying [12] - 10:8, 12:2, 27:1, 27:2, 27:3, 27:5, 27:6, 27:17, 44:19, 50:17, 60:8, 69:3
turn [2] - 7:25, 36:11
turned [1] - 66:2
turns [1] - 67:7
two [17] - 6:3, 6:14,

7:5, 9:2, 9:6, 9:19, 9:22, 16:3, 21:24, 34:12, 42:16, 43:15, 46:21, 53:11, 68:25, 69:5
types [1] - 5:9
typically [2] - 17:16, 21:2

## U

U.S.D.C.J [1] - 1:14
ultimate [3] - 8:21, 23:19, 40:24
unclear [1] - 26:21
uncover [1] - 48:3
under [13] - 4:7, 5:18, 21:1, 28:2, 35:9, 45:13, 46:10, 51:5, 51:18, 63:1, 64:15, 67:17
underlying [9] - 5:12, 12:5, 16:18, 27:2, 28:16, 34:25, 49:17, 63:22, 64:7
understood [3] - 36:19, 49:19, 50:7
unfair [1] - 35:18
unfortunate [1] - 70:21
unfortunately [1] - 43:17
Union [7] - 65:3, 65:8, 65:18, 65:25, 66:13, 66:24, 68:20
UNITED [1] - 1:1
unnecessary [1] - 70:2
unquote [1] - 7:3
unrelated [1] - 23:7
unusual [1] - 65:20
up [37] - 4:2, 4:5, 4:8, 6:10, 7:11, 12:4, 12:16, 12:22, 13:4, 13:5, 13:9, 14:7, 14:10, 15:11, 15:25, 16:10, 21:25, 23:23, 30:13, 30:16, 35:7, 36:10, 38:3, 38:10, 38:24, 41:24, 44:1, 44:2, 48:22, 50:10, 54:18, 58:5, 59:7, 61:20, 63:6, 65:12
Upjohn [1] - 41:2

## V

Valerie [1] - 1:24
validity [1] - 30:6
value [15] - 13:12,

15:3, 16:2, 17:3, 20:16, 22:16, 34:21, 40:17, 40:19, 44:15, 47:11, 54:4, 54:9, 54:15, 70:24
valuing [1] - 39:5
verbally [1] - 10:19
view [13] - 6:16, 7:4, 16:18, 20:17, 24:14, 25:20, 33:13, 37:3, 52:14, 53:18, 53:20, 60:14, 62:21
views [2] - 34:21, 63:14
virtual [7] - 6:7, 7:20, 8:10, 8:18, 9:4, 9:20, 24:24
vs [1] - 1:6

## W

wait [9] - 12:15, 25:23, 39:13, 43:16, 56:17, 62:6, 62:16
waive [1] - 35:5
waived [10] - 27:22, 30:10, 30:15, 35:5, 35:12, 38:25, 41:7, 49:17, 58:18, 59:22
waiver [21] - 26:24, 26:25, 27:10, 27:14, 27:15, 28:2, 33:15, 37:25, 38:22, 43:4, 43:5, 43:6, 45:12, 45:15, 46:13, 46:24, 51:12, 51:19, 51:20, 60:5, 63:20
waiving [1] - 26:13
wants [6] - 39:14, 39:15, 40:1, 51:6, 53:9, 59:24
weaknesses [1] - 37:20
Wednesday [2] - 70:7, 70:19
week [1] - 6:4
weeks [1] - 48:2
weighed [1] - 26:20
Westinghouse [2] - 28:2, 31:8
whole [5] - 24:15, 37:17, 45:9, 58:6, 65:25
widely [1] - 67:12
willing [1] - 56:5
Wilmington [1] - 1:11
wind [1] - 16:10
Wisdom [4] - 17:17, 17:23, 20:1, 20:21
wishes [1] - 69:25

withdrawn [1] - 7:1
witness [23] - 6:23, 7:23, 7:24, 7:25, 8:5, 8:12, 8:22, 9:1, 9:3, 10:22, 11:24, 13:15, 25:12, 32:10, 40:9, 42:5, 42:21, 49:11, 49:21, 59:18, 59:19, 59:20, 59:23
won [1] - 43:8
word [1] - 33:25
words [3] - 38:3, 40:6, 70:8
wore [1] - 41:15
works [1] - 44:14
worried [4] - 34:24, 53:13, 65:21
worry [1] - 63:24
worth [7] - 37:2, 37:14, 40:7, 40:10, 40:14, 41:15, 57:11
wound [1] - 65:12
write [1] - 24:20
wrongly [2] - 60:22, 61:2
wrote [1] - 53:16

## Y

year [1] - 14:22
YOUNKIN [54] - 2:12, 34:9, 35:24, 36:8, 36:13, 36:15, 36:22, 36:24, 37:7, 38:1, 39:9, 39:23, 40:4, 40:13, 41:22, 42:11, 42:22, 43:3, 43:9, 43:23, 44:3, 44:5, 44:7, 44:19, 46:2, 46:12, 47:17, 48:14, 49:14, 50:20, 51:4, 52:15, 52:19, 52:24, 53:17, 57:18, 57:20, 58:18, 59:5, 59:9, 60:1, 60:20, 62:20, 63:9, 63:16, 66:21, 67:3, 68:5, 68:12, 68:19, 68:22, 68:25, 70:17, 71:8
Younkin [7] - 3:20, 7:21, 8:4, 8:11, 32:10, 34:10

Case 1:13-cv-00885-CFC-SRF Document 221-1 Filed 30/30/06, 83:07:85 of 169 PageID #:

# EXHIBIT B

## FILED UNDER SEAL

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -


 4
      10X GENOMICS, INC.,            :    CIVIL ACTION
 5                                   :
                    Plaintiff,       :
 6                                   :
           vs.                       :
 7                                   :
      CELSEE, INC.,                  :
 8                                   :
                    Defendant.       :    NO. 19-00862-CFC-SRF
 9

10                            - - -

11                            Wilmington, Delaware
                              Thursday, November 5, 2020
12                            9:30 o'clock, a.m.
                              ***Telephone conference
13                            - - -

14
      BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
15
                              - - -
16
      APPEARANCES:
17

18              RICHARDS, LAYTON & FINGER
                BY:  JASON J. RAWNSLEY, ESQ. and
19                   FREDERICK L. COTTRELL III, ESQ.

20                        -and-

21

22

23

24
                                   Valerie J. Gunning
25                                 Official Court Reporter
```

1    APPEARANCES (Continued):

2

               DURIE TANGRI
3              BY:  DARALYN J. DURIE, ESQ.
                    EUGENE NOVIKOV, ESQ. and
4                   DAVID F. McGOWAN, ESQ.
                    (San Francisco, California)
5

6                   Counsel for Plaintiff

7

8              FARNAN LLP
               BY:  BRIAN E. FARNAN, ESQ.
9

10                      -and-

11

               FOLEY HOAG LLP
12             BY:  BARBARA A. FIACCO, ESQ. and
                    JEREMY A. YOUNKIN, ESQ.
13                  (Boston, Massachusetts)

14

15                  Counsel for Defendant

16                      -  -  -

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3                    (The following telephone conference began at

 4        9:30 a.m.)

 5

 6                    THE COURT:  All right.  Can I have a roll call?

 7        Let's hear from plaintiffs, please.

 8                    MR. RAWNSLEY:  Good morning, Your Honor.  This

 9        is Jason Rawnsley of Richards Layton & Finger, and I'm also

10        joined by Fred Cottrell from Richards Layton for the

11        plaintiff.

12                    Today we're joined by Dave McGowan, Daralyn

13        Durie and Gene Novikov of Durie Tangri, and with the

14        Court's permission, Mr. McGowan will be presenting the

15        argument.

16                    THE COURT:  Okay.  Thank you very much.  How

17        about from defendant?

18                    MR. FARNAN:  Good morning, Your Honor.  Brian

19        Farnan on behalf of the defendant, and with me is Barbara

20        Fiacco and Jeremy Younkin from Foley Hoag, and Mr. Younkin

21        will be addressing the Court.

22                    THE COURT:  All right.  Very good.

23                    Before we begin, let me just give you some --

24        why I decided to have a call on this.

25                    First of all, I think it's a very interesting
```

1      issue, and by issue, I mean the common interest issue.  But

2      I'm very concerned this is really not teed up.  I mean, I

3      think that that issue is complicated.  I don't think there's

4      any binding precedent, and it just doesn't seem to be teed

5      up in a way that would permit me to make a really informed

6      decision about the scope of the common interest exception

7      under these facts.  That is one issue.

8              The second issue is the way it was teed up, I

9      find it very confusing, because on one hand, the defendants

10     have expressly stated in their letter to the Magistrate that

11     they didn't want any attorney impressions.  Basically, in

12     the footnote, as far as I'm concerned, they're basically

13     saying we don't want work product and yet they seem to be

14     pursuing work product.

15             And there's a footnote from 10X in its papers

16     where it does raise a relevance objection, but I don't know

17     that there was any kind of briefing or consideration in

18     front of the Magistrate about proportionality and relevance

19     and burden, so I want to hear about that.

20             So I think both parties can be guided in their

21     arguments by what I've just shared.  And then I would ask at

22     the outset from plaintiff to just tell me the status of

23     things.  Was the deponent -- was there, in fact, a second

24     deposition?  Where do things stand in terms of discovery in

25     the case generally?  And so let's hear first then from the

1     plaintiff.

2                 MR. McGOWAN:   Thank you, Your Honor.   This is

3     David McGowan from Durie Tangri.   I will try and take the

4     Court's guidance in I think reverse order.

5                 Your first question was, is -- are the

6     plaintiffs seeking mental impressions as opposed to some

7     non-work product material.   The distinction that's being

8     drawn that the Court references is between the merger

9     negotiation and between the work product and the types of

10    things that in these cases are considered work product,

11    which would be, for example, an opinion letter from the

12    underlying litigation was at issue in the Hewlett-Packard

13    case, but the distinction is between what were the attorneys

14    in the litigation thinking about and pondering inside their

15    heads and what the parties to the merger negotiations said

16    to each other across the table.

17                The across-the-table discussions we do not think

18    are work product under Rule 26 or any precedent and they're

19    also not deliberations that are inside the head.   They're

20    statements in a negotiation.

21                If I might proceed stepwise and see if that

22    clarifies the scope for the Court.

23                THE COURT:   Well, so I appreciate -- I mean,

24    frankly, the way you just kind of did it, I mean, that's the

25    way I do it, I think of it.   I'm not sure your papers did

1   that in front of the Magistrate especially because of the

2   footnote you dropped.

3           And the way I looked at it is you had two

4   depositions.  I read the papers last week, so I may get

5   something wrong here.  But my recollection is the deposition

6   conducted by Ms. Durie, the questions went to what was put

7   into the data room, into the virtual data room.  Is that

8   right?

9           MR. McGOWAN:  The question, the specific

10  question that was teed up is what were the considerations

11  that went to the holdback number with respect to the

12  instruction that they're citing.

13          THE COURT:  Okay.

14          MR. McGOWAN:  So there are two different

15  questions, the Court is exactly right.  And we are

16  proceeding in view of that distinction, I think, in Exhibit

17  D, Mr. Starks' deposition, the question that led to the

18  instruction the defendant cites in its footnote, in its

19  papers to this Court, that what were the considerations that

20  led to the holdback number and there was an objection on

21  work product and privilege ground.

22          THE COURT:  Right.

23          MR. McGOWAN:  In a subsequent corporate witness

24  deposition of Mr. LaPointe, the questioning was drawn

25  specifically to conversation, and when that question was

 1    withdrawn specifically to conversations, there was not a

 2    work product objection.  There was an objection based on,

 3    quote unquote, "common interest privilege," which doesn't

 4    exist in our view as a standalone privilege.

 5             There are two depositions.  There are two

 6    different framings of the question.

 7             THE COURT:  Yes.  Let's go to the first, the

 8    first one, because -- hold on a second.  Give me a second.

 9    All right.

10             And this conversation points to why I've got

11    concerns about the way the issue was teed up.  So I'm

12    looking right now at document 204-1, which is the transcript

13    of the deposition that Ms. Durie conducted, and at page 2

14    87, there's a question.

15             And these -- incidentally, these questions and

16    these responses were cited by you in your briefing.  And so

17    the first question is found at line 16 of 287.

18             Question:  So can you tell me, do you know,

19    Mr. Stark, what information Celsee provided Bio-Rad about

20    the 10X litigation in the virtual data room?

21             And Mr. Younkin said, that's a yes or no.  You

22    can answer that question.

23             And so the witness answered.  Actually, the

24    witness asked for some kind of repetition.  And then if you

25    turn to page 288, the question is repeated.  The witness

1    said, I believe I do, yes.

2            Then the question is:  What information did

3    Celsee provide?

4            Mr. Younkin at that point objected:  I'm going

5    to instruct the witness not to answer the question on the

6    grounds that it calls for work product protection material.

7    All right.

8            Then Ms. Durie asked:  Did Celsee provide

9    information Bio-Rad about the 10X litigation outside of the

10    virtual data room, and then again, there's an objection.

11            Now, this time Mr. Younkin says:  I'm going to

12    instruct the witness not to answer that question as phrased

13    on the ground that it calls for privileged and work product

14    information.

15            So then if you go to the next page, page 289,

16    the question that again where we have an objection is, the

17    question is:  Did Celsee provide any information Bio-Rad

18    about the 10X litigation outside the virtual data room

19    between the time the letter of intent, the non-binding

20    letter of intent was signed and the time the parties entered

21    into the ultimate transaction?

22            The witness was permitted to answer that

23    question initially, and then though there was an objection,

24    and the objection was for both privilege and for work

25    product.

1          So in there, this witness I do see, the way I

2     look at it is, there are two things now at issue with this

3     witness.  One is questions that are being addressed about

4     the contents of the virtual data room, there's a work

5     product objection.  Questions that are addressed by the

6     negotiations between the two parties, it looks at the very

7     least it's privileged and perhaps it's also work product.

8          Then later on there's a question I think you're

9     talking about, which says, did the parties -- this is on

10    page 291 -- did the parties discuss in connection with

11    negotiating this non-binding letter of intent whether the

12    escrow holdback would include some for the 10X litigation?

13         And then on that one, there's a work product

14    objection, not a privilege question, a work product

15    question, and that's found at lines 19 to 22.

16         Then the next -- well, that's it, I think.

17    Right?  So that's the first deposition.

18         So as I understand the objections for that

19    deposition, there are really two issues.  One is, what's put

20    in the virtual data room and that's a work product

21    objection.  And then the second one is conversations between

22    the two parties, and there's a, it looks like I will give

23    you the benefit of the doubt, an attorney/client privilege

24    objection and a work product objection.

25         All right.  Now, in your papers before the

1    Magistrate you say, we don't want any work product.  I mean,

2    you say you don't want any attorney impressions.  That, to

3    me, I'm treating synonymous with you don't want work

4    product.

5            So what is it, you know, that you really want, I

6    mean, when I look at that?

7            MR. McGOWAN:  So the note in the submission to

8    the Magistrate indicated that we're not trying to delve into

9    their files, which was a reference to the kind of material

10   that is discussed in the Hewlett-Packard case, which is

11   something that's created to the litigation, may have been

12   transferred, but which exists on a standalone basis as a

13   work product doctrine.  That would correspond possibly,

14   because we don't know the contents, to something that would

15   have been put in the data room, but it exists independently

16   of the conversations and the negotiation.  It sits there and

17   maybe somebody looks at it.  Maybe they don't.

18           It's not something that is said back and forth

19   verbally or exchanged back and forth in an e-mail as a

20   counter-proposal or something like that.

21           But I do believe that distinction tracks.  The

22   30(b)(6) witness on this topic, Mr. LaPointe, which is in

23   Exhibit B, and the instruction there is somewhat different

24   as the scope was more highly drawn.

25           And I apologize, Your Honor.  When you were just

1    reading the second excerpt that you were reading, I missed

2    the page number you were on.  The portion that I was

3    referring to was on page 298, 3 to 14, which is what

4    defendant cited in its submission to this Court.  My

5    apologies.

6                    THE COURT:  Right.  298.

7                    MR. McGOWAN:  Eight to 14.  My apologies.

8                    THE COURT:  And that is a specific question.

9    It's another one.  I didn't read that one, but that's

10   another one.  What were the considerations that led you to

11   the █████████ number, and there's an objection.  Don't

12   answer because it calls for the disclosure of privileged and

13   work product information.

14                    MR. McGOWAN:  That's the, that's the reference,

15   it's my recollection, that defendant cited in its submission

16   to this Court saying that the defendant did instruct on work

17   product grounds.

18                    We then have the 30(b)(6) deposition --

19                    THE COURT:  But this is my point.  You say you

20   cite that to me.  What did you cite to the Magistrate?

21                    MR. McGOWAN:  To the Magistrate, we did not

22   understand that they were taking the position that the

23   negotiations themselves are work product because the

24   instruction to the corporate witness was the common interest

25   instruction with respect to discussions.

1              What we tried to do with the Magistrate is

2      narrow this down somewhat.  We're trying to narrow it down

3      somewhat here so that we present a cleaner issue in an

4      effort to actually tee it up than is sometimes presented in

5      the cases where you have underlying work product doctrine

6      material.

7              So what we presented to the Magistrate was an

8      effort to get at the back and forth, so I don't know if

9      that's responsive to your question.  What we're focusing on

10     both here and before the Magistrate is the communications

11     themselves.  So if the Court's question is, where is the

12     argument to the Magistrate, it would be in the transcript

13     before the Magistrate at page 27.

14              And --

15              THE COURT:  Well, wait.  Well, let's go to your

16     letter, because you've got to tee this up in your letter.

17     So where is it in the letter?

18              MR. McGOWAN:  I mean --

19              THE COURT:  And the reason I'm getting at all of

20     this because, see, I think this is a really important issue.

21     Right?  It deals with privilege.  I don't think it was teed

22     up really cleanly, and I'm not faulting anybody because

23     there were a lot of discovery issues and it's in the middle

24     of a deposition.  And I mean, frankly, the fact that it was

25     the third issue is my recollection in the letter, it was

1    almost like it didn't seem this was the most pressing issue

2    and yet I don't want to rush into a very important decision

3    about privilege and work product when it really hasn't been

4    teed up.

5              And then, and I think you are cleaning up things

6    now, and, again, I'm not necessarily faulting for that, to

7    try to make it like it's, you know, a narrow issue.  But,

8    see, then that's why I want you to get back to the practical

9    issue, which I asked you to open up with.  Where are things,

10   because, you know, it's almost like we should just present

11   this anew, and therefore it's important for me to think

12   about proportionality issues, burden, probative value of the

13   information being sought, and so that's why I want to know,

14   where do things stand?  Did you, after the Magistrate ruled,

15   was there another deposition of any witness?

16             MS. DURIE:  Your Honor, this is Daralyn Durie.

17   May I address that issue?

18             THE COURT:  Sure.

19             MS. DURIE:  Your Your Honor, so we did take a

20   second deposition of Mr. Stark.  It was extremely

21   abbreviated and there were literally a handful of questions

22   that Celsee permitted, but we were not able to get any

23   further information from Mr. Stark on this topic.  The only

24   information that he provided was the identity of the lawyers

25   whose analysis had been referenced in the investor letter

 1    and that was that.

 2               THE COURT:  Okay.

 3               MS. DURIE:  So from our perspective, this does

 4    remain very much a live and important issue.

 5               THE COURT:  All right.  And where does the case

 6    stand?  See, this all became an issue right at the very end

 7    of fact discovery, or you tell me.  When did it come up in

 8    terms of the case schedule and where do things stand with

 9    the case schedule?

10               MS. DURIE:  It did come up towards the end of

11    fact discovery and we are now in the process of submitting

12    expert reports.

13               THE COURT:  All right.  So fact discovery is

14    over?

15               MS. DURIE:  It is.

16               THE COURT:  All right.  You're in the middle of

17    expert discovery.  Do we have a trial date?

18               MS. DURIE:  We do, Your Honor.  The trial

19    date -- go ahead.

20               MR. McGOWAN:  I didn't mean to interrupt.  We do

21    have a trial date, Your Honor, yes.  It's June 14th.

22               THE COURT:  June 14th of next year.  Okay.  When

23    are summary judgment motions due?

24               MR. McGOWAN:  February 5th, Your Honor.

25               THE COURT:  All right.  What do you hope to get

1    from Mr. Stark?  Give me some examples of the information

2    that you think you could get if there were no objections and

3    explain to me its probative value.

4              MR. McGOWAN:   Okay.  Your Honor, this is Dave

5    McGowan again.  I can respond to that.

6              If I may just note for the record, the answer to

7    the question that you asked, where was it raised in the

8    submission to the Magistrate, is at page 3 of the letter

9    where both the Stark and LaPointe transcripts are cited in

10   limited portion that we referenced.

11             THE COURT:  Okay.  Hold up, hold up.  It's page

12   3 of the letter?

13             MR. McGOWAN:  Page 3.

14             THE COURT:  Right.  And you say, you just

15   broadly say -- basically, you went through what I cited,

16   which is the 287 to 291, 295 to 296, and then the one we

17   just covered, 298 to 299.  Correct?  And then you also

18   point to the LaPointe transcript at 55, 56 and page 59.

19   Correct?

20             MR. McGOWAN:  Yes.  The LaPointe transcript is

21   the distinction I was drawing earlier.  The LaPointe

22   transcript is drawn to conversations and the assertion at

23   those pages is common interest.

24             THE COURT:  And I read that.  I agree that that

25   was teed up.  Okay.

1          MR. McGOWAN:  In answer to the Court's question

2   with respect to relevance and probative value, the

3   communications between the two parties regarding the

4   litigation are relevant to the issues certainly of

5   infringement, damages, in the sense that what the buyer in

6   these cases is asking is, what's going on in this case?  How

7   do I think about it?

8          Now, this is just a stock acquisition.  This is

9   not one of the cases where the buyer is getting a division,

10  they're going to keep selling the product and wind up being

11  a joint, joint defendant, which is what all the other cases

12  are like, and it is a not a successor liability case as far

13  as the defendants are arguing.

14         But what they are asking is, tell us how right

15  we should be about this, how right do you think we should

16  be, and the buyer and the seller are going to have different

17  takes on that presumably, but they are going to talk about

18  the underlying merits from a business point of view in the

19  sense that they are going to translate the business

20  practices of the defendant in the dollar terms based on

21  whether the defendant is practicing the patent, the kind of

22  information that is relevant to the Georgia-Pacific factors,

23  how important is this business, what kind of a holdback do

24  we need to cover ourselves, what implications does this

25  have.

1          When you go through the Georgia-Pacific factors,

2    a lot of them are about the competitive position of the

3    business team, the value of the invention.  In essence, how

4    significant is this.

5          THE COURT:  Can I stop you for a second?

6          MR. McGOWAN:  Yes.

7          THE COURT:  So, all right.  So you are telling

8    me that these negotiations occur when?

9          MR. McGOWAN:  These negotiations are in 2019.

10          THE COURT:  All right.  And what is the time

11    frame that I'm supposed to consider in applying the

12    Georgia-Pacific factors to ascertain damages or what a

13    jury would be instructed to consider?  What is the time

14    frame?

15          MR. McGOWAN:  So you're going to look at it on

16    the eve of first infringement typically subject to the Book

17    of Wisdom, which means that sometimes you can do a lookback.

18          To the extent that the negotiations are

19    addressing --

20          THE COURT:  I'm not a patent lawyer.

21          MR. McGOWAN:  Sorry.

22          THE COURT:  I'm thinking Bible when you say Book

23    of Wisdom, so I don't know what that means and I don't know

24    what the clause you said afterwards.  But, you know, I don't

25    have your expertise, so I have to go back to, so the

1    negotiations that we're talking about are occurring in 2019.

2    Do you have a month?

3                MR. McGOWAN:  August is my recollection.

4                THE COURT:  Okay.  And then infringement for

5    damages in the patent, this patent case, I'm supposed to

6    look to Exhibit 8 of first infringement.  When is that

7    alleged by you to have occurred, or actually by Celsee to

8    have occurred?

9                MR. McGOWAN:  I need to look at it by month.

10               THE COURT:  That's all right.

11               MS. DURE:  Your Honor --

12               MR. McGOWAN:  I misspoke, Your Honor.

13   Negotiation of the letter of intent is December of '19.

14               THE COURT:  December of 2019.  Okay.  But that's

15   the letter of intent.  So beginning December of '19 and

16   extending into what would cover the negotiations?

17               MR. McGOWAN:  So the date range is the case is

18   filed in May.  The negotiation of the initial NDA is

19   September of '19.  The letter of intent on which the

20   Magistrate relied is December of '19.  The business

21   transaction is done, the acquisition is in April of '20.

22               THE COURT:  Okay.  Great.  All right.  So it's

23   going to be some time between December of 2019 and April of

24   2020 when the conversations about which you would like to

25   learn occurred.  Is that correct?

```
 1                    MR. McGOWAN:  And if I can go back to the
 2       Court's --
 3                    THE COURT:  Sorry.  We didn't hear an answer.  I
 4       think it might have been a technical thing.
 5                    Am I correct, the time frame of the negotiations
 6       about which you'd like to discover evidence, those
 7       negotiations occurred between December 2019 and April 2020?
 8                    MR. McGOWAN:  That is correct, Your Honor.
 9                    THE COURT:  Okay.  Sorry.  All right.  Now, so
10       then let's go back to date of first infringement.  What are
11       we looking at?  What's the time frame for that?
12                    MR. NOVIKOV:  Your Honor, this is Gene Novikov
13       for 10X.
14                    I can answer that quickly as folks try to
15       marshal back.  December 8, 2018.
16                    THE COURT:  December 8, 2018.  Okay.  All right.
17                    So then, and forgive me, sir.  It's Mr. --
18       what's your name again, sir?
19                    MR. McGOWAN:  McGowan.
20                    THE COURT:  McGowan.  Sorry.
21                    So, Mr. McGowan, why is it probative what folks
22       are thinking about in 2019, when I'm supposed to be looking
23       at what occurred or at least I'm supposed to be using the
24       time frame as of December 8, 2018?
25                    MR. McGOWAN:  Sure.  Thank you, Your Honor.  And
```

1    I apologize for the Book of Wisdom reference.  I tried

2    to clarify that.  I try to avoid jargon.  The Court is

3    quite right, this is a general issue, not a patent specific

4    issue.

5            To the extent that the business discussions bear

6    on the question of what are the prospective damages from the

7    case, part of that is going to have a liability element.

8    Part of that is going to have a damages element.

9            The damages element, there should be no

10   difference between what is said in the business discussions

11   and the date of hypothetical negotiation, because the date

12   of hypothetical negotiation is part of the damages input,

13   and to the extent the business discussion and the merger is

14   talking about what do we think that number will be, it's

15   going to be talking about the process of estimating the

16   value of litigation.

17           So from that point of view, there is no

18   difference between what one would expect the business

19   discussions to be focusing on and the analysis the Court

20   would do in a damages context.

21           The reference that I made to the Book of Wisdom

22   refers to the Supreme Court case and some District Court

23   cases that indicate that in some circumstances, if there's

24   relevant information during a period of time after the

25   hypothetical negotiation, that can be taken into account as

1    well.  It is not prohibited.  It is true that under the

2    Georgia-Pacific factors, typically look at the date of first

3    infringement.  There's not a flat prohibition on considering

4    subsequent evidence, and sometimes that happens.  And, for

5    example, people are looking at changing the business

6    practices, which one would expect to be part of an

7    acquisition negotiation as well.

8             So --

9             THE COURT:  Okay.  Sorry.  Let me just push you

10   back though.  Let's assume there were no negotiations.

11   Right?  I'm going to go back, or the jury is going to be

12   asked to go back to December 8, 2018, and consider the

13   Georgia-Pacific factors.  Right?

14            Now, do the Georgia-Pacific factors include

15   anything about the trial judge's proclivities or a

16   philosophical approach to patent cases and damages?

17            MR. McGOWAN:  Ideally, they certainly don't say

18   that, and one would expect that that is not something a

19   juror would be instructed on.

20            THE COURT:  Okay.  Do they consider the quality

21   of the lawyers that are engaged in the patent lawsuit that's

22   before them?

23            MR. McGOWAN:  The Georgia-Pacific factors don't.

24   I don't know if the Court is asking me two questions.  The

25   jurors -- I think that would be up to them.

1          THE COURT:  Well, okay.  That's fair because

2     it's a pretty bad question.

3          My point is that we don't ask jurors, and, in

4     fact, I think the law would preclude us from asking jurors

5     in deciding whether damages should be awarded and how much

6     damages should be awarded to consider all of the things that

7     lawyers consider when they evaluate a case, right, which

8     would include things like the quality of the judge or the

9     philosophy or proclivities of the judge, whether the

10    jurisdiction is a plaintiff or defendant-friendly

11    jurisdiction, how good the lawyers are, how much time has

12    been spent in developing the case, all of these kind of

13    legal strategic things.  Right?

14          You would agree that that is what really goes

15    into or at least it plays a prominent role in any assessment

16    of the value of a case.  Right?

17          MR. McGOWAN:  I think with respect, Your Honor,

18    I would provide qualified agreement.  I think that might

19    reflect the litigation side, but I would not presume, and

20    certainly I don't think there has been a proffer to this

21    effect, that that is what the business discussions are

22    about, because the business discussions from the buyer's

23    side are, we're going to buy the stock of this company.  We

24    see there's litigation out there and we need to pick a

25    number to protect ourselves.

1            It would surprise me, quite candidly, if the

2     only thing the businesspeople talked about were things that

3     business lawyers don't do day to day, which is proclivities

4     of judges, this and that.

5            I certainly would not assume that the

6     discussions that are the subject of the present motion would

7     exclusively bear on specific factors unrelated to the

8     business of the defendant, the infringement of the defendant

9     and the economic consequences of that infringement.  It

10    would surprise me if there were only litigation tactics

11    discussed in a merger where you've got corporate people

12    talking to each other.  If that's the testimony, then that

13    would be the testimony, but we don't know that and I don't

14    think we can assume it.

15            THE COURT:  All right.  Now, this is a stock

16    acquisition.  Right?  You mentioned that?

17            MR. McGOWAN:  That's what the letter of intent

18    states.

19            THE COURT:  What was the ultimate transaction?

20    In what form did it take?  How was it structured?

21            MR. McGOWAN:  I don't have the answer to that

22    question at my fingertips.  I believe it was consistent

23    throughout, but I need to look that up.

24            So --

25            THE COURT:  So you don't know if it was a stock

1    acquisition or a merger, or we just don't know.  All we know

2    is that at the time of the negotiation, Bio-Rad wanted to

3    buy stock.  Right?

4              MR. McGOWAN:  At the time of the letter of

5    intent on which the Magistrate relied, the letter of intent

6    recites a stock date.

7              THE COURT:  Right.

8              MR. McGOWAN:  And I have nothing to contradict

9    that.

10             THE COURT:  And I might have overstated it.

11   Right?  It's not that -- I mean, it's probably more precise

12   to say Bio-Rad was interested in purchasing stock.

13             MR. McGOWAN:  Correct.  It is a nonbinding

14   letter on the system, and in our view, that distinguishes it

15   from most of, on whole of the common interest case law,

16   which there found to be a common interest.

17             THE COURT:  Right.  So I go back to understand

18   how exactly this was presented to the Magistrate or how it

19   ought to be presented today.  You know, in footnote 3 you

20   write, 10X is not seeking attorney files or mental

21   impression, but rather information concerning the

22   negotiation of the agreement between counterparties, but

23   then the questions you cite, at least a lot of them, go to

24   the content of the virtual data room.

25             So maybe, I mean, is it fair to say that really,

1    you're not pursuing, you don't need to know what's in the

2    data room?  All you want to know is what was said across the

3    table?

4              MR. McGOWAN:  What we're pursuing in this

5    submission is the across-the-table communications.  That

6    would be for the e-mails.

7              THE COURT:  And you had an agreement, I think,

8    right, that there would be no logging of documents that

9    postdate the beginning of the litigation.  Is that right?

10             MR. McGOWAN:  That is correct.

11             THE COURT:  And you want what?  A 30(b)(6)

12   witness to come in and just answer questions about what was

13   said to Bio-Rad during the negotiation.  That's, at the end

14   of the day, what you want.  Is that fair?

15             MR. McGOWAN:  Fair.  Yes, Your Honor.

16             THE COURT:  All right.  Anything else you want

17   to bring to my attention?

18             MR. McGOWAN:  The only point that I'd like to

19   make is that I believe that this can be done simply on the

20   law just by looking at Rule 26, because in our view, the

21   across-the-table communications and work product in the

22   first instance.

23             THE COURT:  Wait, we had a technical glitch.

24   Can you repeat that because I don't know what you said

25   between privilege and work product, so can you just start?

1              MR. McGOWAN:  Sure.

2              THE COURT:  What did you say?  We can resolve by

3     looking at Rule 26 because what?

4              MR. McGOWAN:  Because we don't believe the

5     across-the-table communications are work product in the

6     first instance, and we believe the Magistrate treated them

7     as being work product.

8              THE COURT:  Well, I mean, look, and this may

9     be -- I mean, they could be work product to the extent if

10    somebody from 10X said, my lawyer told me X, Y and Z because

11    she thought blank because she thought A, B and C, I mean,

12    that's work product.  Right?  It's communicating work

13    product.  You would argue it's waiving it, but the point is,

14    it is conveying the mental impression.

15             MR. McGOWAN:  Right.

16             THE COURT:  And you said you're not interested

17    in getting those.  So that's why you, you know, say you're

18    not seeking attorney mental impressions, so it seems to me

19    based on that footnote, you shouldn't get to get work

20    product even if it were weighed during the negotiation.

21             MR. McGOWAN:  And I apologize if it's unclear.

22    I think that if a statement is made across the table,

23    that's, A, not work product; and, B, if there were work

24    product, it would be waiver, and we can talk about the

25    Philippines case and selective waiver and all the rest.

1    What we're trying to indicate in that footnote

2 is, we're not trying to dive down into the underlying

3 documents and the litigation files.  We're trying to

4 distinguish what we're asking for in the Hewlett-Packard

5 case, Sealed Air case, where they are trying to go down into

6 the litigation files.  We're trying to stay across the

7 table.

8    If across the table a lawyer or a businessperson

9 in a corporate setting recites something, then that

10 recitation is not work product, and it's strictly a waiver

11 analysis, we think the error that we want to draw to the

12 Court's attention is in treating those statements themselves

13 as work product.

14    I believe the law on waiver would establish that

15 the communication constitutes a waiver because we don't have

16 the facts that were put within the common interest stock,

17 but the distinction we're trying to draw is between

18 litigation files and across the table, and I apologize if I

19 was not clear on that point.

20    THE COURT:  Well, that's all right.  But, see,

21 you know, the thing is, work product, it's a different test

22 whether work product has been waived.  And would you agree

23 that at least there are circumstances where an NDA -- let me

24 start again.

25    There are circumstances where parties share

1    attorney impressions pursuant to an NDA and there would be

2    no waiver because under Westinghouse, they did take

3    appropriate measures to try to guard the secrecy of that and

4    limit the distribution of that work product?

5              MR. McGOWAN:  I think that the answer to Your

6    Honor's question is a qualified yes.  The qualification

7    comes from the requirement in the common interest cases that

8    there be a common legal interest as this Court said, in the

9    Dow chemical case, such as co-defendants or anticipation of

10   joint litigation.

11             Just for the record, I think that the rule on

12   this is stated in the Philippines case, the Republic of the

13   Philippines case at page 1429, where the Court says, a party

14   who discloses documents protected by the work product

15   doctrine may continue to assert the document's protection

16   only when the disclosure furthers the doctrine's underlying

17   goal.

18             I agree that work product and privilege have

19   some different aspects.  The purpose of work product is to

20   prepare for trial.  Rule 26 says, in anticipation of

21   litigation or for use at trial.

22             It is not anything that happens because

23   litigation is out there.  It's not the case that if I have

24   to rent extra office space in order to accommodate the files

25   of the case, that the lease agreement becomes work product

1    and is subjectively the reason I did it is because of the

2    litigation.  It's a purpose driven doctrine, and the point

3    is whether the communication in question furthers the

4    purpose of the doctrine.

5            In the Hewlett-Packard case and the other common

6    interest cases in Maine, disclosures are found within a

7    common interest when there is a common interest such as

8    being joint defendants, and the disclosure relates to that

9    interest.

10           THE COURT:  Right.  Now, on this though, let me

11   just stop you, because you didn't argue any of this to the

12   Magistrate.  Right?

13           MR. McGOWAN:  I think that before the

14   Magistrate, I think that what we did is argue that -- we

15   argued the instruction we got.  We did not understand at the

16   time that they were going to claim that, the defendant was

17   going to claim that the negotiations were themselves work

18   product, so what we argued was the common interest point.

19           THE COURT:  Right.  But, see, in fairness to

20   them, I know you apologized for it.  You don't need to

21   apologize, but you have.

22           I mean, I go back to how you presented it in

23   footnote 3.  You said you're not seeking attorney files or

24   mental impression, and that's why I began the conversation

25   by just talking about dissatisfaction on my part in the way

1    the thing was teed up.  I'm not faulting anybody, but just

2    that's the reality.  And a lot of the questions in the first

3    deposition were really designed to find out what was in the

4    data room, and I could see in the data room there being what

5    would normally be called work product, like opinions of

6    counsel about validity or invalidity of patents, things like

7    that.

8              MR. McGOWAN:  Sure.

9              THE COURT:  But I'm just going to tell you right

10   now, I mean, I think you've waived your right to pursue that

11   because of the footnote, the content of the footnote says

12   it, and it sounds like you're not pursuing the data room

13   documents anyway.  So I think that I'm just going to go

14   ahead and say that's the way I am going to rule, that you

15   have -- by footnote 3, you waived your right, or at least

16   you didn't tee up, and it's too late to do so now, to find

17   out or obtain documents that would reflect the mental

18   impressions of attorneys.

19              And, furthermore, it sounds like this morning

20   you're saying you are not even pursuing documents from the

21   data room at this point.  You want to limit the scope of

22   your discovery requests to oral and e-mail communications

23   between the parties between December 2019 and April of 2020.

24   Is that right?

25              MR. McGOWAN:  Yes.  And just to go back to the

1        point you just made, it was at the end of footnote 3 where

2        we say we're not seeking mental impressions, but information

3        concerning the negotiation of the agreement.  What we're

4        doing, in fairness, I think is consistent with the

5        negotiations point even in that footnote.

6                    THE COURT:  Well, but I raised it because I

7        think it explains why -- you know, you say you didn't raise

8        these, this issue of Westinghouse or what's the purpose of

9        the disclosure.  You're faulting 10X.  I'm sorry.  You're

10       faulting Celsee, and I'm not finding that very persuasive.

11       It sounds like you have raised cases in the first instance

12       before me that weren't addressed to the Magistrate.

13                   MR. McGOWAN:  May I have one brief response to

14       that, Your Honor?

15                   THE COURT:  Sure.  Go ahead.

16                   MR. McGOWAN:  As I said before, when we were

17       going through exhibits, Exhibit G, by focusing on

18       communication, we were focusing on the line of inquiry where

19       the objection was straightforwardly common interest.  I

20       don't think that there was any effort made at any point in

21       time to establish that a negotiating statement is a work

22       product statement, but the briefing before the Magistrate

23       focused on the question whether there was a common interest,

24       and we discussed the Hewlett-Packard cases on most of those.

25       But I don't believe there was ever any effort to establish

1          that the communications were themselves work product.   The

2          objection of the 30(b)(6) deposition, a common interest

3          privilege.

4                          THE COURT:  Well see, I disagree.  That's why I

5          read it to you at the outset.  I mean 291:

6                          Question:  Did the parties discuss in connection

7          with negotiating this nonbinding letter of intent whether

8          that escrow holdback would include some for the 10X

9          litigation?

10                         Mr.  Younkin:  Instruct the witness not to

11         answer that question on the grounds it calls for work

12         product.  That sounds like a work product objection.

13                         MR. McGOWAN:  Right, but I was referencing the

14         30(b) deposition.

15                         THE COURT:  Well, okay.  All right.  But you

16         cited before the Magistrate, and I thought that was -- the

17         discovery issue is related to both depositions.

18                         MR. McGOWAN:  It is.  The more specific to the

19         communications in the negotiation I think is the 30(b)

20         instruction.  That's the point that I'm making.

21                         THE COURT:  Okay.  All right.  We have narrowed

22         it now, I think.  We have narrowed it to all you want are

23         oral and e-mail communications between December '19,

24         April 2020, between Celsee and Bio-Rad relating to the

25         escrow and fees, expenses and damages relating to this

1     case.

2               MR. McGOWAN:  I would say the litigation.  I

3     don't know if there are things that are --

4               THE COURT:  Okay.

5               MR. McGOWAN:  -- related to the escrow that are

6     in there, because we don't know what was said yet.

7               THE COURT:  Right.

8               MR. McGOWAN:  A fair summary.

9               THE COURT:  Okay.  That's where we are.  All

10    right.  And you want to also get from that any statements

11    that may have conveyed attorney mental impressions?

12              MR. McGOWAN:  Yes.  Anything that was said back

13    and forth, our view is not work product in the first

14    instance, and if it happened to convey work product does not

15    fall within the common interest exception for waiver.

16              We have not discussed the details of the

17    exception a lot, but it caches out to just what the Court

18    said.  If there is a mental impression and an

19    across-the-table statement, our request is that that would

20    have to be disclosed as well.  What doesn't need to be

21    disclosed are the things sitting in the files themselves

22    or things just sitting in people's heads that were not

23    stated.

24              THE COURT:  Okay.  And then on the merits -- I

25    don't know if it's the right word, but on the common

1    interest issue, I mean, your position is it's a non-binding

2    letter, the negotiating across the table from each other.

3    It's a stock acquisition, so it's not like Bio-Rad has taken

4    on the defense of this litigation and so the cases that are

5    cited by 10X are inapposite.  Is that a fair summary?

6              MR. McGOWAN:  Fair summary, Your Honor.  Yes.

7              THE COURT:  Okay.  All right.  Let me hear from

8    the other side then.

9              MR. YOUNKIN:  Thank you, Your Honor.  This is

10   Jeremy Younkin.

11             I think if I may just at the outset point out

12   that there were really two independent grounds for the

13   Magistrate Judge's decision, and so one of them was the

14   squarely work product.

15             And so as we have discussed today, 10X stated in

16   their footnote that they were not interested in attorney

17   mental impressions, and then the Judge asked, well, why do

18   you want this information?

19             And they said, because we think, as we've heard

20   today, that the negotiation is going to reflect the parties'

21   views about the value of this case.  And, indeed, I think

22   Mr. McGowan has made it clear, it's their theory this

23   evidence is relevant because, you know, it's going to

24   reflect, you know, quote, "how worried we should be and what

25   are the underlying merits of the action and what are the

1    potential damages."

2              And when Magistrate Judge Fallon heard that, she

3    said, I can't think of a clearer example of work product,

4    and then she said, that work product protection was not

5    waived because it is difficult to waive work product.  You

6    need to do something that allows your adversary to find out

7    the information, and that was not done here.

8              Celsee and Bio-Rad were talking to one another

9    under a nondisclosure agreement about an acquisition and

10   there was really no risk that 10X was going to get the

11   information and so work product protection applies and it

12   wasn't waived, full stop.  I mean, and that standing alone

13   without even getting into common interest case law provides

14   grounds to affirm Magistrate Judge Fallon's decision and

15   finds --

16             THE COURT:  But I mean I feel bad for Magistrate

17   Judge Fallon because I just think the way it was teed up was

18   kind of unfair to her.

19             So let's go to the transcript that you've just

20   recited.  What page are you on?

21             MR. McGOWAN:  Well, her statements, if you look

22   at the very end on page 38 of the transcript.

23             THE COURT:  Right.

24             MR. YOUNKIN:  She says, in addition, even

25   putting aside the common interest doctrine, so she is taking

1   that out of the equation, the work product doctrine affords

2   an additional basis for protection of the information that

3   plaintiffs plaintiff seeks to compel.

4           THE COURT:  Right.  Now, you know, it's not

5   clear to me.  What is she talking about?  The information

6   the plaintiff seeks to compel?  What's the information the

7   plaintiff seeks to compel that she's referring to?

8           MR. YOUNKIN:  I think what she's referring to

9   are the communications between Bio-Rad and Celsee about this

10  litigation.  And so the way that this kind of came up, Your

11  Honor, if you turn to page 28 of the transcript --

12          THE COURT:  Right.

13          MR. YOUNKIN:  Okay?

14          THE COURT:  I'm there.

15          MR. YOUNKIN:  Okay.  So this is Mr. Novikov

16  arguing about why he says the negotiations of the escrow

17  provision are not subject to common interest, and I will

18  just point out that Mr. Novikov opened with this argument

19  and so clearly 10X understood --

20          THE COURT:  Sorry, sorry.  What line were you on

21  and then start again.

22          MR. YOUNKIN:  Page 28.  28, Line 7.

23          THE COURT:  Okay.  All right.  Got you.  Thanks.

24          MR. YOUNKIN:  Okay.  So this is 10X arguing, and

25  they say that their assessments, meaning the Bio-Rad and

1    Celsee's assessments or representations as part of that back

2    and forth about how much this litigation is worth, and then

3    what financially they view the risk to be is certainly

4    highly relevant to a number of issues.  And so Judge

5    Fallon's reaction to that is found on page 36.

6             THE COURT:  Okay.

7             MR. YOUNKIN:  And if we look at line 16 --

8    sorry, the beginning of that paragraph around line 10, she's

9    talking about these communications.  I think there, clearly

10   we're talking about the communications between Celsee and

11   Bio-Rad about the escrow provision.

12            And then at line 16, she says, these go to the

13   very heart of what the parties think about what this case

14   ending in litigation is worth, and I can't think of a clear

15   example of what might be protected by the work product

16   privilege.

17            And, indeed, we've heard today that their whole

18   theory of this evidence is that it will reflect each party's

19   mental impressions about this litigation -- the strengths,

20   the weaknesses, the damages.  And that sort of evidence

21   is -- it's just product information.

22            THE COURT:  Hold on.  I agree with you.  All

23   right.  So on that statement, I do understand that, and I do

24   think there's no question about it.  Then I think we've got

25   an issue about whether there's a waiver of disclosing it.

1           MR. YOUNKIN:  Okay.

2           THE COURT:  And so the way I look at it is that

3    because of footnote 3, that wasn't teed up.  In other words,

4    the way I look at it is the footnote 3 -- sorry.  Hold on

5    one second.

6           There it is.  In footnote 3, the statement that

7    10X does not seek an attorney files for mental impression.

8    So as far as I'm concerned, they don't get to get -- they

9    are not asking the Magistrate to force them, to force a

10   disclosure of mental impressions.  That wasn't teed up and

11   so I'm going to affirm the Magistrate to the extent that she

12   said that on page 36 that Celsee's evaluation, or, rather,

13   Celsee's attorney's evaluation of the case is quintessential

14   work product, I think that's true.  And why I am going to

15   affirm her, I'm not sure this is the reason she made the

16   ruling, but I'm going to affirm it is, you can't in a, what

17   is effect effectively a motion to compel, which is the

18   letter dated September 21, 2020, at DI 204, you can't say

19   you're not seeking attorney files or mental impressions and

20   then expect to get them.

21          So I don't have to get into whether or not there

22   was a waiver of work product during the course of these

23   negotiations or not because that issue in my mind wasn't

24   properly brought up to the Magistrate, and, in fact, it was

25   essentially -- it was waived, and so I'd affirm her on that

1    issue.

2            So now what I think is left though -- well,

3    what's left in the negotiation and the back and forth, okay,

4    where there's not a disclosure by Celsee about the

5    impressions of their attorney as far as valuing the case,

6    but there are negotiations, other statements they made that

7    do not reveal work product.

8            Now, why shouldn't 10X get that information?

9            MR. YOUNKIN:  Well, I don't think actually that

10   they are seeking that information.  I mean, I think --

11           THE COURT:  Well, I mean, I think Mr. McGowan is

12   seeking that information.

13           Mr. McGowan -- wait.  Let me just ask him

14   because I thought it was pretty clear, that's what he wants.

15   He just wants as well any disclosures that included work

16   product.

17           Mr. McGowan, that's what you are seeking.

18   Right?

19           MR. McGOWAN:  The Court is correct.  If it's

20   across the table, it s the subject of our submission to the

21   Court.

22           THE COURT:  Right.  But, okay.

23           MR. YOUNKIN:  Okay.  But I think we're

24   potentially talking past each other here.  I mean,

25   Mr. McGowan's position is anything said across the table he

1    wants, and I think Your Honor just said, well, if it's work

2    product material, you don't get it.

3              THE COURT:  Correct.

4              MR. YOUNKIN:  And so my -- right.

5              THE COURT:  But there's still a lot of other

6    information.  I mean, in other words, a person across the

7    table could say, he could say, I think the case is worth

8    this much, or she could say, I don't know who the 30(b)(6)

9    witness is going to be.  She could say, you know, we think

10   the case is worth this much, or she could say -- I mean, she

11   could make revelations about a lot of stuff without

12   disclosing work product.

13             MR. YOUNKIN:  Your Honor, I disagree with that.

14   I think if somebody says I think the case is worth X, that

15   is a disclosure of -- I mean, that's protected by the work

16   product, because that is one party telling the other party

17   its mental impression about the value of the litigation,

18   which is, of course, informed by, as I said, that's clearly

19   a mental impression about the value of the case.

20             And so --

21             THE COURT:  Hold on.  Attorney work product goes

22   to the attorney's mental impression.  Now, the client might

23   agree with the attorney or disagree with the attorney, but

24   the client's ultimate mental impression is not the

25   attorney's mental impression.

1           The other thing is, and I'm sure you're

2     familiar, I mean Upjohn, all the work product cases

3     distinguish between fact and opinion.  And so what I want

4     you to focus on now, so this is the issue.  I'm basically,

5     I'm not going to allow Celsee to get a disclosure of the

6     mental impressions of 10X's attorneys.  Okay?  They've

7     waived that by their footnote.  So to that extent, I'm

8     affirming the Magistrate.

9           What remains to be decided is, what about the

10    rest of the negotiation?  And I am concerned that the

11    Magistrate Judge read too much into AgroFresh.  I'm

12    concerned that AgroFresh and the other cases upon which you

13    rely don't really apply here, and yet I'm also concerned, as

14    I mentioned in my questioning of Mr. McGowan, about how

15    probative is this stuff and is it even wore worth the burden

16    of a deposition.

17          And, you know, I see where you drop a footnote

18    in your papers in front of me based on relevance, but did

19    you do that in front of the Magistrate?  Did you argue

20    proportionality or burden or relevance in front of the

21    Magistrate?

22          MR. YOUNKIN:  I believe that I noted it during

23    the hearing, Your Honor, but really, the way that the issue

24    was teed up was, it was an argument to that privilege

25    instructions given at a deposition were improper, and so

1    that was their argument, and so we were defending the

2    privilege instruction.

3                I did note at the hearing that the relevance

4    argument seemed a bit stretched, but certainly, we weren't

5    instructing the witness not to answer a question at a

6    deposition based on relevance grounds.

7                I do think --

8                THE COURT:  I've got the transcript in front of

9    me, where did you say that or something about burden,

10   relevance, or any considerations, proportionality?

11               MR. YOUNKIN:  Yes.  And this may have been --

12   this may have actually been in connection with the first

13   argument.

14               Yes.  I mean, so to be clear, the statement is

15   that I was referring to is on page 19 and it really is

16   dealing with the first of the two arguments that were before

17   her.

18               THE COURT:  Okay.  So the bottom line is, you

19   really didn't argue proportionality or overly burdensome or

20   even relevance as a basis to prevent further deposition of

21   this 30(b)(6) witness.  Correct?

22               MR. YOUNKIN:  Not with respect to this argument.

23   That's right.

24               THE COURT:  Okay.  So then I think we're stuck.

25   Right?  So then I do have to, it looks like, address the

1    common interest doctrine and whether it applies.  Is that

2    fair?

3              MR. YOUNKIN:  I actually don't think that that

4    is correct, Your Honor, because I think that the waiver, the

5    waiver rules around a work product are much more stringent

6    than the waiver rules --

7              THE COURT:  I'm not going to give them work

8    product.  I've already said that.  You've won that.

9              MR. YOUNKIN:  They don't -- okay.  I think there

10   is still an open question about the limits of that though,

11   because, firstly, I do need to say that the work product

12   doctrine does not just protect attorney mental impression.

13   It also protects the mental impressions of a party about

14   litigation, so that's number one.

15             Number two --

16             THE COURT:  All right.  So, wait.  Now, this is

17   an example of, unfortunately, you guys are asking me to make

18   a pretty, you know -- there are few things more important

19   than attorney/client privilege and attorney work product.

20             Do you have a case that says that if I ask a

21   client about the client's mental impressions, that that is

22   prohibited by the attorney work product doctrine?

23             MR. YOUNKIN:  Well, Your Honor, yes.  I think

24   that just the plain language of Federal Rule of Civil

25   Procedure 26(b)(3) --

1        THE COURT:  All right.  Hold up.  Let me pull it

2    up.  26 what?

3        MR. YOUNKIN:  (b)(3).

4        THE COURT:  Okay.

5        MR. YOUNKIN:  Okay.  So, and this is Section A.

6        THE COURT:  All right.

7        MR. YOUNKIN:  Which is basically the work

8    product rule.  And it says, ordinarily, a party, 10X, may

9    not discover documents and tangible things that are prepared

10   in anticipation of litigation or for trial by or for another

11   party, another party, or its representatives, including the

12   party's attorney.

13        And so a party, you know, a company gets a

14   demand letter or something and the CEO works on it and forms

15   a mental impression about the value of the case.  That can

16   clearly be work product.  And so when you have --

17        THE COURT:  Well, I didn't say it couldn't be,

18   but --

19        MR. YOUNKIN:  I was just trying to make the

20   point that work product protection is not limited to an

21   attorney's mental impressions, that it also covers a party's

22   mental impressions about a litigation.  And here, that's all

23   they want.  All they want is a party's mental impressions

24   about this case, and I think Judge Fallon heard that and she

25   said, that's clearly work product.  You don't get that.

1          And, you know, I think in this case, too, I

2     mean, attempting to tease out, you know, even if you were to

3     say, well, okay.  Let's try to distinguish the lawyers's

4     mental impressions from the negotiators mental impressions,

5     I mean, I'm not even sure how you could possibly do that,

6     which is why I say, they're only interested in the mental

7     impressions.  If the discussions do not reveal or reflect

8     what a party thinks about this case, they don't want them.

9     That's their whole theory of relevance here, which is why I

10    think the Magistrate Judge said, that's what sounds like

11    what you want is work product.  You, 10X, have to show

12    waiver of work product and you can't do that because the

13    parties were talking under a nondisclosure agreement and

14    there is no risk that that information would get to 10X.

15    And you can do that just based on the waiver rules around

16    work product without even delving into, you know,

17    Hewlett-Packard and the common interest body of case law.

18    It's just independent grounds of affirmance.

19         And I do not think --

20         THE COURT:  So let me just ask you this.  Let's

21    say Bio-Rad at the last minute said, we're not doing this

22    deal and, or let's say Celsee said we're not doing it and

23    then Bio-Rad sued Celsee.  Are you telling me that those

24    negotiations, they would never see the light of day in a

25    Court if there was a dispute over the meaning or, you know,

1   the way the negotiations went?

2           MR. YOUNKIN:  I don't know the answer to that

3   question, Your Honor.  I mean, I think it's possible in that

4   situation that --

5           THE COURT:  Well, it happens all the time.  It

6   happens all the time when there's a negotiation that doesn't

7   get consummated or gets consummated and the parties argue

8   about it.  As long as parol evidence is admitted, if you

9   have then an ambiguous contract or something, this is the

10  kind of evidence that comes in under the parol evidence

11  rule.

12          MR. YOUNKIN:  Well, the parties -- the parties,

13  of course, are free to waiver work product if they decide to

14  in a litigation, and here, that's not being done.  The

15  parties are, you know, making their work product objection.

16          I also want to make just one point about it

17  seems like Mr. McGowan is drawing this distinction between

18  the documents in the data room, which he, I think, now

19  concedes is off-the-table and communications that were made

20  in a negotiation, but there's no reason to draw a

21  distinction between those two things.  It's just, it's just

22  the form of communication.

23          And so if we all agree that if an opinion of

24  counsel gets put into the data room and there's no waiver,

25  then the same thing should apply if the contents of the

1    opinion of counsel are disclosed in an oral communication or

2    an e-mail.

3              THE COURT:  I don't think he said that and I

4    don't need to rule on that because I've already said he

5    doesn't get work product.  He doesn't get work product

6    because they took the position in footnote 3 that they

7    weren't seeking it.  All right.

8              So the only question is, do they get the

9    communications that went back and forth between the parties.

10   I mean, to me, I mean, I don't think it has huge probative

11   value, but as you said, you didn't make that argument.

12             Now, the good question is, you know, they're

13   making a new argument, you could argue, so can I just

14   consider now, like what's the relevance of this material?

15   What would be the burden to produce it?  But you have not

16   said anything in that regard even though I've asked.

17             MR. YOUNKIN:  Well, I mean, I think that I mean

18   I would point to the footnote that we make in the response

19   to the objection, and I would also say that the

20   circumstances have changed a bit because, you know, where we

21   find ourselves right now is November 5th, the plaintiffs

22   served an opening damages report, so we already have their

23   expert opinion on what she thinks the damages in this case

24   should be, and we're about to serve our rebuttal report on

25   Friday, tomorrow.

1          And then what they want to do is have a

2    deposition in the next couple of weeks, I guess, that they

3    think is going to uncover evidence that's going to bear on

4    damages, and so then what are we going to do?  Supplemental

5    reports, you know, as we head towards summary judgment in

6    February?

7          I mean, just from a practical standpoint, you

8    know, it's going to be difficult.  Like I said --

9          THE COURT:  Have you considered what kind of

10   burden it would take to go review all the different e-mails

11   and communications between 10X and Bio-Rad?  You didn't log

12   the material.  Right?  Have you even conducted a search for

13   the material?

14          MR. YOUNKIN:  I don't, I don't know the answer

15   to that question.  You know, these requests, the requests

16   for the Bio-Rad discussions in particular came in pretty

17   late in discovery.  We objected to them.  There was a little

18   bit of hashing things out.  But I mean I think that we have

19   been pretty clear that we weren't going to produce these

20   communications, you know, going way back.

21          And, really, I mean, the issue really got teed

22   up around this, the deposition as opposed to responses to

23   document requests.  But like I said, Your Honor, I think

24   that we still have to address this issue of we all agree

25   that they're not entitled to work product information, but I

1    think it still leaves open a question, well, what is work

2    product information?  And Judge Fallon said, communications

3    about this litigation are covered by the work product

4    doctrine, and that conclusion, we submit, is not clearly

5    erroneous, and 10X has not shown that it was.

6              They are not asking for communications about,

7    you know, some random provision in this merger agreement.

8    They are asking for communications about the litigation.

9    That's all they care about.

10             THE COURT:  Well, there was no work product

11   objection lodged to the 30(b)(6) witness.  Right?  It was

12   based solely on the objection on the common interest

13   exception.

14             MR. YOUNKIN:  But the common interest exception,

15   I mean, I don't think that's mutually exclusive of work

16   product.  Really, what the common interest exception is

17   saying, the underlying privilege was not waived.  And, by

18   the way, the LaPointe deposition happened first, and so they

19   understood kind of what our position was, I think, and if

20   they had any questions about it, they could approach further

21   with Mr. Stark, the witness who is actually involved in the

22   negotiation, and they didn't.

23             And so they asked him specific questions.  You

24   know, what were the considerations that led to this escrow

25   provision?  And I was there and I objected to work product

1    grounds.  And as I think you said, it really couldn't have

2    been clearer.

3            And then in the meet-and-confer, which

4    Mr. McGowan didn't attend, work product was featured.  I

5    mean, I was telling Mr. Novikov that I thought that work

6    product prevented him from getting this information.  And so

7    they understood this was an issue, which is why they dropped

8    a footnote to address it briefly in their letter.

9            And then when we got to the argument,

10   Mr. Novikov opened up by arguing that communications about

11   this negotiation, about the negotiation of this merger

12   agreement are not covered by the work product doctrine.

13           So that was aired, and the Magistrate Judge

14   disagreed and said, no, that those communications are

15   covered by the work product doctrine.

16           THE COURT:  So why don't you explain to me why

17   communications with another party that's trying to buy, is

18   interested in purchasing your stock, why would my

19   communications with that entity constitute work product?

20           MR. YOUNKIN:  Because the content of the

21   communication is a mental impression about the litigation,

22   and so just as a side note here, the deal is being

23   characterized as a stock deal.  I mean, this is an

24   acquisition.  Right?  Bio-Rad bought it.  They own it now.

25   It's not just they bought ten percent of the shares or

1    anything like that.  Bio-Rad purchased, acquired,

2    100 percent of Celsee.

3              THE COURT:  Okay.

4              MR. YOUNKIN:  But so if there's a negotiation

5    happening and under an NDA where a defendant in a lawsuit is

6    talking about somebody who wants to buy them and the

7    defendant says to the potential acquirer, let me tell you my

8    mental impressions about this litigation, okay.  So what is

9    being communicated is a mental impression that had been

10   formed in connection with the litigation.

11             And the disclosure of that mental impression to

12   the other side is not a waiver in the same way that, you

13   know, if you had -- you know, a general counsel sits down

14   and says something like, you know, here are the defenses to

15   this, to this claim, here are the arguments that I think,

16   you know, are good ones that we're making, those are his or

17   her mental impressions.  And if you disclose that to a

18   potential acquirer under an NDA, under the very strict rules

19   surrounding waiver, which they had the burden to prove,

20   there is no waiver, and that's what Judge Fallon held and

21   she was correct.

22             THE COURT:  Well, I'm having a hard time.  You

23   know, you cite 26(b)(3)(A).  I mean, that deals with

24   documents and tangible things.  So, A, that is off the

25   table.  We're not talking about that.  We're talking about

```
 1    conversations, number one, and then we're talking about

 2    e-mails that are sent to Bio-Rad.  They are not in

 3    anticipation of litigation.  I mean, you've got to

 4    demonstrate to me why they would be.

 5              I get where it may be within those documents

 6    they are conveying what 10X's lawyers thought about the case

 7    and they are not getting that.  We've already discussed

 8    that.  So I want us to go back and narrow the scope of what

 9    is really being addressed.

10              Now, I do think it's, you know, it's informative

11    that they are buying all the stock, so they are taking over,

12    they're basically taking over the case, and they are, is it

13    fair to say then they are at least indirectly inheriting the

14    liability in the litigation in your view?

15              MR. YOUNKIN:  I mean, subject to the terms of

16    the merger, which address this.

17              THE COURT:  Okay.  What does it address?  What

18    does it say?

19              MR. YOUNKIN:  Well, there are -- I mean, there

20    are --

21              THE COURT:  Actually, what does the letter of

22    intent say?  Let's focus on that, about what happened to the

23    litigation.

24              MR. YOUNKIN:  The letter of intent says that

25    Bio-Rad will acquire a hundred percent of Celsee, and then
```

```
 1    it goes through some of the money payments.  I do not

 2    believe that it talks about -- you know, then it says we're

 3    going to do due diligence and it doesn't mention the

 4    litigation, I don't think, just looking at it quickly,

 5    expressly.

 6              The merger agreements does contain provisions

 7    that squarely address the litigation, including how it's

 8    going to be paid for, and those are, those are the

 9    provisions that 10X wants discovery on.

10              But, again, if you have -- let's just say you

11    have two businesspeople sitting across the table from each

12    other and one businessperson says, as Mr. McGowan asked, how

13    worried should we be?  How could that question possibly be

14    answered without revealing the attorney's mental impression?

15              THE COURT:  Very easily.  You just don't

16    disclose what your attorney said to you or wrote to you.

17              MR. YOUNKIN:  But the negotiators, the

18    negotiators's view on that is inextricably tied to what his

19    lawyers are telling him.  A businessperson is not an

20    independent view of the potential liability separate and

21    apart from information that has been given to him by

22    lawyers.  No way is he forming a judgment about that.

23              THE COURT:  Well, I don't find that argument

24    very compelling.

25              So, Mr. McGowan, here's where I am.  It just
```

strikes me that I don't see how I would let into evidence in

front of a jury any statements that were made during the

course of the negotiations, because I think if I applied

Rule 403, I would conclude that the probative value here

would be substantially outweighed by a number of

considerations.  I think it would confuse the jury and

potentially mislead the jury because I don't think any of

the statements that might have been made during the

negotiation with respect to the value of the litigation or

potential damages award, I don't think that it would be --

it would be fair or proper to have the jury try to parse,

well, how much of that is based on things that the jury

should never think about, some of the legal strategies and

assessments about juries, about judges.  I just think it

would -- and I think the probative value is limited.

Now, I have not heard anything about burden

from 10X, but I really just question why we need to have

teed up --

MR. McGOWAN:  May I respond, Your Honor?

THE COURT:  Yes.  Sorry.  I was hoping you

would.  Thanks.

MR. McGOWAN:  I just wasn't sure if the Court

was concluded.

Let me suggest that a 403 ruling usually has the

benefit of the proffered testimony, so there's something

1    concrete to rule on.  Part of the discussion we've just been

2    having is hypothesizing what the testimony might be, and if

3    Bio-Rad comes in and makes its own statement, that's what

4    we've looked at.  Says, yes, we've got a problem there.  It

5    feels very different from the kind of hypotheses that 10X's

6    counsel was just making.

7                I think the way to cut through all of this is to

8    actually adduce the testimony respecting the Court's work

9    product, the way the Court has ruled, but the Court I think

10   is correct, that that is not everything.  And I agree that

11   back and forth across the table in a merger in a hundred

12   percent stock acquisition, I don't think that makes a

13   difference in the common interest doctrine.  But I think

14   that kind of evidence comes in all the time.  I don't think

15   there's a plausible work product decision there.

16               So I think the way to cut through this is to

17   respect the Court's ruling that it has made on work product,

18   recognized that there was some residuum, then find out what

19   it is and then have a concrete piece of testimony or a

20   concrete question that can be addressed.  That's what I

21   would suggest.

22               I feel as though making assumptions about what

23   might be the case is not a good way to resolve the question

24   of admissibility or a question of burden when that hasn't

25   really even been briefed.

1            And --

2            THE COURT:  Well, I said, I used the conditional

3    language when I said it, and I said it with the hope that

4    you might think the odds of it coming in are so minimal,

5    that you wouldn't pursue it.  But you are not willing to do

6    that, and I'm not making a definitive 403 judgment because I

7    don't have something specific in front of me.  I was just

8    sharing with you my general thought process based on your

9    explanation of how this information you hoped to get would

10   be probative.  It is just I didn't find it really, really

11   compelling.

12            MR. McGOWAN:  Sure.  If I can just -- let me

13   just -- I don't want to dwell too much in hypotheticals, but

14   the Court alluded earlier to the idea that, well, maybe

15   Bio-Rad makes a comment that is not -- and a Celsee person

16   agree with it.

17            THE COURT:  Wait.  You broke off again.  You

18   said Bio-Rad makes a comment and then I lost you.

19            MR. McGOWAN:  And then a Celsee person agrees

20   with it and says, yes, that's true.  That could be a

21   liability issue, not a damages issue.  That's a response to

22   a comment.  That's not work product in any respect.

23            Now, what the Court would do with that, would

24   think about that in a 403 context would depend, I think, on

25   the question, and the Court would have something concrete to

1    look at.  But I really feel as though with respect to the

2    Magistrate's ruling, that the premise that the non-mental

3    impressions across the table testimony is not work product,

4    I think that's a matter of law.  I don't think there was any

5    foundation laid to show that it's work product and I don't

6    think there has been any laid here.

7              So I think that ruling was incorrect with

8    respect to the traunch of communications the Court has

9    identified this morning.

10              Then the question becomes, if I take the Court's

11   point to be is the game worth the candle with respect to

12   that bit of information.  We're looking at a June trial

13   date.  I don't think this -- I have not heard a reason why

14   this should take a huge amount of time, but I think that in

15   order to follow the legal rules of work product and

16   admissibility, we really need to see what the evidence is so

17   concrete decisions can be made.

18              MR. YOUNKIN:  If I can respond to that?

19              THE COURT:  Yes.  Sure.  Go ahead.

20              MR. YOUNKIN:  I mean, you know, Courts make

21   relevance calls all the time before we know what the answer

22   is.  That's what -- I mean, when you are ruling on a motion

23   to compel a document request, the question is, you know,

24   what is the question?  What are the documents you are

25   seeking and are those relevant?  Can you show that they're

1    relevant?

2              And, you know, and prejudice and burden can play

3    a role in that as well.  I mean, here, we're here on a

4    motion to compel answers to questions that were asked at a

5    deposition.  This shouldn't be, you know, open up, have a

6    whole deposition.  They should come in here and say, point

7    to the transcript.  Here's the question I asked.  It was

8    blocked.  I would like an answer to that question.

9              And I don't think that Mr. McGowan can point to

10   any questions that were asked where, you know, he feels like

11   he needs the answer in order to make an argument that, you

12   know, that passes 403 muster.

13             MR. McGOWAN:  May I respond, Your Honor?

14             THE COURT:  Sure.

15             MR. McGOWAN:  The instruction given in

16   Exhibit G, the corporate deposition, was a categorical

17   instruction.

18             MR. YOUNKIN:  That issue has been waived.  I

19   mean, what they asked Magistrate Judge Fallon for was a

20   deposition of Mr. Stark.  They did not ask for a new

21   30(b)(6).  They didn't ask for Mr. LaPointe to reappear.

22   They said, this is in --

23             THE COURT:  All right.  So, hold on.  This is

24   the first, you know, that somebody has said that to me.

25   Maybe it's in the papers, but this is -- again, I go back

1    to, it just wasn't really presented, at least something that

2    I would grasp immediately.  So hold on.

3              So the pending motion is solely to redepose

4    Mr. Stark.  Is that right?

5              MR. YOUNKIN:  Yes.  Footnote 1 in their letter

6    brief to the Magistrate Judge.

7              THE COURT:  All right.  Hold up.  Well, this is

8    made in the context of another argument.

9              MR. YOUNKIN:  Well, the proposed order is to

10   produce Mr. Stark to provide deposition testimony as a

11   corporate representative.  I mean, Mr. Stark wasn't our

12   corporate representative on any topic.  He is a former

13   employee.

14             THE COURT:  Okay.  So, you know, now I'm looking

15   at it, it does say, Celsee should be compelled to reproduce

16   Mr. Stark to testify as its corporate representative

17   concerning the negotiation of the merger agreement.  I mean,

18   that's a 30(b)(6) witness.  They want Mr. Stark to be the

19   witness because they think he's probably most knowledgeable,

20   but I mean, they're asking for a 30(b)(6) witness.  They

21   just want it to be Mr. Stark.  That's on page 3 of your

22   letter, DI 204.  I don't think they've waived their right to

23   have a 30(b)(6) witness given that language.

24             Okay.  Anything else anybody wants to bring to

25   my attention?

```
 1              MR. YOUNKIN:   I mean, we've been going for

 2   awhile, Your Honor, so I don't want to belabor the point.   I

 3   will just say though that I think you have really focused on

 4   this one prong of the Magistrate Judge's decision, which I

 5   think is fully sufficient to affirm, which is the no waiver

 6   of work product, but there is a separate and independent

 7   ground around the common interest doctrine, and I think that

 8   what, you know, what 10X is trying to do here, you know, and

 9   I think that they've been pretty candid about it, is

10   basically get this Court to rule for the first time in

11   Delaware at the Third Circuit that you cannot have a common

12   interest when you're in merger talks.   A common interest

13   doctrine simply doesn't apply there.

14              THE COURT:   No.   So I don't view it that

15   broadly.   I mean, frankly, I would prefer not to opine,

16   period, because I don't think -- because of the manner in

17   which the issues were brought to me and brought to the

18   Magistrate.   But I don't think they're asking for as broad a

19   ruling as you just said.   Am I correct?

20              MR. YOUNKIN:   At the hearing they told the

21   Magistrate Judge -- I mean, their position is that

22   Hewlett-Packard was wrongly decided and that it should no

23   longer be followed.   And the Magistrate Judge says, well, if

24   I agree with you, is this going to (inaudible) privilege

25   whenever there's a merger?
```

1          And they candidly said, yes, they would like the

2     District of Delaware to say that Hewlett-Packard was wrongly

3     decided and it's not the law in Delaware.  And so that when

4     parties -- and they would like the Court to follow, you

5     know, other cases, like out of Illinois that say that when

6     parties are in a merger negotiation, there's no common

7     interest.

8          It's just not the law in the Third Circuit.  I

9     mean, the Sealed Air case rejected that, rejected that

10    argument squarely and then there's a Bankruptcy Court in

11    Delaware that did the same.

12         And so I think that they are candidly saying

13    that they would like, that they would like Your Honor to

14    rule that Hewlett-Packard is not the law of Delaware and

15    that that line of cases --

16         THE COURT:  First of all, when you say that the

17    law -- so actually, this gives me a perfect example.  In

18    fact, I'm glad.  I forgot to raise this and I really should

19    have at the outset, but it's a perfect example of why I mean

20    this is not teed up for me.  And let me ask Mr. McGowan

21    first.

22         Mr. McGowan, are you there?

23         MR. McGOWAN:  I'm here.

24         THE COURT:  So what law of privilege should

25    guide, should I follow?

1          MR. McGOWAN:  To the extent that -- Rule 26 is

2     the answer to the Court's question.  To the extent the

3     common interest doctrine has been recognized and we're

4     dealing with a federal question case, then I think on work

5     product, it's always Rule 26.

6          THE COURT:  Wait, wait, wait.  So hold on.

7     We're not dealing with work product.  I already ruled on

8     work product.

9          MR. McGOWAN:  Right.

10          THE COURT:  So we are only dealing with

11     privilege.  All right?  So what rule applies?

12          MR. McGOWAN:  Okay.  I apologize.  When the

13     Court said privilege, so the rules that the Court would be

14     bound by I believe would be Third Circuit.

15          The rule --

16          THE COURT:  When you say -- wait.  When you say

17     rule of the Third Circuit, so when the Third Circuit

18     addresses a privilege, doesn't it look to the state law, the

19     state law privilege that's relevant?

20          MR. YOUNKIN:  So it depends on the basis for

21     jurisdiction in my view, Your Honor.

22          So in a diversity case, for example,

23     attorney/client privilege with respect to causes of action

24     grounded in state law would be governed by state law.  With

25     respect to work product, state law is not relevant because

1    it's a rule of civil procedure, and under the Erie doctrine,

2    the Federal Rules govern.

3              THE COURT:  But we're not dealing with work

4    product.  Right?  I only have a brain, I've got a limited

5    brain.  I'm not as smart as you guys.  The reason why I'm

6    bringing up work product, I lose track of things.  I'm only

7    interested in this issue and no one briefed this.

8              So let help out again with --

9              MR. YOUNKIN:  Sure.

10             THE COURT:  -- when I'm making a privilege call

11   in a patent case in the Third Circuit, does it matter

12   whether the lawyers are from one jurisdiction or another?

13   Does it matter -- you tell me.  How do I figure out, because

14   the states have different views about what's privileged or

15   not.  Correct?

16             MR. YOUNKIN:  I agree with that, Your Honor, and

17   I don't want to repeat the Rule 26 phrase if I can call it

18   that because I don't want to sidetrack this discussion.

19             The common interest doctrine is not an

20   independent privilege.  It is an anti-waiver rule.  So if

21   the question is how does the common interest doctrine relate

22   to some underlying privilege against disclosure, then the

23   answer to what law the Court looks to depends on the basis

24   of jurisdiction.  In a patent case, we don't need to worry

25   about that.  It's a federal question.

1              The common interest doctrine is largely federal

2      common law, which I understand is not supposed to exist, the

3      Erie case, but it has been absorbed out of the criminal

4      cases starting with joint defense and it has now become a

5      case law doctrine.

6              So the answer to the Court's question, the

7      exception is a federal case law exception, the underlying

8      privileges or protections against disclosure are Rule 26 in

9      this case, because I don't believe there has been an

10     attorney/client privilege argument in this case and we can

11     set that aside.

12             You were correct, if it were attorney/client

13     privilege, then you would have to look to see if it's

14     diversity or federal question, then federal question would

15     be under the rules and would probably absorb common law of

16     the state in which the communication was made, but that's

17     not important to the Court's decision here, I don't think.

18             THE COURT:  What --

19             MR. McGOWAN:  So if I can --

20             THE COURT:  Go ahead.

21             MR. McGOWAN:  So if I can respond on the common

22     interest question, I don't think that we're asking for a

23     ruling of the breadth that counsel just described and I also

24     don't think the Hewlett-Packard case is the font of all

25     knowledge.

1          This Court, the District of Delaware,

2     established the rule applied in Hewlett-Packard in the

3     Union Carbide case with reference to protective shield

4     in cases such as co-defendants or anticipated joint

5     litigation.

6          Hewlett-Packard has a broad policy discussion of

7     how important it is for business deals to get done, but its

8     very specific holding tracked the Union Carbide case.  And

9     in the Hewlett-Packard case, the issue was sale of a

10    division where the seller had been practicing the patent for

11    the sale and the buyer was going to practice after the sale,

12    so in all likelihood they would have wound up on the same

13    caption as defendants with respect to different periods of

14    time.

15          The Sealed Air case, when it goes back to

16    Hewlett-Packard and reads it, also applied the joint

17    litigation test that goes back to this Court's 1985 ruling

18    in Union Carbide.

19          And our point is then the Sealed Air case is a

20    successor liability case.  It's a little unusual because the

21    parties were worried that the transaction itself was going

22    to be a fraudulent transfer of assets, but the Court made

23    very clear that the liability of the seller and the buyer

24    was the same liability.

25          So using the Union Carbide rule and its whole

1    stars of co-defendants for joint litigation, that's what the

2    case is recognizing a common interest against Lozier turned

3    on.

4              The reason I mentioned the stock acquisition is

5    acquiring even a hundred percent of the stock of a company

6    doesn't really matter, doesn't put the buyer on the same

7    caption.  It gives it an economic interest in the company

8    whose assets it holds, but I've not heard Celsee suggest

9    that Celsee has been merged into Bio-Rad so that it's now

10   Bio-Rad.  I haven't heard it suggested that it's no longer a

11   standalone company.  What has been suggested I believe is

12   that its stock is now owned by somebody else.  That's not

13   Hewlett-Packard, Sealed Air, and it's not the Union Carbide

14   test.

15             So I don't think that there needs to be any

16   broad ruling or very general statement about the common

17   interest doctrine.  If we just follow the actual facts and

18   holdings of the cases and bring it back to its origin, I

19   think that that doctrine doesn't apply in this circumstance.

20             THE COURT:  Okay.

21             MR. YOUNKIN:  If I may, Your Honor, I need to

22   point out --

23             THE COURT:  No.  Go ahead.  I think that the

24   challenge for you is that Union Carbide addressed a

25   situation where there was, where both parties were likely to

```
 1    be involved in what the Court called "anticipated joint
 2    litigation," and we don't have that here, do we?
 3              MR. YOUNKIN:  Well, what we have here is a
 4    company that is the -- that now owns, 100 percent owns a
 5    party to litigation.  And I don't think that there's
 6    anything in the case law that suggests that this question
 7    turns on whether or not post acquisition the acquiring
 8    company is going to be added as a named defendant in the
 9    case.  I think that that is a much too narrow reading of
10    these cases and it's not what they argued.
11              I mean, what they argued to the Judge, to
12    Magistrate Judge Fallon, was Courts have widely rejected the
13    contention that a company and a potential purchaser who sat
14    on opposite sides of the bargaining table share a commonly
15    owned interest in contemplated or pending legal proceedings.
16    That was the argument they presented to her, and she said,
17    that's not correct.  That's not correct under Sealed Air.
18    It's contrary to AgroFresh and it's contrary to the
19    Hewlett-Packard line of cases.
20              The cases that they cite are completely
21    different from our case.  They cite a case where somebody
22    was going to buy a majority share of a company, just a
23    majority share, but that's just an investment.
24              When you buy 51 percent of a company, you might
25    have an economic interest, but that is completely different
```

```
 1   from owning the company.  You know, owning 100 percent of

 2   it.  It's a subsidiary at that point.  Right?

 3               And --

 4               THE COURT:  Yes, but I mean --

 5               MR. YOUNKIN:  The way the deal was structured --

 6               THE COURT:  Have you read Judge Chen's opinion

 7   in Nidec?  I mean, he really braces the history of the

 8   common interest privilege, and one thing he points out is

 9   that the parties have to have a joint legal interest and we

10   don't have that here.  Right?  There there's no joint legal

11   interest, is there?  It's economic.

12               MR. YOUNKIN:  Well, I think it's the same

13   interest you see in Sealed Air or you see in

14   Hewlett-Packard.

15               Nidec, all that was happening in Nidec was --

16               THE COURT:  You know, you keep saying

17   Hewlett-Packard, and you say, oh, it's binding in Delaware.

18   I mean, Judge Chen didn't go with Hewlett-Packard.  Right?

19               MR. YOUNKIN:  I'm not suggesting --

20               THE COURT:  A Delaware case, which is Union

21   Carbide, but even it's not binding.  You know, why --

22               MR. YOUNKIN:  I agree with you, Your Honor.

23               THE COURT:  Yes.  Why should I give more to

24   Hewlett-Packard that I give to Nidec?

25               MR. YOUNKIN:  Well, I think for two reasons.
```

```
 1              One, I think that Nidec is distinguishable

 2    because there, you have a situation where an investment

 3    group is trying to buy the majority stake of a company.

 4    They are not going to own it.  That's number one.

 5              Number two, Hewlett-Packard has been -- has been

 6    followed in the Sealed Air case out of New Jersey, and also,

 7    you know, we think that it is the correct, it's the correct

 8    decision.

 9              But, you know, as I think we've been talking

10    about, I mean, what they tried to do in a very short letter

11    brief to the Magistrate Judge was get a ruling, and the

12    transcript is crystal clear on this.  The Magistrate says,

13    the Magistrate asked them, if I find in your favor, won't

14    that mean that there's no common interest when there's

15    merger discussions?  And the answer was, yes, I think that's

16    right.

17              And the Magistrate Judge said, I don't think

18    that is the law.  And it's their burden now to come in and

19    say that she, that she, like, misapplies binding precedent.

20              And then they point to Nidec, which is a

21    factually distinguishable case out of the Northern District

22    of California.

23              THE COURT:  All right.  Anything else?

24              MR. McGOWAN:  I could comment further if the

25    Court wishes it.
```

```
 1              THE COURT:  No.  You know, I had hoped this
 2   argument would make it unnecessary for me to have to address
 3   the legal issue, but I guess it doesn't look like I'm going
 4   to be able to do that, and, frankly, it's going to take me a
 5   little bit of time.
 6              What I would like is, I'm going to give you
 7   chance by next Wednesday to file a letter no more than
 8   750 words to address what is the applicable law of privilege
 9   to make the decision.  You know, Mr. McGowan, you can answer
10   orally that question, but I think I wouldn't mind seeing
11   both parties respond to that.
12              Whether I might look to state law, federal law,
13   federal common law and also just to lay out how I make that
14   decision, what's a starting point for that decision, and
15   then what is the applicable privilege law and common
16   interest law.  All right?
17              MR. YOUNKIN:  You want both parties to submit on
18   the same day, Your Honor?
19              THE COURT:  Yes.  Why don't you do Wednesday at
20   noon, so you both have to do it at the same time.  You know,
21   I think the unfortunate thing about this is, you know, you
22   guys have to keep going with the calendar here and I'm just
23   bothered because I still continue to think at the end of the
24   day, I doubt this has really much probative value and, you
25   know, I've got to spend -- we just have limited resources
```

1   and the cases are, I don't want to take the case off the

2   track its on as far as proceeding to trial in June, but

3   we'll just have to do what we do.

4                    All right.  Anything else from the plaintiff?

5                    MR. McGOWAN:  No.  Thank you, Your Honor.

6                    THE COURT:  All right.  Anything from the

7   defendant?

8                    MR. YOUNKIN:  No, Your Honor.  Thank you.

9                    THE COURT:  Thanks, everybody.  Bye-bye.

10                   (Telephone conference concluded at 11:14 a.m.)

11                             -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

■■ - 11:11

**'**

**'19** [5] - 18:13, 18:15, 18:19, 18:20, 32:23
**'20** [1] - 18:21

**1**

**1** [1] - 59:5
**10** [1] - 37:8
**100** [3] - 51:2, 67:4, 68:1
**10X** [26] - 1:4, 4:15, 7:20, 8:9, 8:18, 9:12, 19:13, 24:20, 26:10, 31:9, 32:8, 34:5, 34:15, 35:10, 36:19, 36:24, 38:7, 39:8, 44:8, 45:11, 45:14, 48:11, 49:5, 53:9, 54:17, 60:8
**10X's** [3] - 41:6, 52:6, 55:5
**11:14** [1] - 71:10
**14** [2] - 11:3, 11:7
**1429** [1] - 28:13
**14th** [2] - 14:21, 14:22
**16** [3] - 7:17, 37:7, 37:12
**19** [2] - 9:15, 42:15
**19-00862-CFC-SRF** [1] - 1:8
**1985** [1] - 65:17

**2**

**2** [1] - 7:13
**2018** [4] - 19:15, 19:16, 19:24, 21:12
**2019** [7] - 17:9, 18:1, 18:14, 18:23, 19:7, 19:22, 30:23
**2020** [6] - 1:11, 18:24, 19:7, 30:23, 32:24, 38:18
**204** [2] - 38:18, 59:22
**204-1** [1] - 7:12
**21** [1] - 38:18
**22** [1] - 9:15
**26** [9] - 5:18, 25:20, 26:3, 28:20, 44:2, 62:1, 62:5, 63:17, 64:8
**26(b)(3** [1] - 43:25
**26(b)(3)(A)** [1] - 51:23
**27** [1] - 12:13

**28** [3] - 36:11, 36:22
**287** [2] - 7:17, 15:16
**288** [1] - 7:25
**289** [1] - 8:15
**291** [3] - 9:10, 15:16, 32:5
**295** [1] - 15:16
**296** [1] - 15:16
**298** [3] - 11:3, 11:6, 15:17
**299** [1] - 15:17

**3**

**3** [13] - 11:3, 15:8, 15:12, 15:13, 24:19, 29:23, 30:15, 31:1, 38:3, 38:4, 38:6, 47:6, 59:21
**30(b** [2] - 32:14, 32:19
**30(b)(6** [10] - 10:22, 11:18, 25:11, 32:2, 40:8, 42:21, 49:11, 59:18, 59:20, 59:23
**30(b)(6)** [1] - 58:21
**36** [2] - 37:5, 38:12
**38** [1] - 35:22

**4**

**403** [5] - 54:4, 54:24, 56:6, 56:24, 58:12

**5**

**5** [1] - 1:11
**51** [1] - 67:24
**55** [1] - 15:18
**56** [1] - 15:18
**59** [1] - 15:18
**5th** [2] - 14:24, 47:21

**7**

**7** [1] - 36:22
**750** [1] - 70:8

**8**

**8** [5] - 18:6, 19:15, 19:16, 19:24, 21:12
**87** [1] - 7:14

**9**

**9:30** [2] - 1:12, 3:4

**A**

**a.m** [3] - 1:12, 3:4, 71:10

**abbreviated** [1] - 13:21
**able** [2] - 13:22, 70:4
**absorb** [1] - 64:15
**absorbed** [1] - 64:3
**accommodate** [1] - 28:24
**account** [1] - 20:25
**acquire** [1] - 52:25
**acquired** [1] - 51:1
**acquirer** [2] - 51:7, 51:18
**acquiring** [2] - 66:5, 67:7
**acquisition** [11] - 16:8, 18:21, 21:7, 23:16, 24:1, 34:3, 35:9, 50:24, 55:12, 66:4, 67:7
**across-the-table** [5] - 5:17, 25:5, 25:21, 26:5, 33:19
**action** [2] - 34:25, 62:23
**ACTION** [1] - 1:4
**actual** [1] - 66:17
**added** [1] - 67:8
**addition** [1] - 35:24
**additional** [1] - 36:2
**address** [9] - 13:17, 42:25, 48:24, 50:8, 52:16, 52:17, 53:7, 70:2, 70:8
**addressed** [6] - 9:3, 9:5, 31:12, 52:9, 55:20, 66:24
**addresses** [1] - 62:18
**addressing** [2] - 3:21, 17:19
**adduce** [1] - 55:8
**admissibility** [2] - 55:24, 57:16
**admitted** [1] - 46:8
**adversary** [1] - 35:6
**affirm** [6] - 35:14, 38:11, 38:15, 38:16, 38:25, 60:5
**affirmance** [1] - 45:18
**affirming** [1] - 41:8
**affords** [1] - 36:1
**afterwards** [1] - 17:24
**agree** [13] - 15:24, 22:14, 27:22, 28:18, 37:22, 40:23, 46:23, 48:24, 55:10, 56:16, 60:24, 63:16, 68:22
**agreement** [10] - 22:18, 24:22, 25:7, 28:25, 31:3, 35:9, 45:13, 49:7, 50:12,

59:17
**agreements** [1] - 53:6
**agrees** [1] - 56:19
**AgroFresh** [3] - 41:11, 41:12, 67:18
**ahead** [6] - 14:19, 30:14, 31:15, 57:19, 64:20, 66:23
**Air** [8] - 27:5, 61:9, 65:15, 65:19, 66:13, 67:17, 68:13, 69:6
**aired** [1] - 50:13
**alleged** [1] - 18:7
**allow** [1] - 41:5
**allows** [1] - 35:6
**alluded** [1] - 56:14
**almost** [2] - 13:1, 13:10
**alone** [1] - 35:12
**ambiguous** [1] - 46:9
**amount** [1] - 57:14
**analysis** [3] - 13:25, 20:19, 27:11
**AND** [1] - 1:2
**anew** [1] - 13:11
**answer** [24] - 7:22, 8:5, 8:12, 8:22, 11:12, 15:6, 16:1, 19:3, 19:14, 23:21, 25:12, 28:5, 32:11, 42:5, 46:2, 48:14, 57:21, 58:8, 58:11, 62:2, 63:23, 64:6, 69:15, 70:9
**answered** [2] - 7:23, 53:14
**answers** [1] - 58:4
**anti** [1] - 63:20
**anti-waiver** [1] - 63:20
**anticipated** [2] - 65:4, 67:1
**anticipation** [4] - 28:9, 28:20, 44:10, 52:3
**anyway** [1] - 30:13
**apart** [1] - 53:21
**apologies** [2] - 11:5, 11:7
**apologize** [6] - 10:25, 20:1, 26:21, 27:18, 29:21, 62:12
**apologized** [1] - 29:20
**APPEARANCES** [2] - 1:16, 2:1
**applicable** [2] - 70:8, 70:15
**applied** [3] - 54:3, 65:2, 65:16
**applies** [3] - 35:11, 43:1, 62:11
**apply** [4] - 41:13,

46:25, 60:13, 66:19
**applying** [1] - 17:11
**appreciate** [1] - 5:23
**approach** [2] - 21:16, 49:20
**appropriate** [1] - 28:3
**April** [5] - 18:21, 18:23, 19:7, 30:23, 32:24
**argue** [7] - 26:13, 29:11, 29:14, 41:19, 42:19, 46:7, 47:13
**argued** [4] - 29:15, 29:18, 67:10, 67:11
**arguing** [4] - 16:13, 36:16, 36:24, 50:10
**argument** [18] - 3:15, 12:12, 36:18, 41:24, 42:1, 42:4, 42:13, 42:22, 47:11, 47:13, 50:9, 53:23, 58:11, 59:8, 61:10, 64:10, 67:16, 70:2
**arguments** [3] - 4:21, 42:16, 51:15
**ascertain** [1] - 17:12
**aside** [2] - 35:25, 64:11
**aspects** [1] - 28:19
**assert** [1] - 28:15
**assertion** [1] - 15:22
**assessment** [1] - 22:15
**assessments** [3] - 36:25, 37:1, 54:14
**assets** [2] - 65:22, 66:8
**assume** [3] - 21:10, 23:5, 23:14
**assumptions** [1] - 55:22
**attempting** [1] - 45:2
**attend** [1] - 50:4
**attention** [3] - 25:17, 27:12, 59:25
**attorney** [19] - 4:11, 10:2, 24:20, 26:18, 28:1, 29:23, 33:11, 34:16, 38:7, 38:19, 39:5, 40:21, 40:23, 43:12, 43:19, 43:22, 44:12, 53:16
**attorney's** [5] - 38:13, 40:22, 40:25, 44:21, 53:14
**attorney/client** [5] - 9:23, 43:19, 62:23, 64:10, 64:12
**attorneys** [3] - 5:13, 30:18, 41:6

**August** [1] - 18:3
**avoid** [1] - 20:2
**award** [1] - 54:10
**awarded** [2] - 22:5, 22:6
**awhile** [1] - 60:2

# B

**b)(3)** [1] - 44:3
**bad** [2] - 22:2, 35:16
**Bankruptcy** [1] - 61:10
**BARBARA** [1] - 2:12
**Barbara** [1] - 3:19
**bargaining** [1] - 67:14
**based** [9] - 7:2, 16:20, 26:19, 41:18, 42:6, 45:15, 49:12, 54:12, 56:8
**basis** [5] - 10:12, 36:2, 42:20, 62:20, 63:23
**bear** [3] - 20:5, 23:7, 48:3
**became** [1] - 14:6
**become** [1] - 64:4
**becomes** [2] - 28:25, 57:10
**BEFORE** [1] - 1:14
**began** [2] - 3:3, 29:24
**begin** [1] - 3:23
**beginning** [3] - 18:15, 25:9, 37:8
**behalf** [1] - 3:19
**belabor** [1] - 60:2
**benefit** [2] - 9:23, 54:25
**between** [25] - 5:8, 5:9, 5:13, 8:19, 9:6, 9:21, 16:3, 18:23, 19:7, 20:10, 20:18, 24:22, 25:25, 27:17, 30:23, 32:23, 32:24, 36:9, 37:10, 41:3, 46:17, 46:21, 47:9, 48:11
**Bible** [1] - 17:22
**binding** [7] - 4:4, 8:19, 9:11, 34:1, 68:17, 68:21, 69:19
**Bio** [25] - 7:19, 8:9, 8:17, 24:2, 24:12, 25:13, 32:24, 34:3, 35:8, 36:9, 36:25, 37:11, 45:21, 45:23, 48:11, 48:16, 50:24, 51:1, 52:2, 52:25, 55:3, 56:15, 56:18, 66:9, 66:10
**Bio-Rad** [25] - 7:19,

8:9, 8:17, 24:2, 24:12, 25:13, 32:24, 34:3, 35:8, 36:9, 36:25, 37:11, 45:21, 45:23, 48:11, 48:16, 50:24, 51:1, 52:2, 52:25, 55:3, 56:15, 56:18, 66:9, 66:10
**bit** [5] - 42:4, 47:20, 48:18, 57:12, 70:5
**blank** [1] - 26:11
**blocked** [1] - 58:8
**body** [1] - 45:17
**Book** [4] - 17:16, 17:22, 20:1, 20:21
**boston** [1] - 2:13
**bothered** [1] - 70:23
**bottom** [1] - 42:18
**bought** [2] - 50:24, 50:25
**bound** [1] - 62:14
**braces** [1] - 68:7
**brain** [2] - 63:4, 63:5
**breadth** [1] - 64:23
**BRIAN** [1] - 2:8
**Brian** [1] - 3:18
**brief** [3] - 31:13, 59:6, 69:11
**briefed** [2] - 55:25, 63:7
**briefing** [3] - 4:17, 7:16, 31:22
**briefly** [1] - 50:8
**bring** [3] - 25:17, 59:24, 66:18
**bringing** [1] - 63:6
**broad** [3] - 60:18, 65:6, 66:16
**broadly** [2] - 15:15, 60:15
**broke** [1] - 56:17
**brought** [3] - 38:24, 60:17
**burden** [12] - 4:19, 13:12, 41:15, 41:20, 42:9, 47:15, 48:10, 51:19, 54:16, 55:24, 58:2, 69:18
**burdensome** [1] - 42:19
**business** [15] - 16:18, 16:19, 16:23, 17:3, 18:20, 20:5, 20:10, 20:13, 20:18, 21:5, 22:21, 22:22, 23:3, 23:8, 65:7
**businesspeople** [2] - 23:2, 53:11
**businessperson** [3] - 27:8, 53:12, 53:19

**buy** [7] - 22:23, 24:3, 50:17, 51:6, 67:22, 67:24, 69:3
**buyer** [6] - 16:5, 16:9, 16:16, 65:11, 65:23, 66:6
**buyer's** [1] - 22:22
**buying** [1] - 52:11
**BY** [3] - 1:18, 2:8, 2:12
**bye** [2] - 71:9
**bye-bye** [1] - 71:9

# C

**caches** [1] - 33:17
**calendar** [1] - 70:22
**California** [2] - 2:4, 69:22
**candid** [1] - 60:9
**candidly** [3] - 23:1, 61:1, 61:12
**candle** [1] - 57:11
**cannot** [1] - 60:11
**caption** [2] - 65:13, 66:7
**Carbide** [7] - 65:3, 65:8, 65:18, 65:25, 66:13, 66:24, 68:21
**care** [1] - 49:9
**case** [71] - 4:25, 5:13, 10:10, 14:5, 14:8, 14:9, 16:6, 16:12, 18:5, 18:17, 20:7, 20:22, 22:7, 22:12, 22:16, 24:15, 26:25, 27:5, 28:9, 28:12, 28:13, 28:23, 28:25, 29:5, 33:1, 34:21, 35:13, 37:13, 38:13, 39:5, 40:7, 40:10, 40:14, 40:19, 43:20, 44:15, 44:24, 45:1, 45:8, 45:17, 47:23, 52:6, 52:12, 55:23, 61:9, 62:4, 62:22, 63:11, 63:24, 64:3, 64:5, 64:7, 64:9, 64:10, 64:24, 65:3, 65:8, 65:9, 65:15, 65:19, 65:20, 66:2, 67:6, 67:9, 67:21, 68:20, 69:6, 69:21, 71:1
**cases** [23] - 5:10, 12:5, 16:6, 16:9, 16:11, 20:23, 21:16, 28:7, 29:6, 31:11, 31:24, 34:4, 41:2, 41:12, 61:5, 61:15, 64:4, 65:4, 66:18, 67:10,

67:19, 67:20, 71:1
**categorical** [1] - 58:16
**causes** [1] - 62:23
**Celsee** [22] - 7:19, 8:3, 8:8, 8:17, 13:22, 18:7, 31:10, 32:24, 35:8, 36:9, 37:10, 39:4, 41:5, 45:22, 45:23, 51:2, 52:25, 56:15, 56:19, 59:15, 66:8, 66:9
**CELSEE** [1] - 1:7
**Celsee's** [3] - 37:1, 38:12, 38:13
**CEO** [1] - 44:14
**certainly** [6] - 16:4, 21:17, 22:20, 23:5, 37:3, 42:4
**challenge** [1] - 66:24
**chance** [1] - 70:7
**changed** [1] - 47:20
**changing** [1] - 21:5
**characterized** [1] - 50:23
**chemical** [1] - 28:9
**Chen** [1] - 68:18
**Chen's** [1] - 68:6
**Circuit** [6] - 60:11, 61:8, 62:14, 62:17, 63:11
**circumstance** [1] - 66:19
**circumstances** [4] - 20:23, 27:23, 27:25, 47:20
**cite** [6] - 11:20, 24:23, 51:23, 67:20, 67:21
**cited** [7] - 7:16, 11:4, 11:15, 15:9, 15:15, 32:16, 34:5
**cites** [1] - 6:18
**citing** [1] - 6:12
**civil** [1] - 63:1
**Civil** [1] - 43:24
**CIVIL** [1] - 1:4
**claim** [3] - 29:16, 29:17, 51:15
**clarifies** [1] - 5:22
**clarify** [1] - 20:2
**clause** [1] - 17:24
**cleaner** [1] - 12:3
**cleaning** [1] - 13:5
**cleanly** [1] - 12:22
**clear** [9] - 27:19, 34:22, 36:5, 37:14, 39:14, 42:14, 48:19, 65:23, 69:12
**clearer** [2] - 35:3, 50:2
**clearly** [6] - 36:19, 37:9, 40:18, 44:16,

44:25, 49:4
**client** [2] - 40:22, 43:21
**client's** [2] - 40:24, 43:21
**co** [3] - 28:9, 65:4, 66:1
**co-defendants** [3] - 28:9, 65:4, 66:1
**COLM** [1] - 1:14
**coming** [1] - 56:4
**comment** [4] - 56:15, 56:18, 56:22, 69:24
**common** [45] - 4:1, 4:6, 7:3, 11:24, 15:23, 24:15, 24:16, 27:16, 28:7, 28:8, 29:5, 29:7, 29:18, 31:19, 31:23, 32:2, 33:15, 33:25, 35:13, 35:25, 36:17, 43:1, 45:17, 49:12, 49:14, 49:16, 55:13, 60:7, 60:11, 60:12, 61:6, 62:3, 63:19, 63:21, 64:1, 64:2, 64:15, 64:21, 66:2, 66:16, 68:8, 69:14, 70:13, 70:15
**commonly** [1] - 67:14
**communicated** [1] - 51:9
**communicating** [1] - 26:12
**communication** [7] - 27:15, 29:3, 31:18, 46:22, 47:1, 50:21, 64:16
**communications** [24] - 12:10, 16:3, 25:5, 25:21, 26:5, 30:22, 32:1, 32:19, 32:23, 36:9, 37:9, 37:10, 46:19, 47:9, 48:11, 48:20, 49:2, 49:6, 49:8, 50:10, 50:14, 50:17, 50:19, 57:8
**company** [12] - 22:23, 44:13, 66:5, 66:7, 66:11, 67:4, 67:8, 67:13, 67:22, 67:24, 68:1, 69:3
**compel** [6] - 36:3, 36:6, 36:7, 38:17, 57:23, 58:4
**compelled** [1] - 59:15
**compelling** [2] - 53:24, 56:11
**competitive** [1] - 17:2
**completely** [2] -

67:20, 67:25
**complicated** [1] - 4:3
**concedes** [1] - 46:19
**concerned** [6] - 4:2, 4:12, 38:8, 41:10, 41:12, 41:13
**concerning** [3] - 24:21, 31:3, 59:17
**concerns** [1] - 7:11
**conclude** [1] - 54:4
**concluded** [2] - 54:23, 71:10
**conclusion** [1] - 49:4
**concrete** [5] - 55:1, 55:19, 55:20, 56:25, 57:17
**conditional** [1] - 56:2
**conducted** [3] - 6:6, 7:13, 48:12
**confer** [1] - 50:3
**conference** [3] - 1:12, 3:3, 71:10
**confuse** [1] - 54:6
**confusing** [1] - 4:9
**connection** [4] - 9:10, 32:6, 42:12, 51:10
**CONNOLLY** [1] - 1:14
**consequences** [1] - 23:9
**consider** [7] - 17:11, 17:13, 21:12, 21:20, 22:6, 22:7, 47:14
**consideration** [1] - 4:17
**considerations** [6] - 6:10, 6:19, 11:10, 42:10, 49:24, 54:6
**considered** [2] - 5:10, 48:9
**considering** [1] - 21:3
**consistent** [2] - 23:22, 31:4
**constitute** [1] - 50:19
**constitutes** [1] - 27:15
**consummated** [2] - 46:7
**contain** [1] - 53:6
**contemplated** [1] - 67:15
**content** [3] - 24:24, 30:11, 50:20
**contention** [1] - 67:13
**contents** [3] - 9:4, 10:14, 46:25
**context** [3] - 20:20, 56:24, 59:8
**continue** [2] - 28:15, 70:23
**Continued** [1] - 2:1
**contract** [1] - 46:9

**contradict** [1] - 24:8
**contrary** [2] - 67:18
**conversation** [3] - 6:25, 7:10, 29:24
**conversations** [6] - 7:1, 9:21, 10:16, 15:22, 18:24, 52:1
**convey** [1] - 33:14
**conveyed** [1] - 33:11
**conveying** [2] - 26:14, 52:6
**corporate** [8] - 6:23, 11:24, 23:11, 27:9, 58:16, 59:11, 59:12, 59:16
**correct** [20] - 15:17, 15:19, 18:25, 19:5, 19:8, 24:13, 25:10, 39:19, 40:3, 42:21, 43:4, 51:21, 55:10, 60:19, 63:15, 64:12, 67:17, 69:7
**correspond** [1] - 10:13
**Cottrell** [3] - 3:10
**COTTRELL** [1] - 1:19
**counsel** [4] - 30:6, 46:24, 47:1, 51:13, 55:6, 64:23
**Counsel** [2] - 2:6, 2:14
**counter** [1] - 10:20
**counter-proposal** [1] - 10:20
**counterparties** [1] - 24:22
**couple** [1] - 48:2
**course** [4] - 38:22, 40:18, 46:13, 54:3
**COURT** [132] - 1:1, 3:6, 3:16, 3:22, 5:23, 6:13, 6:22, 7:7, 11:6, 11:8, 11:19, 12:15, 12:19, 13:18, 14:2, 14:5, 14:13, 14:16, 14:22, 14:25, 15:11, 15:14, 15:24, 17:5, 17:7, 17:10, 17:20, 17:22, 18:4, 18:10, 18:14, 18:22, 19:3, 19:9, 19:16, 19:20, 21:9, 21:20, 22:1, 23:15, 23:19, 23:25, 24:7, 24:10, 24:17, 25:7, 25:11, 25:16, 25:23, 26:2, 26:8, 26:16, 27:20, 29:10, 29:19, 30:9, 31:6, 31:15, 32:4, 32:15, 32:21, 33:4, 33:7, 33:9, 33:24, 34:7,

35:16, 35:23, 36:4, 36:12, 36:14, 36:20, 36:23, 37:6, 37:22, 38:2, 39:11, 39:22, 40:3, 40:5, 40:21, 42:8, 42:18, 42:24, 43:7, 43:16, 44:1, 44:4, 44:6, 44:17, 45:20, 46:5, 47:3, 48:9, 49:10, 50:16, 51:3, 51:22, 52:17, 52:21, 53:15, 53:23, 54:20, 56:2, 56:17, 57:19, 58:14, 58:23, 59:7, 59:14, 60:14, 61:16, 61:24, 62:6, 62:10, 62:16, 63:3, 63:10, 64:18, 64:20, 66:20, 66:23, 68:4, 68:6, 68:16, 68:20, 68:23, 69:23, 70:1, 70:19, 71:6, 71:9
**Court** [36] - 1:25, 3:21, 5:8, 5:22, 6:15, 6:19, 11:4, 11:16, 20:2, 20:19, 20:22, 21:24, 28:8, 28:13, 33:17, 39:19, 39:21, 45:25, 54:22, 55:9, 56:14, 56:23, 56:25, 57:8, 60:10, 61:4, 61:10, 62:13, 63:23, 65:1, 65:22, 67:1, 69:25
**Court's** [13] - 3:14, 5:4, 12:11, 16:1, 19:2, 27:12, 55:8, 55:17, 57:10, 62:2, 64:6, 64:17, 65:9
**Courts** [2] - 57:20, 67:12
**cover** [2] - 16:24, 18:16
**covered** [4] - 15:17, 49:3, 50:12, 50:15
**covers** [1] - 44:21
**created** [1] - 10:11
**criminal** [1] - 64:3
**crystal** [1] - 69:12
**cut** [2] - 55:7, 55:16

## D

**damages** [19] - 16:5, 17:12, 18:5, 20:6, 20:8, 20:9, 20:12, 20:20, 21:16, 22:5, 22:6, 32:25, 35:1, 37:20, 47:22, 47:23, 48:4, 54:10, 56:21
**Daralyn** [2] - 3:12,

13:16
**DARALYN** [1] - 2:3
**data** [16] - 6:7, 7:20, 8:10, 8:18, 9:4, 9:20, 10:15, 24:24, 25:2, 30:4, 30:12, 30:21, 46:18, 46:24
**date** [10] - 14:17, 14:19, 14:21, 18:17, 19:10, 20:11, 21:2, 24:6, 57:13
**dated** [1] - 38:18
**Dave** [2] - 3:12, 15:4
**David** [1] - 5:3
**DAVID** [1] - 2:4
**deal** [4] - 45:22, 50:22, 50:23, 68:5
**dealing** [5] - 42:16, 62:4, 62:7, 62:10, 63:3
**deals** [3] - 12:21, 51:23, 65:7
**December** [12] - 18:13, 18:14, 18:15, 18:20, 18:23, 19:7, 19:15, 19:16, 19:24, 21:12, 30:23, 32:23
**decide** [1] - 46:13
**decided** [4] - 3:24, 41:9, 60:22, 61:3
**deciding** [1] - 22:5
**decision** [11] - 4:6, 13:2, 34:13, 35:14, 55:15, 60:4, 64:17, 69:8, 70:9, 70:14
**decisions** [1] - 57:17
**Defendant** [2] - 1:8, 2:14
**defendant** [17] - 3:17, 3:19, 6:18, 11:4, 11:15, 11:16, 16:11, 16:20, 16:21, 22:10, 23:8, 29:16, 51:5, 51:7, 67:8, 71:7
**defendant-friendly** [1] - 22:10
**defendants** [7] - 4:9, 16:13, 28:9, 29:8, 65:4, 65:13, 66:1
**defending** [1] - 42:1
**defense** [2] - 34:4, 64:4
**defenses** [1] - 51:14
**definitive** [1] - 56:6
**DELAWARE** [1] - 1:2
**Delaware** [9] - 1:11, 60:11, 61:2, 61:3, 61:11, 61:14, 65:1, 68:17, 68:20
**deliberations** [1] -

5:19
**delve** [1] - 10:8
**delving** [1] - 45:16
**demand** [1] - 44:14
**demonstrate** [1] - 52:4
**deponent** [1] - 4:23
**deposition** [26] - 4:24, 6:5, 6:17, 6:24, 7:13, 9:17, 9:19, 11:18, 12:24, 13:15, 13:20, 30:3, 32:2, 32:14, 41:16, 41:25, 42:6, 42:20, 48:2, 48:22, 49:18, 58:5, 58:6, 58:16, 58:20, 59:10
**depositions** [3] - 6:4, 7:5, 32:17
**described** [1] - 64:23
**designed** [1] - 30:3
**details** [1] - 33:16
**developing** [1] - 22:12
**DI** [2] - 38:18, 59:22
**difference** [3] - 20:10, 20:18, 55:13
**different** [12] - 6:14, 7:6, 10:23, 16:16, 27:21, 28:19, 48:10, 55:5, 63:14, 65:13, 67:21, 67:25
**difficult** [2] - 35:5, 48:8
**diligence** [1] - 53:3
**disagree** [3] - 32:4, 40:13, 40:23
**disagreed** [1] - 50:14
**disclose** [2] - 51:17, 53:16
**disclosed** [3] - 33:20, 33:21, 47:1
**discloses** [1] - 28:14
**disclosing** [2] - 37:25, 40:12
**disclosure** [1] - 11:12, 28:16, 29:8, 31:9, 38:10, 39:4, 40:15, 41:5, 51:11, 63:22, 64:8
**disclosures** [1] - 29:6, 39:15
**discover** [2] - 19:6, 44:9
**discovery** [10] - 4:24, 12:23, 14:7, 14:11, 14:13, 14:17, 30:22, 32:17, 48:17, 53:9
**discuss** [2] - 9:10, 32:6
**discussed** [6] - 10:10, 23:11, 31:24, 33:16, 34:15, 52:7

**discussion** [4] - 20:13, 55:1, 63:18, 65:6
**discussions** [11] - 5:17, 11:25, 20:5, 20:10, 20:19, 22:21, 22:22, 23:6, 45:7, 48:16, 69:15
**dispute** [1] - 45:25
**dissatisfaction** [1] - 29:25
**distinction** [8] - 5:7, 5:13, 6:16, 10:21, 15:21, 27:17, 46:17, 46:21
**distinguish** [3] - 27:4, 41:3, 45:3
**distinguishable** [2] - 69:1, 69:21
**distinguishes** [1] - 24:14
**distribution** [1] - 28:4
**DISTRICT** [2] - 1:1, 1:2
**District** [4] - 20:22, 61:2, 65:1, 69:21
**dive** [1] - 27:2
**diversity** [2] - 62:22, 64:14
**division** [2] - 16:9, 65:10
**doctrine** [24] - 10:13, 12:5, 28:15, 29:2, 29:4, 35:25, 36:1, 43:1, 43:12, 43:22, 49:4, 50:12, 50:15, 55:13, 60:7, 60:13, 62:3, 63:1, 63:19, 63:21, 64:1, 64:5, 66:17, 66:19
**doctrine's** [1] - 28:16
**document** [3] - 7:12, 48:23, 57:23
**document's** [1] - 28:15
**documents** [11] - 25:8, 27:3, 28:14, 30:13, 30:17, 30:20, 44:9, 46:18, 51:24, 52:5, 57:24
**dollar** [1] - 16:20
**done** [5] - 18:21, 25:19, 35:7, 46:14, 65:7
**doubt** [2] - 9:23, 70:24
**Dow** [1] - 28:9
**down** [5] - 12:2, 27:2, 27:5, 51:13
**draw** [3] - 27:11, 27:17, 46:20
**drawing** [2] - 15:21,

46:17
**drawn** [4] - 5:8, 6:24, 10:24, 15:22
**driven** [1] - 29:2
**drop** [1] - 41:17
**dropped** [2] - 6:2, 50:7
**due** [3] - 14:23, 53:3
**DURE** [1] - 18:11
**DURIE** [8] - 2:2, 2:3, 13:16, 13:19, 14:3, 14:10, 14:15, 14:18
**Durie** [7] - 3:13, 5:3, 6:6, 7:13, 8:8, 13:16
**during** [7] - 20:24, 25:13, 26:20, 38:22, 41:22, 54:2, 54:8
**dwell** [1] - 56:13

## E

**e-mail** [4] - 10:19, 30:22, 32:23, 47:2
**e-mails** [3] - 25:6, 48:10, 52:2
**easily** [1] - 53:15
**economic** [4] - 23:9, 66:7, 67:25, 68:11
**effect** [2] - 22:21, 38:17
**effectively** [1] - 38:17
**effort** [4] - 12:4, 12:8, 31:20, 31:25
**Eight** [1] - 11:7
**element** [3] - 20:7, 20:8, 20:9
**employee** [1] - 59:13
**end** [6] - 14:6, 14:10, 25:13, 31:1, 35:22, 70:23
**ending** [1] - 37:14
**engaged** [1] - 21:21
**entered** [1] - 8:20
**entitled** [1] - 48:25
**entity** [1] - 50:19
**equation** [1] - 36:1
**Erie** [2] - 63:1, 64:3
**erroneous** [1] - 49:5
**error** [1] - 27:11
**escrow** [9] - 9:12, 32:8, 32:25, 33:5, 36:16, 37:11, 49:24
**especially** [1] - 6:1
**ESQ** [8] - 1:18, 1:19, 2:3, 2:3, 2:4, 2:8, 2:12, 2:12
**essence** [1] - 17:3
**essentially** [1] - 38:25
**establish** [3] - 27:14, 31:21, 31:25
**established** [1] - 65:2

**estimating** [1] - 20:15
**EUGENE** [1] - 2:3
**evaluate** [1] - 22:7
**evaluation** [2] - 38:12, 38:13
**eve** [1] - 17:16
**evidence** [12] - 19:6, 21:4, 34:23, 37:18, 37:20, 46:8, 46:10, 48:3, 54:1, 55:14, 57:16
**exactly** [2] - 6:15, 24:18
**example** [8] - 5:11, 21:5, 35:3, 37:15, 43:17, 61:17, 61:19, 62:22
**examples** [1] - 15:1
**exception** [8] - 4:6, 33:15, 33:17, 49:13, 49:14, 49:16, 64:7
**excerpt** [1] - 11:1
**exchanged** [1] - 10:19
**exclusive** [1] - 49:15
**exclusively** [1] - 23:7
**Exhibit** [5] - 6:16, 10:23, 18:6, 31:17, 58:16
**exhibits** [1] - 31:17
**exist** [2] - 7:4, 64:2
**exists** [2] - 10:12, 10:15
**expect** [4] - 20:18, 21:6, 21:18, 38:20
**expenses** [1] - 32:25
**expert** [3] - 14:12, 14:17, 47:23
**expertise** [1] - 17:25
**explain** [2] - 15:3, 50:16
**explains** [1] - 31:7
**explanation** [1] - 56:9
**expressly** [2] - 4:10, 53:5
**extending** [1] - 18:16
**extent** [8] - 17:18, 20:5, 20:13, 26:9, 38:11, 41:7, 62:1, 62:2
**extra** [1] - 28:24
**extremely** [1] - 13:20

## F

**fact** [9] - 4:23, 12:24, 14:7, 14:11, 14:13, 22:4, 38:24, 41:3, 61:18
**factors** [8] - 16:22, 17:1, 17:12, 21:2,

21:13, 21:14, 21:23, 23:7
**facts** [3] - 4:7, 27:16, 66:17
**factually** [1] - 69:21
**fair** [10] - 22:1, 24:25, 25:14, 25:15, 33:8, 34:5, 34:6, 43:2, 52:13, 54:11
**fairness** [2] - 29:19, 31:4
**fall** [1] - 33:15
**Fallon** [7] - 35:2, 35:17, 44:24, 49:2, 51:20, 58:19, 67:12
**Fallon's** [2] - 35:14, 37:5
**familiar** [1] - 41:2
**far** [5] - 4:12, 16:12, 38:8, 39:5, 71:2
**FARNAN** [3] - 2:8, 2:8, 3:18
**Farnan** [1] - 3:19
**faulting** [5] - 12:22, 13:6, 30:1, 31:9, 31:10
**favor** [1] - 69:13
**featured** [1] - 50:4
**February** [2] - 14:24, 48:6
**Federal** [2] - 43:24, 63:2
**federal** [8] - 62:4, 63:25, 64:1, 64:7, 64:14, 70:12, 70:13
**fees** [1] - 32:25
**few** [1] - 43:18
**FIACCO** [1] - 3:20
**Fiacco** [1] - 3:20
**figure** [1] - 63:13
**file** [1] - 70:7
**filed** [1] - 18:18
**files** [10] - 10:9, 24:20, 27:3, 27:6, 27:18, 28:24, 29:23, 33:21, 38:7, 38:19
**financially** [1] - 37:3
**Finger** [1] - 3:9
**FINGER** [1] - 1:18
**fingertips** [1] - 23:22
**first** [23] - 3:25, 4:25, 5:5, 7:7, 7:8, 7:17, 9:17, 17:16, 18:6, 19:10, 21:2, 25:22, 26:6, 30:2, 31:11, 33:13, 42:12, 42:16, 49:18, 58:24, 60:10, 61:16, 61:21
**firstly** [1] - 43:11
**flat** [1] - 21:3

**focus** [2] - 41:4, 52:22
**focused** [2] - 31:23, 60:3
**focusing** [4] - 12:9, 20:19, 31:17, 31:18
**FOLEY** [1] - 2:11
**Foley** [1] - 3:20
**folks** [2] - 19:14, 19:21
**follow** [4] - 57:15, 61:4, 61:25, 66:17
**followed** [2] - 60:23, 69:6
**following** [1] - 3:3
**font** [1] - 64:24
**footnote** [23] - 4:12, 4:15, 6:2, 6:18, 24:19, 26:19, 27:1, 29:23, 30:11, 30:15, 31:1, 31:5, 34:16, 38:3, 38:4, 38:6, 41:7, 41:17, 47:6, 47:18, 50:8, 59:5
**FOR** [1] - 1:2
**force** [2] - 38:9
**forgive** [1] - 19:17
**forgot** [1] - 61:18
**form** [2] - 23:20, 46:22
**formed** [1] - 51:10
**former** [1] - 59:12
**forming** [1] - 53:22
**forms** [1] - 44:14
**forth** [8] - 10:18, 10:19, 12:8, 33:13, 37:2, 39:3, 47:9, 55:11
**foundation** [1] - 57:5
**frame** [5] - 17:11, 17:14, 19:5, 19:11, 19:24
**framings** [1] - 7:6
**Francisco** [1] - 2:4
**frankly** [4] - 5:24, 12:24, 60:15, 70:4
**fraudulent** [1] - 65:22
**Fred** [1] - 3:10
**FREDERICK** [1] - 1:19
**free** [1] - 46:13
**Friday** [1] - 47:25
**friendly** [1] - 22:10
**front** [8] - 4:18, 6:1, 41:18, 41:19, 41:20, 42:8, 54:2, 56:7
**full** [1] - 35:12
**fully** [1] - 60:5
**furthermore** [1] - 30:19
**furthers** [2] - 28:16, 29:3

## G

**game** [1] - 57:11
**Gene** [2] - 3:13, 19:12
**general** [4] - 20:3, 51:13, 56:8, 66:16
**generally** [1] - 4:25
**GENOMICS** [1] - 1:4
**Georgia** [7] - 16:22, 17:1, 17:12, 21:2, 21:13, 21:14, 21:23
**Georgia-Pacific** [7] - 16:22, 17:1, 17:12, 21:2, 21:13, 21:14, 21:23
**given** [4] - 41:25, 53:21, 58:15, 59:23
**glad** [1] - 61:18
**glitch** [1] - 25:23
**goal** [1] - 28:17
**govern** [1] - 63:2
**governed** [1] - 62:24
**grasp** [1] - 59:2
**great** [1] - 18:22
**ground** [3] - 6:21, 8:13, 60:7
**grounded** [1] - 62:24
**grounds** [8] - 8:6, 11:17, 32:11, 34:12, 35:14, 42:6, 45:18, 50:1
**group** [1] - 69:3
**guard** [1] - 28:3
**guess** [2] - 48:2, 70:3
**guidance** [1] - 5:4
**guide** [1] - 61:25
**guided** [1] - 4:20
**Gunning** [1] - 1:24
**guys** [3] - 43:17, 63:5, 70:22

## H

**hand** [1] - 4:9
**handful** [1] - 13:21
**hard** [1] - 51:22
**hashing** [1] - 48:18
**head** [2] - 5:19, 48:5
**heads** [2] - 5:15, 33:22
**hear** [5] - 3:7, 4:19, 4:25, 19:3, 34:7
**heard** [8] - 34:19, 35:2, 37:17, 44:24, 54:16, 57:13, 66:8, 66:10
**hearing** [3] - 41:23, 42:3, 60:20
**heart** [1] - 37:13
**held** [1] - 51:20
**help** [1] - 63:8

**Hewlett** [21] - 5:12, 10:10, 27:4, 29:5, 31:24, 45:17, 60:22, 61:2, 61:14, 64:24, 65:2, 65:6, 65:9, 65:16, 66:13, 67:19, 68:14, 68:17, 68:18, 68:24, 69:5
**Hewlett-Packard** [21] - 5:12, 10:10, 27:4, 29:5, 31:24, 45:17, 60:22, 61:2, 61:14, 64:24, 65:2, 65:6, 65:9, 65:16, 66:13, 67:19, 68:14, 68:17, 68:18, 68:24, 69:5
**highly** [1] - 10:24, 37:4
**history** [1] - 68:7
**HOAG** [1] - 2:11
**Hoag** [1] - 3:20
**hold** [11] - 7:8, 15:11, 37:22, 38:4, 40:21, 44:1, 58:23, 59:2, 59:7, 62:6
**holdback** [5] - 6:11, 6:20, 9:12, 16:23, 32:8
**holding** [1] - 65:8
**holdings** [1] - 66:18
**holds** [1] - 66:8
**Honor** [39] - 3:8, 3:18, 5:2, 10:25, 13:16, 13:19, 14:18, 14:21, 14:24, 15:4, 18:11, 18:12, 19:8, 19:12, 19:25, 22:17, 25:15, 31:14, 34:6, 34:9, 36:11, 40:1, 40:13, 41:23, 43:4, 43:23, 46:3, 48:23, 54:19, 58:13, 60:2, 61:13, 62:21, 63:16, 66:21, 68:22, 70:18, 71:5, 71:8
**Honor's** [1] - 28:6
**HONORABLE** [1] - 1:14
**hope** [2] - 14:25, 56:3
**hoped** [2] - 56:9, 70:1
**hoping** [1] - 54:20
**huge** [2] - 47:10, 57:14
**hundred** [3] - 52:25, 55:11, 66:5
**hypotheses** [1] - 55:5
**hypothesizing** [1] - 55:2
**hypothetical** [3] - 20:11, 20:12, 20:25

**hypotheticals** [1] - 56:13

## I

**idea** [1] - 56:14
**ideally** [1] - 21:17
**identified** [1] - 57:9
**identity** [1] - 13:24
**III** [1] - 1:19
**Illinois** [1] - 61:5
**immediately** [1] - 59:2
**implications** [1] - 16:24
**important** [8] - 12:20, 13:2, 13:11, 14:4, 16:23, 43:18, 64:17, 65:7
**impression** [16] - 24:21, 26:14, 29:24, 33:18, 38:7, 40:17, 40:19, 40:22, 40:24, 40:25, 43:12, 44:15, 50:21, 51:9, 51:11, 53:14
**impressions** [25] - 4:11, 5:6, 10:2, 26:18, 28:1, 30:18, 31:2, 33:11, 34:17, 37:19, 38:10, 38:19, 39:5, 41:6, 43:13, 43:21, 44:21, 44:22, 44:23, 45:4, 45:7, 51:8, 51:17, 57:3
**improper** [1] - 41:25
**IN** [2] - 1:1, 1:2
**inapposite** [1] - 34:5
**inaudible** [1] - 60:24
**INC** [2] - 1:4, 1:7
**incidentally** [1] - 7:15
**include** [4] - 9:12, 21:14, 22:8, 32:8
**included** [1] - 39:15
**including** [2] - 44:11, 53:7
**incorrect** [1] - 57:7
**indeed** [2] - 34:21, 37:17
**independent** [5] - 34:12, 45:18, 53:20, 60:6, 63:20
**independently** [1] - 10:15
**indicate** [2] - 20:23, 27:1
**indicated** [1] - 10:8
**indirectly** [1] - 52:13
**inextricably** [1] - 53:18
**information** [32] -

7:19, 8:2, 8:9, 8:14, 8:17, 11:13, 13:13, 13:23, 13:24, 15:1, 16:22, 20:24, 24:21, 31:2, 34:18, 35:7, 35:11, 36:2, 36:5, 36:6, 37:21, 39:8, 39:10, 39:12, 40:6, 45:14, 48:25, 49:2, 50:6, 53:21, 56:9, 57:12
**informative** [1] - 52:10
**informed** [2] - 4:5, 40:18
**infringement** [8] - 16:5, 17:16, 18:4, 18:6, 19:10, 21:3, 23:8, 23:9
**inheriting** [1] - 52:13
**initial** [1] - 18:18
**input** [1] - 20:12
**inquiry** [1] - 31:18
**inside** [2] - 5:14, 5:19
**instance** [4] - 25:22, 26:6, 31:11, 33:14
**instruct** [4] - 8:5, 8:12, 11:16, 32:10
**instructed** [2] - 17:13, 21:19
**instructing** [1] - 42:5
**instruction** [10] - 6:12, 6:18, 10:23, 11:24, 11:25, 29:15, 32:20, 42:2, 58:15, 58:17
**instructions** [1] - 41:25
**intent** [12] - 8:19, 8:20, 9:11, 18:13, 18:15, 18:19, 23:17, 24:5, 32:7, 52:22, 52:24
**interest** [49] - 4:1, 4:6, 7:3, 11:24, 15:23, 24:15, 24:16, 27:16, 28:7, 28:8, 29:6, 29:7, 29:9, 29:18, 31:19, 31:23, 32:2, 33:15, 34:1, 35:13, 35:25, 36:17, 43:1, 45:17, 49:12, 49:14, 49:16, 55:13, 60:7, 60:12, 61:7, 62:3, 63:19, 63:21, 64:1, 64:22, 66:2, 66:7, 66:17, 67:15, 67:25, 68:8, 68:9, 68:11, 68:13, 69:14, 70:16
**interested** [6] - 24:12, 26:16, 34:16, 45:6, 50:18, 63:7
**interesting** [1] - 3:25

**interrupt** [1] - 14:20
**invalidity** [1] - 30:6
**invention** [1] - 17:3
**investment** [2] - 67:23, 69:2
**investor** [1] - 13:25
**involved** [2] - 49:21, 67:1
**issue** [37] - 4:1, 4:3, 4:7, 4:8, 5:12, 7:11, 9:2, 12:3, 12:20, 12:25, 13:1, 13:7, 13:9, 13:17, 14:4, 14:6, 20:3, 20:4, 31:8, 32:17, 34:1, 37:25, 38:23, 39:1, 41:4, 41:23, 48:21, 48:24, 50:7, 56:21, 58:18, 63:7, 65:9, 70:3
**issues** [6] - 9:19, 12:23, 13:12, 16:4, 37:4, 60:17
**itself** [1] - 65:21

## J

**jargon** [1] - 20:2
**JASON** [1] - 1:18
**Jason** [1] - 3:9
**JEREMY** [1] - 2:12
**Jeremy** [2] - 3:20, 34:10
**Jersey** [1] - 69:6
**joined** [2] - 3:10, 3:12
**joint** [11] - 16:11, 28:10, 29:8, 64:4, 65:4, 65:16, 66:1, 67:1, 68:9, 68:10
**judge** [2] - 22:8, 22:9
**Judge** [21] - 34:17, 35:2, 35:14, 35:17, 37:4, 41:11, 44:24, 45:10, 49:2, 50:13, 51:20, 58:19, 59:6, 60:21, 60:23, 67:11, 67:12, 68:6, 68:18, 69:11, 69:17
**judge's** [1] - 21:15
**Judge's** [2] - 34:13, 60:4
**judges** [2] - 23:4, 54:14
**judgment** [4] - 14:23, 48:5, 53:22, 56:6
**June** [4] - 14:21, 14:22, 57:12, 71:2
**juries** [1] - 54:14
**jurisdiction** [5] - 22:10, 22:11, 62:21,

63:12, 63:24
**juror** [1] - 21:19
**jurors** [3] - 21:25, 22:3, 22:4
**jury** [7] - 17:13, 21:11, 54:2, 54:6, 54:7, 54:11, 54:12

## K

**keep** [3] - 16:10, 68:16, 70:22
**kind** [14] - 4:17, 5:24, 7:24, 10:9, 16:21, 16:23, 22:12, 35:18, 36:10, 46:10, 48:9, 49:19, 55:5, 55:14
**knowledge** [1] - 64:25
**knowledgeable** [1] - 59:19

## L

**laid** [2] - 57:5, 57:6
**language** [3] - 43:24, 56:3, 59:23
**LaPointe** [8] - 6:24, 10:22, 15:9, 15:18, 15:20, 15:21, 49:18, 58:21
**largely** [1] - 64:1
**last** [2] - 6:4, 45:21
**late** [2] - 30:16, 48:17
**law** [30] - 22:4, 24:15, 25:20, 27:14, 35:13, 45:17, 57:4, 61:3, 61:8, 61:14, 61:17, 61:24, 62:18, 62:19, 62:24, 62:25, 63:23, 64:2, 64:5, 64:7, 64:15, 67:6, 69:18, 70:8, 70:12, 70:13, 70:15, 70:16
**lawsuit** [2] - 21:21, 51:5
**lawyer** [1] - 17:20, 26:10, 27:8
**lawyers** [9] - 13:24, 21:21, 22:7, 22:11, 23:3, 52:6, 53:19, 53:22, 63:12
**lawyers's** [1] - 45:3
**lay** [1] - 70:13
**Layton** [2] - 3:9, 3:10
**LAYTON** [1] - 1:18
**learn** [1] - 18:25
**lease** [1] - 28:25
**least** [8] - 9:7, 19:23, 22:15, 24:23, 27:23, 30:15, 52:13, 59:1

**leaves** [1] - 49:1
**led** [4] - 6:17, 6:20, 11:10, 49:24
**left** [2] - 39:2, 39:3
**legal** [8] - 22:13, 28:8, 54:13, 57:15, 67:15, 68:9, 68:10, 70:3
**letter** [30] - 4:10, 5:11, 8:19, 8:20, 9:11, 12:16, 12:17, 12:25, 13:25, 15:8, 15:12, 18:13, 18:15, 18:19, 23:17, 24:4, 24:5, 24:14, 32:7, 34:2, 38:18, 44:14, 50:8, 52:21, 52:24, 59:5, 59:22, 69:10, 70:7
**liability** [8] - 16:12, 20:7, 52:14, 53:20, 56:21, 65:20, 65:23, 65:24
**light** [1] - 45:24
**likelihood** [1] - 65:12
**likely** [1] - 66:25
**limit** [2] - 28:4, 30:21
**limited** [5] - 15:10, 44:20, 54:15, 63:4, 70:25
**limits** [1] - 43:10
**line** [9] - 7:17, 31:18, 36:20, 37:7, 37:8, 37:12, 42:18, 61:15, 67:19
**Line** [1] - 36:22
**lines** [1] - 9:15
**literally** [1] - 13:21
**litigation** [48] - 5:12, 5:14, 7:20, 8:9, 8:18, 9:12, 10:11, 16:4, 20:16, 22:19, 22:24, 23:10, 25:9, 27:3, 27:6, 27:18, 28:10, 28:21, 28:23, 29:2, 32:9, 33:2, 34:4, 36:10, 37:2, 37:14, 37:19, 40:17, 43:14, 44:10, 44:22, 46:14, 49:3, 49:8, 50:21, 51:8, 51:10, 52:3, 52:14, 52:23, 53:4, 53:7, 54:9, 65:5, 65:17, 66:1, 67:2, 65:17, 66:1, 67:2, 65:17
**live** [1] - 14:4
**LLP** [2] - 2:8, 2:11
**lodged** [1] - 49:11
**log** [1] - 48:11
**logging** [1] - 25:8
**look** [17] - 9:2, 10:6, 17:15, 18:6, 18:9,

21:2, 23:23, 26:8, 35:21, 37:7, 38:2, 38:4, 57:1, 62:18, 64:13, 70:3, 70:12
**lookback** [1] - 17:17
**looked** [2] - 6:3, 55:4
**looking** [9] - 7:12, 19:11, 19:22, 21:5, 25:20, 26:3, 53:4, 57:12, 59:14
**looks** [5] - 9:6, 9:22, 10:17, 42:25, 63:23
**lose** [1] - 63:6
**lost** [1] - 56:18
**Lozier** [1] - 66:2

## M

**Magistrate** [47] - 4:10, 4:18, 6:1, 10:1, 10:8, 11:20, 11:21, 12:1, 12:7, 12:10, 12:12, 12:13, 13:14, 15:8, 18:20, 24:5, 24:18, 26:6, 29:12, 29:14, 31:12, 31:22, 32:16, 34:13, 35:2, 35:14, 35:16, 38:9, 38:11, 38:24, 41:8, 41:11, 41:19, 41:21, 45:10, 50:13, 58:19, 59:6, 60:4, 60:18, 60:21, 60:23, 67:12, 69:11, 69:12, 69:13, 69:17
**Magistrate's** [1] - 57:2
**mail** [4] - 10:19, 30:22, 32:23, 47:2
**mails** [3] - 25:6, 48:10, 52:2
**Maine** [1] - 29:6
**majority** [3] - 67:22, 67:23, 69:3
**manner** [1] - 60:16
**marshal** [1] - 19:15
**Massachusetts** [1] - 2:13
**material** [8] - 5:7, 8:6, 10:9, 12:6, 40:2, 47:14, 48:12, 48:13
**matter** [4] - 57:4, 63:11, 63:13, 66:6
**McGowan** [91] - 3:12, 5:2, 5:3, 6:9, 6:14, 6:23, 10:7, 11:7, 11:14, 11:21, 12:18, 14:20, 14:24, 15:4, 15:5, 15:13, 15:20, 16:1, 17:6, 17:9, 17:15, 17:21, 18:3, 18:9, 18:12, 18:17,

19:1, 19:8, 19:19, 19:20, 19:21, 19:25, 21:17, 21:23, 22:17, 23:17, 23:21, 24:4, 24:8, 24:13, 25:4, 25:10, 25:15, 25:18, 26:1, 26:4, 26:15, 26:21, 28:5, 29:13, 30:8, 30:25, 31:13, 31:16, 32:13, 32:18, 33:2, 33:5, 33:8, 33:12, 34:6, 34:22, 35:21, 39:11, 39:13, 39:17, 39:19, 41:14, 46:17, 50:4, 53:12, 53:25, 54:19, 54:22, 56:12, 56:19, 58:9, 58:13, 58:15, 61:20, 61:22, 61:23, 62:1, 62:9, 62:12, 64:19, 64:21, 69:24, 70:9, 71:5
**mcGowan** [2] - 2:4, 3:14
**McGowan's** [1] - 39:25
**mean** [63] - 4:1, 4:2, 5:23, 5:24, 10:1, 10:6, 12:18, 12:24, 14:20, 24:11, 24:25, 26:8, 26:9, 26:11, 29:22, 30:10, 32:5, 34:1, 35:12, 35:16, 39:10, 39:11, 39:24, 40:6, 40:10, 40:15, 41:2, 42:14, 45:2, 45:5, 46:3, 47:10, 47:17, 48:7, 48:18, 48:21, 49:15, 50:5, 50:23, 51:23, 52:3, 52:15, 52:19, 57:20, 57:22, 58:3, 58:19, 59:11, 59:17, 59:20, 60:1, 60:15, 60:21, 61:9, 61:19, 67:11, 68:4, 68:7, 68:18, 69:10, 69:14
**meaning** [2] - 36:25, 45:25
**means** [2] - 17:17, 17:23
**measures** [1] - 28:3
**meet** [1] - 50:3
**meet-and-confer** [1] - 50:3
**mental** [37] - 5:6, 24:20, 26:14, 26:18, 29:24, 30:17, 31:2, 33:11, 33:18, 34:17, 37:19, 38:7, 38:10,

38:19, 40:17, 40:19, 40:22, 40:24, 40:25, 41:6, 43:12, 43:13, 43:21, 44:15, 44:21, 44:22, 44:23, 45:4, 45:6, 50:21, 51:8, 51:9, 51:11, 51:17, 53:14, 57:2
**mention** [1] - 53:3
**mentioned** [3] - 23:16, 41:14, 66:4
**merged** [1] - 66:9
**merger** [15] - 5:8, 5:15, 20:13, 23:11, 24:1, 49:7, 50:11, 52:16, 53:6, 55:11, 59:17, 60:12, 60:25, 61:6, 69:15
**merits** [3] - 16:18, 33:24, 34:25
**middle** [2] - 12:23, 14:16
**might** [12] - 5:21, 19:4, 22:18, 24:10, 37:15, 40:22, 54:8, 55:2, 55:23, 56:4, 67:24, 70:12

███ ██ █

**mind** [2] - 38:23, 70:10
**minimal** [1] - 56:4
**minute** [1] - 45:21
**misapplies** [1] - 69:19
**mislead** [1] - 54:7
**missed** [1] - 11:1
**misspoke** [1] - 18:12
**money** [1] - 53:1
**month** [2] - 18:2, 18:9
**morning** [4] - 3:8, 3:18, 30:19, 57:9
**most** [4] - 13:1, 24:15, 31:24, 59:19
**motion** [5] - 23:6, 38:17, 57:22, 58:4, 59:3
**motions** [1] - 14:23
**MR** [128] - 3:8, 3:18, 5:2, 6:9, 6:14, 6:23, 10:7, 11:7, 11:14, 11:21, 12:18, 14:20, 14:24, 15:4, 15:13, 15:20, 16:1, 17:6, 17:9, 17:15, 17:21, 18:3, 18:9, 18:12, 18:17, 19:1, 19:8, 19:12, 19:19, 19:25, 21:17, 21:23, 22:17, 23:17, 23:21, 24:4, 24:8, 24:13, 25:4, 25:10, 25:15, 25:18,

26:1, 26:4, 26:15,
26:21, 28:5, 29:13,
30:8, 30:25, 31:13,
31:16, 32:13, 32:18,
33:2, 33:5, 33:8,
33:12, 34:6, 34:9,
35:21, 35:24, 36:8,
36:13, 36:15, 36:22,
36:24, 37:7, 38:1,
39:9, 39:19, 39:23,
40:4, 40:13, 41:22,
42:11, 42:22, 43:3,
43:9, 43:23, 44:3,
44:5, 44:7, 44:19,
46:2, 46:12, 47:17,
48:14, 49:14, 50:20,
51:4, 52:15, 52:19,
52:24, 53:17, 54:19,
54:22, 56:12, 56:19,
57:18, 57:20, 58:13,
58:15, 58:18, 59:5,
59:9, 60:1, 60:20,
61:23, 62:1, 62:9,
62:12, 62:20, 63:9,
63:16, 64:19, 64:21,
66:21, 67:3, 68:5,
68:12, 68:19, 68:22,
68:25, 69:24, 70:17,
71:5, 71:8
**MS** [7] - 13:16, 13:19,
14:3, 14:10, 14:15,
14:18, 18:11
**muster** [1] - 58:12
**mutually** [1] - 49:15

## N

**name** [1] - 19:18
**named** [1] - 67:8
**narrow** [5] - 12:2,
13:7, 52:8, 67:9
**narrowed** [2] - 32:21,
32:22
**NDA** [5] - 18:18,
27:23, 28:1, 51:5,
51:18
**necessarily** [1] - 13:6
**need** [14] - 16:24,
18:9, 22:24, 23:23,
25:1, 29:20, 33:20,
35:6, 43:11, 47:4,
54:17, 57:16, 63:24,
66:21
**needs** [2] - 58:11,
66:15
**negotiating** [4] - 9:11,
31:21, 32:7, 34:2
**negotiation** [27] - 5:9,
5:20, 10:16, 18:13,
18:18, 20:11, 20:12,

20:25, 21:7, 24:2,
24:22, 25:13, 26:20,
31:3, 32:19, 34:20,
39:3, 41:10, 46:6,
46:20, 49:22, 50:11,
51:4, 54:9, 59:17,
61:6
**negotiations** [19] -
5:15, 9:6, 11:23,
17:8, 17:9, 17:18,
18:1, 18:16, 19:5,
19:7, 21:10, 29:17,
31:5, 36:16, 38:23,
39:6, 45:24, 46:1,
54:3
**negotiators** [2] - 45:4,
53:17
**negotiators's** [1] -
53:18
**never** [2] - 45:24,
54:13
**New** [1] - 69:6
**new** [2] - 47:13, 58:20
**next** [5] - 8:15, 9:16,
14:22, 48:2, 70:7
**Nidec** [6] - 68:7,
68:15, 68:24, 69:1,
69:20
**NO** [1] - 1:8
**non** [5] - 5:7, 8:19,
9:11, 34:1, 57:2
**non-binding** [2] -
8:19, 9:11, 34:1
**non-mental** [1] - 57:2
**non-work** [1] - 5:7
**nonbinding** [2] -
24:13, 32:7
**nondisclosure** [2] -
35:9, 45:13
**noon** [1] - 70:20
**normally** [1] - 30:5
**Northern** [1] - 69:21
**note** [4] - 10:7, 15:6,
42:3, 50:22
**noted** [1] - 41:22
**nothing** [1] - 24:8
**November** [2] - 1:11,
47:21
**Novikov** [6] - 3:13,
19:12, 36:15, 36:18,
50:5, 50:10
**NOVIKOV** [2] - 2:3,
19:12
**number** [13] - 6:11,
6:20, 11:2, 11:11,
20:14, 22:25, 37:4,
43:14, 43:15, 52:1,
54:5, 69:4, 69:5

## O

**o'clock** [1] - 1:12
**objected** [3] - 8:4,
48:17, 49:25
**objection** [21] - 4:16,
6:20, 7:2, 8:10, 8:16,
8:23, 8:24, 9:5, 9:14,
9:21, 9:24, 11:11,
31:19, 32:2, 32:12,
46:15, 47:19, 49:11,
49:12
**objections** [2] - 9:18,
15:2
**obtain** [1] - 30:17
**occur** [1] - 17:8
**occurred** [5] - 18:7,
18:8, 18:25, 19:7,
19:23
**occurring** [1] - 18:1
**odds** [1] - 56:4
**OF** [1] - 1:2
**off-the-table** [1] -
46:19
**office** [1] - 28:24
**Official** [1] - 1:25
**one** [30] - 4:7, 4:9, 7:8,
9:3, 9:13, 9:19, 9:21,
11:9, 11:10, 15:16,
16:9, 20:18, 21:6,
21:18, 31:13, 34:13,
35:8, 38:5, 40:16,
43:14, 46:16, 52:1,
53:12, 60:4, 63:7,
63:12, 68:8, 69:1,
69:4
**ones** [1] - 51:16
**open** [4] - 13:9, 43:10,
49:1, 58:5
**opened** [2] - 36:18,
50:10
**opening** [1] - 47:22
**opine** [1] - 60:15
**opinion** [6] - 5:11,
41:3, 46:23, 47:1,
47:23, 68:6
**opinions** [1] - 30:5
**opposed** [2] - 5:6,
48:22
**opposite** [1] - 67:14
**oral** [3] - 30:22, 32:23,
47:1
**orally** [1] - 70:10
**order** [5] - 5:4, 28:24,
57:15, 58:11, 59:9
**ordinarily** [1] - 44:8
**origin** [1] - 66:18
**ought** [1] - 24:19
**ourselves** [3] - 16:24,
22:25, 47:21

**outset** [4] - 4:22, 32:5,
34:11, 61:19
**outside** [2] - 8:9, 8:18
**outweighed** [1] - 54:5
**overly** [1] - 42:19
**overstated** [1] - 24:10
**own** [3] - 50:24, 55:3,
69:4
**owned** [2] - 66:12,
67:15
**owning** [2] - 68:1
**owns** [2] - 67:4

## P

**Pacific** [7] - 16:22,
17:1, 17:12, 21:2,
21:13, 21:14, 21:23
**Packard** [21] - 5:12,
10:10, 27:4, 29:5,
31:24, 45:17, 60:22,
61:2, 61:14, 64:24,
65:2, 65:6, 65:9,
65:16, 66:13, 67:19,
68:14, 68:17, 68:18,
68:24, 69:5
**page** [21] - 7:13, 7:25,
8:15, 9:10, 11:2,
11:3, 12:13, 15:8,
15:11, 15:13, 15:18,
28:13, 35:20, 35:22,
36:11, 36:22, 37:5,
38:12, 42:15, 59:21
**pages** [1] - 15:23
**paid** [1] - 53:8
**papers** [7] - 4:15,
5:25, 6:4, 6:19, 9:25,
41:18, 58:25
**paragraph** [1] - 37:8
**parol** [2] - 46:8, 46:10
**parse** [1] - 54:11
**part** [7] - 20:7, 20:8,
20:12, 21:6, 29:25,
37:1, 55:1
**particular** [1] - 48:16
**parties** [25] - 4:20,
5:15, 8:20, 9:6, 9:9,
9:10, 9:22, 16:3,
27:25, 30:23, 32:6,
37:13, 45:13, 46:7,
46:12, 46:15, 47:9,
61:4, 61:6, 65:21,
66:25, 68:9, 70:11,
70:17
**parties'** [1] - 34:20
**party** [11] - 28:13,
40:16, 43:13, 44:8,
44:11, 44:13, 45:8,
50:17, 67:5
**party's** [4] - 37:18,

44:12, 44:21, 44:23
**passes** [1] - 58:12
**past** [1] - 39:24
**patent** [10] - 16:21,
17:20, 18:5, 20:3,
21:16, 21:21, 63:11,
63:24, 65:10
**patents** [1] - 30:6
**payments** [1] - 53:1
**pending** [2] - 59:3,
67:15
**people** [2] - 21:5,
23:11
**people's** [1] - 33:22
**percent** [8] - 50:25,
51:2, 52:25, 55:12,
66:5, 67:4, 67:24,
68:1
**perfect** [2] - 61:17,
61:19
**perhaps** [1] - 9:7
**period** [2] - 20:24,
60:16
**periods** [1] - 65:13
**permission** [1] - 3:14
**permit** [1] - 4:5
**permitted** [2] - 8:22,
13:22
**person** [3] - 40:6,
56:15, 56:19
**perspective** [1] - 14:3
**persuasive** [1] - 31:10
**Philippines** [3] -
26:25, 28:12, 28:13
**philosophical** [1] -
21:16
**philosophy** [1] - 22:9
**phrase** [1] - 63:17
**phrased** [1] - 8:12
**pick** [1] - 22:24
**piece** [1] - 55:19
**plain** [1] - 43:24
**Plaintiff** [2] - 1:5, 2:6
**plaintiff** [8] - 3:11,
4:22, 5:1, 22:10,
36:3, 36:6, 36:7,
71:4
**plaintiffs** [4] - 3:7, 5:6,
36:3, 47:21
**plausible** [1] - 55:15
**play** [1] - 58:2
**plays** [1] - 22:15
**point** [30] - 8:4, 11:19,
15:18, 16:18, 20:17,
22:3, 25:18, 26:13,
27:19, 29:2, 29:18,
30:21, 31:1, 31:5,
31:20, 32:20, 34:11,
36:18, 44:20, 46:16,
47:18, 57:11, 58:6,

58:9, 60:2, 65:19, 66:22, 68:2, 69:20, 70:14
**points** [2] - 7:10, 68:8
**policy** [1] - 65:6
**pondering** [1] - 5:14
**portion** [2] - 11:2, 15:10
**position** [7] - 11:22, 17:2, 34:1, 39:25, 47:6, 49:19, 60:21
**possible** [1] - 46:3
**possibly** [3] - 10:13, 45:5, 53:13
**post** [1] - 67:7
**postdate** [1] - 25:9
**potential** [6] - 35:1, 51:7, 51:18, 53:20, 54:10, 67:13
**potentially** [2] - 39:24, 54:7
**practical** [2] - 13:8, 48:7
**practice** [1] - 65:11
**practices** [2] - 16:20, 21:6
**practicing** [2] - 16:21, 65:10
**precedent** [3] - 4:4, 5:18, 69:19
**precise** [1] - 24:11
**preclude** [1] - 22:4
**prefer** [1] - 60:15
**prejudice** [1] - 58:2
**premise** [1] - 57:2
**prepare** [1] - 28:20
**prepared** [1] - 44:9
**present** [3] - 12:3, 13:10, 23:6
**presented** [7] - 12:4, 12:7, 24:18, 24:19, 29:22, 59:1, 67:16
**presenting** [1] - 3:14
**pressing** [1] - 13:1
**presumably** [1] - 16:17
**presume** [1] - 22:19
**pretty** [6] - 22:2, 39:14, 43:18, 48:16, 48:19, 60:9
**prevent** [1] - 42:20
**prevented** [1] - 50:6
**privilege** [31] - 6:21, 7:3, 7:4, 8:24, 9:14, 9:23, 12:21, 13:3, 25:25, 28:18, 32:3, 37:16, 41:24, 42:2, 43:19, 49:17, 60:24, 61:24, 62:11, 62:13, 62:18, 62:19, 62:23,

63:10, 63:20, 63:22, 64:10, 64:13, 68:8, 70:8, 70:15
**privileged** [4] - 8:13, 9:7, 11:12, 63:14
**privileges** [1] - 64:8
**probative** [10] - 13:12, 15:3, 16:2, 19:21, 41:15, 47:10, 54:4, 54:15, 56:10, 70:24
**problem** [1] - 55:4
**procedure** [1] - 63:1
**Procedure** [1] - 43:25
**proceed** [1] - 5:21
**proceeding** [2] - 6:16, 71:2
**proceedings** [1] - 67:15
**process** [3] - 14:11, 20:15, 56:8
**proclivities** [3] - 21:15, 22:9, 23:3
**produce** [3] - 47:15, 48:19, 59:10
**product** [111] - 4:13, 4:14, 5:7, 5:9, 5:10, 5:18, 6:21, 7:2, 8:6, 8:13, 8:25, 9:5, 9:7, 9:13, 9:14, 9:20, 9:24, 10:1, 10:4, 10:13, 11:13, 11:17, 11:23, 12:5, 13:3, 16:10, 25:21, 25:25, 26:5, 26:7, 26:9, 26:12, 26:13, 26:20, 26:23, 26:24, 27:10, 27:13, 27:21, 27:22, 28:4, 28:14, 28:18, 28:19, 28:25, 29:18, 30:5, 31:22, 32:1, 32:12, 33:13, 33:14, 34:14, 35:3, 35:4, 35:5, 35:11, 36:1, 37:15, 37:21, 38:14, 38:22, 39:7, 39:16, 40:2, 40:12, 40:16, 40:21, 41:2, 43:5, 43:8, 43:11, 43:19, 43:22, 44:8, 44:16, 44:20, 44:25, 45:11, 45:12, 45:16, 46:13, 46:15, 47:5, 48:25, 49:2, 49:3, 49:10, 49:16, 49:25, 50:4, 50:6, 50:12, 50:15, 50:19, 55:9, 55:15, 55:17, 56:22, 57:3, 57:5, 57:15, 60:6, 62:5, 62:7, 62:8, 62:25, 63:4, 63:6

**proffer** [1] - 22:20
**proffered** [1] - 54:25
**prohibited** [2] - 21:1, 43:22
**prohibition** [1] - 21:3
**prominent** [1] - 22:15
**prong** [1] - 60:4
**proper** [1] - 54:11
**properly** [1] - 38:24
**proportionality** [5] - 4:18, 13:12, 41:20, 42:10, 42:19
**proposal** [1] - 10:20
**proposed** [1] - 59:9
**prospective** [1] - 20:6
**protect** [2] - 22:25, 43:12
**protected** [3] - 28:14, 37:15, 40:15
**protection** [6] - 8:6, 28:15, 35:4, 35:11, 36:2, 44:20
**protections** [1] - 64:8
**protective** [1] - 65:3
**protects** [1] - 43:13
**prove** [1] - 51:19
**provide** [5] - 8:3, 8:8, 8:17, 22:18, 59:10
**provided** [2] - 7:19, 13:24
**provides** [1] - 35:13
**provision** [4] - 36:17, 37:11, 49:7, 49:25
**provisions** [2] - 53:6, 53:9
**pull** [1] - 44:1
**purchased** [1] - 51:1
**purchaser** [1] - 67:13
**purchasing** [2] - 24:12, 50:18
**purpose** [4] - 28:19, 29:2, 29:4, 31:8
**pursuant** [1] - 28:1
**pursue** [2] - 30:10, 56:5
**pursuing** [5] - 4:14, 25:1, 25:4, 30:12, 30:20
**push** [1] - 21:9
**put** [6] - 6:6, 9:19, 10:15, 27:16, 46:24, 66:6
**putting** [1] - 35:25

**Q**

**qualification** [1] - 28:6
**qualified** [2] - 22:18, 28:6
**quality** [2] - 21:20,

22:8
**questioning** [2] - 6:24, 41:14
**questions** [14] - 6:6, 6:15, 7:15, 9:3, 9:5, 13:21, 21:24, 24:23, 25:12, 30:2, 49:20, 49:23, 58:4, 58:10
**quickly** [2] - 19:14, 53:4
**quintessential** [1] - 38:13
**quite** [2] - 20:3, 23:1
**quote** [2] - 7:3, 34:24

**R**

**Rad** [25] - 7:19, 8:9, 8:17, 24:2, 24:12, 25:13, 32:24, 34:3, 35:8, 36:9, 36:25, 37:11, 45:21, 45:23, 48:11, 48:16, 50:24, 51:1, 52:2, 52:25, 55:3, 56:15, 56:18, 66:9, 66:10
**raise** [3] - 4:16, 31:7, 61:18
**raised** [3] - 15:7, 31:6, 31:11
**random** [1] - 49:7
**range** [1] - 18:17
**rather** [4] - 24:21, 38:12
**Rawnsley** [1] - 3:9
**RAWNSLEY** [2] - 1:18, 3:8
**reaction** [1] - 37:5
**read** [6] - 6:4, 11:9, 15:24, 32:5, 41:11, 68:6
**reading** [3] - 11:1, 67:9
**reads** [1] - 65:16
**reality** [1] - 30:2
**really** [33] - 4:2, 4:5, 9:19, 10:5, 12:20, 12:22, 13:3, 22:14, 24:25, 30:3, 34:12, 35:10, 41:13, 41:23, 42:15, 42:19, 48:21, 49:16, 50:1, 52:9, 54:17, 55:25, 56:10, 57:1, 57:16, 59:1, 60:3, 61:18, 66:6, 68:7, 70:24
**reappear** [1] - 58:21
**reason** [7] - 12:19, 29:1, 38:15, 46:20, 57:13, 63:5, 66:4

**reasons** [1] - 68:25
**rebuttal** [1] - 47:24
**recitation** [1] - 27:10
**recited** [1] - 35:20
**recites** [2] - 24:6, 27:9
**recognized** [2] - 55:18, 62:3
**recognizing** [1] - 66:2
**recollection** [4] - 6:5, 11:15, 12:25, 18:3
**record** [2] - 15:6, 28:11
**redepose** [1] - 59:3
**reference** [5] - 10:9, 11:14, 20:1, 20:21, 65:3
**referenced** [2] - 13:25, 15:10
**references** [1] - 5:8
**referencing** [1] - 32:13
**referring** [4] - 11:3, 36:7, 36:8, 42:15
**refers** [1] - 20:22
**reflect** [6] - 2:19, 30:17, 34:20, 34:24, 37:18, 45:7
**regard** [1] - 47:16
**regarding** [1] - 16:3
**rejected** [2] - 61:9, 67:12
**relate** [1] - 63:21
**related** [2] - 32:17, 33:5
**relates** [1] - 29:8
**relating** [2] - 32:24, 32:25
**relevance** [12] - 4:16, 4:18, 16:2, 41:18, 41:20, 42:3, 42:6, 42:10, 42:20, 45:9, 47:14, 57:21
**relevant** [9] - 16:4, 16:22, 20:24, 34:23, 37:4, 57:25, 58:1, 62:19, 62:25
**relied** [2] - 18:20, 24:5
**rely** [1] - 41:13
**remain** [1] - 14:4
**remains** [1] - 41:9
**rent** [1] - 28:24
**repeat** [2] - 25:24, 63:17
**repeated** [1] - 7:25
**repetition** [1] - 7:24
**report** [2] - 47:22, 47:24
**Reporter** [1] - 1:25
**reports** [2] - 14:12, 48:5
**representations** [1] -

37:1
**representative** [3] - 59:11, 59:12, 59:16
**representatives** [1] - 44:11
**reproduce** [1] - 59:15
**Republic** [1] - 28:12
**request** [2] - 33:19, 57:23
**requests** [4] - 30:22, 48:15, 48:23
**requirement** [1] - 28:7
**residuum** [1] - 55:18
**resolve** [2] - 26:2, 55:23
**resources** [1] - 70:25
**respect** [14] - 6:11, 11:25, 16:2, 22:17, 42:22, 54:9, 55:17, 56:22, 57:1, 57:8, 57:11, 62:23, 62:25, 65:13
**respecting** [1] - 55:8
**respond** [6] - 15:5, 54:19, 57:18, 58:13, 64:21, 70:11
**response** [3] - 31:13, 47:18, 56:21
**responses** [2] - 7:16, 48:22
**responsive** [1] - 12:9
**rest** [2] - 26:25, 41:10
**reveal** [2] - 39:7, 45:7
**revealing** [1] - 53:14
**revelations** [1] - 40:11
**reverse** [1] - 5:4
**review** [1] - 48:10
**Richards** [2] - 3:9, 3:10
**RICHARDS** [1] - 1:18
**risk** [3] - 35:10, 37:3, 45:14
**role** [2] - 22:15, 58:3
**roll** [1] - 3:6
**room** [16] - 6:7, 7:20, 8:10, 8:18, 9:4, 9:20, 10:15, 24:24, 25:2, 30:4, 30:12, 30:21, 46:18, 46:24
**rule** [15] - 28:11, 30:14, 44:8, 46:11, 47:4, 55:1, 60:10, 61:14, 62:11, 62:15, 62:17, 63:1, 63:20, 65:2, 65:25
**Rule** [10] - 5:18, 25:20, 26:3, 28:20, 43:24, 54:4, 62:1, 62:5, 63:17, 64:8
**ruled** [3] - 13:14, 55:9,

62:7
**Rules** [1] - 63:2
**rules** [7] - 43:5, 43:6, 45:15, 51:18, 57:15, 62:13, 64:15
**ruling** [1] - 38:16, 54:24, 55:17, 57:2, 57:7, 57:22, 60:19, 64:23, 65:17, 66:16, 69:11
**rush** [1] - 13:2

**S**

**sale** [3] - 65:9, 65:11
**san** [1] - 2:4
**sat** [1] - 67:13
**schedule** [2] - 14:8, 14:9
**scope** [5] - 4:6, 5:22, 10:24, 30:21, 52:8
**Sealed** [8] - 27:5, 61:9, 65:15, 65:19, 66:13, 67:17, 68:13, 69:6
**search** [1] - 48:12
**second** [9] - 4:8, 4:23, 7:8, 9:21, 11:1, 13:20, 17:5, 38:5
**secrecy** [1] - 28:3
**Section** [1] - 44:5
**see** [17] - 5:21, 9:1, 12:20, 13:8, 14:6, 22:24, 27:20, 29:19, 30:4, 32:4, 41:17, 45:24, 54:1, 57:16, 64:13, 68:13
**seeing** [1] - 70:10
**seek** [1] - 38:7
**seeking** [11] - 5:6, 24:20, 26:18, 29:23, 31:2, 38:19, 39:10, 39:12, 39:17, 47:7, 57:25
**seeks** [3] - 36:3, 36:6, 36:7
**seem** [3] - 4:4, 4:13, 13:1
**selective** [1] - 26:25
**seller** [3] - 16:16, 65:10, 65:23
**selling** [1] - 16:10
**sense** [2] - 16:5, 16:19
**sent** [1] - 52:2
**separate** [2] - 53:20, 60:6
**September** [2] - 18:19, 38:18
**serve** [1] - 47:24
**served** [1] - 47:22

**set** [1] - 64:11
**setting** [1] - 27:9
**share** [4] - 27:25, 67:14, 67:22, 67:23
**shared** [1] - 4:21
**shares** [1] - 50:25
**sharing** [1] - 56:8
**shield** [1] - 65:3
**short** [1] - 69:10
**show** [3] - 45:11, 57:5, 57:25
**shown** [1] - 49:5
**side** [5] - 22:19, 22:23, 34:8, 50:22, 51:12
**sides** [1] - 67:14
**sidetrack** [1] - 63:18
**signed** [1] - 8:20
**significant** [1] - 17:4
**simply** [2] - 25:19, 60:13
**sits** [2] - 10:16, 51:13
**sitting** [3] - 33:21, 33:22, 53:11
**situation** [3] - 46:4, 66:25, 69:2
**smart** [1] - 63:5
**solely** [2] - 49:12, 59:3
**sometimes** [3] - 12:4, 17:17, 21:4
**somewhat** [3] - 10:23, 12:2, 12:3
**sorry** [11] - 17:21, 19:3, 19:9, 19:20, 21:9, 31:9, 36:20, 37:8, 38:4, 54:20
**sort** [1] - 37:20
**sought** [1] - 13:13
**sounds** [5] - 30:12, 30:19, 31:11, 32:12, 45:10
**space** [1] - 28:24
**specific** [8] - 6:9, 11:8, 20:3, 23:7, 32:18, 49:23, 56:7, 65:8
**specifically** [2] - 6:25, 7:1
**spend** [1] - 70:25
**spent** [1] - 22:12
**squarely** [3] - 34:14, 53:7, 61:10
**stake** [1] - 69:3
**stand** [4] - 4:24, 13:14, 14:6, 14:8
**standalone** [3] - 7:4, 10:12, 66:11
**standing** [1] - 35:12
**standpoint** [1] - 48:7
**Stark** [9] - 15:9, 49:21, 58:20, 59:4, 59:10, 59:11, 59:16, 59:18,

59:21
**stark** [4] - 7:19, 13:20, 13:23, 15:1
**Starks'** [1] - 6:17
**stars** [1] - 66:1
**start** [3] - 25:25, 27:24, 36:21
**starting** [2] - 64:4, 70:14
**state** [7] - 62:18, 62:19, 62:24, 62:25, 64:16, 70:12
**statement** [9] - 26:22, 31:21, 31:22, 33:19, 37:23, 38:6, 42:14, 55:3, 66:16
**statements** [7] - 5:20, 27:12, 33:10, 35:21, 39:6, 54:2, 54:8
**STATES** [1] - 1:1
**states** [2] - 23:18, 63:14
**status** [1] - 4:22
**stay** [1] - 27:6
**stepwise** [1] - 5:21
**still** [5] - 40:5, 43:10, 48:24, 49:1, 70:23
**stock** [16] - 16:8, 22:23, 23:15, 23:25, 24:3, 24:6, 24:12, 27:16, 34:3, 50:18, 50:23, 52:11, 55:12, 66:4, 66:5, 66:12
**stop** [3] - 17:5, 29:11, 35:12
**straightforwardly** [1] - 31:19
**strategic** [1] - 22:13
**strategies** [1] - 54:13
**strengths** [1] - 37:19
**stretched** [1] - 42:4
**strict** [1] - 51:18
**strictly** [1] - 27:10
**strikes** [1] - 54:1
**stringent** [1] - 43:5
**structured** [2] - 23:20, 68:5
**stuck** [1] - 42:24
**stuff** [2] - 40:11, 41:15
**subject** [5] - 17:16, 23:6, 36:17, 39:20, 52:15
**subjectively** [1] - 29:1
**submission** [6] - 10:7, 11:4, 11:15, 15:8, 25:5, 39:20
**submit** [2] - 49:4, 70:17
**submitting** [1] - 14:11
**subsequent** [2] - 6:23,

21:4
**subsidiary** [1] - 68:2
**substantially** [1] - 54:5
**successor** [2] - 16:12, 65:20
**sued** [1] - 45:23
**sufficient** [1] - 60:5
**suggest** [3] - 54:24, 55:21, 66:8
**suggested** [2] - 66:10, 66:11
**suggesting** [1] - 68:19
**suggests** [1] - 67:6
**summary** [5] - 14:23, 33:8, 34:5, 34:6, 48:5
**supplemental** [1] - 48:4
**supposed** [5] - 17:11, 18:5, 19:22, 19:23, 64:2
**Supreme** [1] - 20:22
**surprise** [2] - 23:1, 23:10
**surrounding** [1] - 51:19
**synonymous** [1] - 10:3
**system** [1] - 24:14

**T**

**table** [21] - 5:16, 5:17, 25:3, 25:5, 25:21, 26:5, 26:22, 27:7, 27:8, 27:18, 33:19, 34:2, 39:20, 39:25, 40:7, 46:19, 51:25, 53:11, 55:11, 57:3, 67:14
**tactics** [1] - 23:10
**talks** [2] - 53:2, 60:12
**tangible** [2] - 44:9, 51:24
**Tangri** [2] - 3:13, 5:3
**TANGRI** [1] - 2:2
**team** [1] - 17:3
**tease** [1] - 45:2
**technical** [2] - 19:4, 25:23
**tee** [3] - 12:4, 12:16, 30:16
**teed** [16] - 4:2, 4:4, 4:8, 6:10, 7:11, 12:21, 13:4, 15:25, 30:1, 35:17, 38:3, 38:10, 41:24, 48:21, 54:18, 61:20
**Telephone** [1] - 1:12

**telephone** [2] - 3:3, 71:10
**ten** [1] - 50:25
**terms** [4] - 4:24, 14:8, 16:20, 52:15
**test** [3] - 27:21, 65:17, 66:14
**testify** [1] - 59:16
**testimony** [8] - 23:12, 23:13, 54:25, 55:2, 55:8, 55:19, 57:3, 59:10
**THE** [133] - 1:1, 1:2, 3:6, 3:16, 3:22, 5:23, 6:13, 6:22, 7:7, 11:6, 11:8, 11:19, 12:15, 12:19, 13:18, 14:2, 14:5, 14:13, 14:16, 14:22, 14:25, 15:11, 15:14, 15:24, 17:5, 17:7, 17:10, 17:20, 17:22, 18:4, 18:10, 18:14, 18:22, 19:3, 19:9, 19:16, 19:20, 21:9, 21:20, 22:1, 23:15, 23:19, 23:25, 24:7, 24:10, 24:17, 25:7, 25:11, 25:16, 25:23, 26:2, 26:8, 26:16, 27:20, 29:10, 29:19, 30:9, 31:6, 31:15, 32:4, 32:15, 32:21, 33:4, 33:7, 33:9, 33:24, 34:7, 35:16, 35:23, 36:4, 36:12, 36:14, 36:20, 36:23, 37:6, 37:22, 38:2, 39:11, 39:22, 40:3, 40:5, 40:21, 42:8, 42:18, 42:24, 43:7, 43:16, 44:1, 44:4, 44:6, 44:17, 45:20, 46:5, 47:3, 48:9, 49:10, 50:16, 51:3, 51:22, 52:17, 52:21, 53:15, 53:23, 54:20, 56:2, 56:17, 57:19, 58:14, 58:23, 59:7, 59:14, 60:14, 61:16, 61:24, 62:6, 62:10, 62:16, 63:3, 63:10, 64:18, 64:20, 66:20, 66:23, 68:4, 68:6, 68:16, 68:20, 68:23, 69:23, 70:1, 70:19, 71:6, 71:9
**themselves** [6] - 11:23, 12:11, 27:12, 29:17, 32:1, 33:21
**theory** [3] - 34:22,

37:18, 45:9
**therefore** [1] - 13:11
**they've** [3] - 41:6, 59:22, 60:9
**thinking** [3] - 5:14, 17:22, 19:22
**thinks** [2] - 45:8, 47:23
**Third** [6] - 60:11, 61:8, 62:14, 62:17, 63:11
**third** [1] - 12:6
**throughout** [1] - 23:23
**Thursday** [1] - 1:11
**tied** [1] - 53:18
**today** [5] - 3:12, 24:19, 34:15, 34:20, 37:17
**tomorrow** [1] - 47:25
**took** [1] - 47:6
**topic** [3] - 10:22, 13:23, 59:12
**towards** [2] - 14:10, 48:5
**track** [2] - 63:6, 71:2
**tracked** [1] - 65:8
**tracks** [1] - 10:21
**transaction** [4] - 8:21, 18:21, 23:19, 65:21
**transcript** [11] - 7:12, 12:12, 15:18, 15:20, 15:22, 35:19, 35:22, 36:11, 42:8, 58:7, 69:12
**transcripts** [1] - 15:9
**transfer** [1] - 65:22
**transferred** [1] - 10:12
**translate** [1] - 16:19
**traunch** [1] - 57:8
**treated** [1] - 26:6
**treating** [2] - 10:3, 27:12
**trial** [9] - 14:17, 14:18, 14:21, 21:15, 28:20, 28:21, 44:10, 57:12, 71:2
**tried** [3] - 12:1, 20:1, 69:10
**true** [3] - 21:1, 38:14, 56:20
**try** [7] - 5:3, 13:7, 19:14, 20:2, 28:3, 45:3, 54:11
**trying** [12] - 10:8, 12:2, 27:1, 27:2, 27:3, 27:5, 27:6, 27:17, 44:19, 50:17, 60:8, 69:3
**turn** [2] - 7:25, 36:11
**turned** [1] - 66:2
**turns** [1] - 67:7
**two** [17] - 6:3, 6:14,

7:5, 9:2, 9:6, 9:19, 9:22, 16:3, 21:24, 34:12, 42:16, 43:15, 46:21, 53:11, 68:25, 69:5
**types** [1] - 5:9
**typically** [2] - 17:16, 21:2

**U**

**U.S.D.C.J** [1] - 1:14
**ultimate** [3] - 8:21, 23:19, 40:24
**unclear** [1] - 26:21
**uncover** [1] - 48:3
**under** [13] - 4:7, 5:18, 21:1, 28:2, 35:9, 45:13, 46:10, 51:5, 51:18, 63:1, 64:15, 67:17
**underlying** [9] - 5:12, 12:5, 16:18, 27:2, 28:16, 34:25, 49:17, 63:22, 64:7
**understood** [3] - 36:19, 49:19, 50:7
**unfair** [1] - 35:18
**unfortunate** [1] - 70:21
**unfortunately** [1] - 43:17
**Union** [10] - 65:3, 65:8, 65:18, 65:25, 66:13, 66:24, 68:20
**UNITED** [1] - 1:1
**unnecessary** [1] - 70:2
**unquote** [1] - 7:3
**unrelated** [1] - 23:7
**unusual** [1] - 65:20
**up** [37] - 4:2, 4:5, 4:8, 6:10, 7:11, 12:4, 12:16, 12:22, 13:4, 13:5, 13:9, 14:7, 14:10, 15:11, 15:25, 16:10, 21:25, 23:23, 30:1, 30:16, 35:17, 36:10, 38:3, 38:10, 38:24, 41:24, 44:1, 44:2, 48:22, 50:10, 54:18, 58:5, 59:7, 61:20, 63:6, 65:12
**Upjohn** [1] - 41:2

**V**

**Valerie** [1] - 1:24
**validity** [1] - 30:6
**value** [15] - 13:12,

15:3, 16:2, 17:3, 20:16, 22:16, 34:21, 40:17, 40:19, 44:15, 47:11, 54:4, 54:9, 54:15, 70:24
**valuing** [1] - 39:5
**verbally** [1] - 10:19
**view** [13] - 6:16, 7:4, 16:18, 20:17, 24:14, 25:20, 33:13, 37:3, 52:14, 53:18, 53:20, 60:14, 62:21
**views** [2] - 34:21, 63:14
**virtual** [7] - 6:7, 7:20, 8:10, 8:18, 9:4, 9:20, 24:24
**vs** [1] - 1:6

**W**

**wait** [9] - 12:15, 25:23, 39:13, 43:16, 56:17, 62:6, 62:16
**waive** [1] - 35:5
**waived** [10] - 27:22, 30:10, 30:15, 35:5, 35:12, 38:25, 41:7, 49:17, 58:18, 59:22
**waiver** [21] - 26:24, 26:25, 27:10, 27:14, 27:15, 28:2, 33:15, 37:25, 38:22, 43:4, 43:5, 43:6, 45:12, 45:15, 46:13, 46:24, 51:12, 51:19, 51:20, 60:5, 63:20
**waiving** [1] - 26:13
**wants** [6] - 39:14, 39:15, 40:1, 51:6, 53:9, 59:24
**weaknesses** [1] - 37:20
**Wednesday** [2] - 70:7, 70:19
**week** [1] - 6:4
**weeks** [1] - 48:2
**weighed** [1] - 26:20
**Westinghouse** [2] - 28:2, 31:8
**whole** [5] - 24:15, 37:17, 45:9, 58:6, 65:25
**widely** [1] - 67:12
**willing** [1] - 56:5
**Wilmington** [1] - 1:11
**wind** [1] - 16:10
**Wisdom** [4] - 17:17, 17:23, 20:1, 20:21
**wishes** [1] - 69:25

**withdrawn** [1] - 7:1
**witness** [23] - 6:23, 7:23, 7:24, 7:25, 8:5, 8:12, 8:22, 9:1, 9:3, 10:22, 11:24, 13:15, 25:12, 32:10, 40:9, 42:5, 42:21, 49:11, 49:21, 59:18, 59:19, 59:20, 59:23
**won** [1] - 43:8
**word** [1] - 33:25
**words** [3] - 38:3, 40:6, 70:8
**wore** [1] - 41:15
**works** [1] - 44:14
**worried** [3] - 34:24, 53:13, 65:21
**worry** [1] - 63:24
**worth** [7] - 37:2, 37:14, 40:7, 40:10, 40:14, 41:15, 57:11
**wound** [1] - 65:12
**write** [1] - 24:20
**wrongly** [2] - 60:22, 61:2
**wrote** [1] - 53:16

**Y**

**year** [1] - 14:22
**YOUNKIN** [54] - 2:12, 34:9, 35:24, 36:8, 36:13, 36:15, 36:22, 36:24, 37:7, 38:1, 39:9, 39:23, 40:4, 40:13, 41:22, 42:11, 42:22, 43:3, 43:9, 43:23, 44:3, 44:5, 44:7, 44:19, 46:2, 46:12, 47:17, 48:14, 49:14, 50:20, 51:4, 52:15, 52:19, 52:24, 53:17, 57:18, 57:20, 58:18, 59:5, 59:9, 60:1, 60:20, 62:20, 63:9, 63:16, 66:21, 67:3, 68:5, 68:12, 68:19, 68:22, 68:25, 70:17, 71:8
**Younkin** [7] - 3:20, 7:21, 8:4, 8:11, 32:10, 34:10

# EXHIBIT C

## FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 10x GENOMICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 19-862-CFC-SRF |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| CELSEE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF CHRISTIAN LAPOINTE
IN SUPPORT OF MOTION TO SEAL**

I, Christian LaPointe, if called upon as a witness could competently testify to the facts set forth below:

1.      From August 2019 to March 2020, I served (part-time) as General Counsel for Celsee, Inc. ("Celsee").  After Celsee was acquired by Bio-Rad Laboratories, Inc. ("Bio-Rad") in April 2020, I continued to serve as (part-time) in-house counsel, under a contract with Bio-Rad, to provide legal services for Celsee in this litigation.

2.      The agreement by which Bio-Rad acquired Celsee includes an escrow provision.  The acquisition agreement, and the escrow provision contained therein, have not been made public.

3.      █████████████████████████████████████████

████████████████████████████████████████████



.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 20, 2020 at Boston, Massachusetts.


Dated: November 20, 2020

/s/ *Christian LaPointe*
Christian LaPointe

# EXHIBIT D

## FILED UNDER SEAL

# REDACTED